The STATE of Texas

v.

David VILLARREAL, Appellee

NO. PD–0306–14

Court of Criminal Appeals of Texas.

Delivered: November 26, 2014

Rehearing Granted Feb. 25, 2015

Opinion on Denial of Rehearing
December 16, 2015

Fred Jimenez, Attorney at Law, Corpus Christi, TX, for Appellant.

Douglas K. Norman, Assistant District Attorney, Corpus Christi, TX, Lisa C. McMinn, State's Attorney, Austin, for The State.

## OPINION

ALCALA, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, and COCHRAN, JJ., joined.

In this case, we are asked to decide whether the warrantless, nonconsensual drawing of blood from an individual suspected of driving while intoxicated, conducted pursuant to the implied-consent and mandatory-blood-draw provisions in the Texas Transportation Code, violates the Fourth Amendment. *See* U.S. CONST. amend. IV; TEX. TRANSP. CODE §§ 724.011(a), 724.012(b), 724.013. This question comes to us in the form of an interlocutory appeal filed by the State challenging the trial court's order granting a motion to suppress in favor of David Villarreal, appellee, who was arrested for felony DWI and subjected to warrantless blood-specimen collection over his objection pursuant to the provisions in the Code. In its petition for discretionary review, the State challenges the trial court's

and the court of appeals's conclusion that the warrantless search of Villarreal's blood under statutory authority providing for implied consent and mandatory blood-specimen collection violated the Fourth Amendment. *See State v. Villarreal*, No. 13–13–00253–CR, 476 S.W.3d 45, 2014 WL 1257150 (Tex.App.—Corpus Christi Jan. 23, 2014). It further challenges two specific aspects of the court of appeals's analysis by contending that the court erred in concluding that (1) the State forfeited its implied-consent argument on appeal by stipulating to the fact that Villarreal did not consent to the blood draw, and (2) the mandatory-blood-draw statute, by its terms, does not dispense with the warrant requirement.

In addressing the merits of the State's challenge to the trial court's ruling, we conclude that the warrantless, nonconsensual testing of a DWI suspect's blood does not categorically fall within any recognized exception to the Fourth Amendment's warrant requirement, nor can it be justified under a general Fourth Amendment balancing test. Accordingly, we hold that the search in this case violated the Fourth Amendment. With respect to the State's specific complaints regarding the court of appeals's analysis, we conclude that, although the court of appeals erred by determining that the State forfeited its implied-consent argument on appeal through stipulation, remand is unnecessary in light of both the court of appeals's implicit rejection of that argument and our express rejection of that argument in our analysis today. We further conclude that the court of appeals erred to address the constitutionality of the mandatory-blood-draw statute and, in light of our holding in this case, we decline to review the State's complaint with respect to that matter. We affirm the trial court's ruling suppressing the blood-test results.

## I. Background

Applying the law to the undisputed facts, the court of appeals upheld the trial court's ruling granting the motion to suppress the results of Villarreal's blood test.

### A. The Facts

One Saturday evening in 2012, Villarreal was stopped for a traffic violation. The officer who made the stop, Officer Preiss, observed that Villarreal had signs of intoxication, and he contacted another officer, Officer Williams, to conduct a DWI investigation. Upon arrival at the scene, Williams observed that Villarreal was exuding a strong odor of alcohol, was swaying back and forth, and had red, watery eyes and slurred speech. Williams requested that Villarreal perform standardized field sobriety tests, but he refused. Believing Villarreal was intoxicated, Williams arrested him on suspicion of DWI. Williams then gave Villarreal a written statutory warning requesting that he provide a blood specimen and advising him that, if he refused to provide a specimen, his refusal may be admissible in a subsequent prosecution and would result in the suspension or denial of his driver's license for not less than 180 days. Villarreal refused.

After a criminal-history check revealed that Villarreal had been convicted of DWI on several occasions, Williams transported him to a hospital and requested that a qualified technician draw his blood over his objection. Williams prepared a written report averring that he had probable cause to believe that Villarreal had committed the offense of DWI and that, based on reliable information possessed or received from a credible source, Villarreal had previously been convicted of or placed on community supervision for DWI on two or more occasions. The report stated that Williams was "invoking [his] authority under [Texas Transportation Code], Section 724.012(b), to require the suspect to submit to the taking of a specimen of the suspect's blood." *See* TEX. TRANSP. CODE § 724.012(b)(3)(B) (statute providing for mandatory-blood-specimen collection for person twice before convicted of DWI). The qualified technician drew Villarreal's blood, which, upon testing, revealed a blood-alcohol concentration of .16 grams of alcohol per hundred milliliters of blood.

### B. The Trial Court Proceedings

Given his multiple prior convictions for DWI, Villarreal was indicted for felony DWI.[1] He filed a written motion to suppress the results of his blood test. In his motion, Villarreal averred that there was no "deemed consent to the taking of a blood specimen."[2] The trial court con-

---

[1]. *See* TEX. PENAL CODE §§ 12.42(d), 49.04, 49.09(b). Villarreal's indictment for driving while intoxicated alleged that, on or about March 31, 2012, he did operate a motor vehicle in a public place while intoxicated. The indictment further alleged that he had twice before been convicted of misdemeanor offenses in 1988 and 1994 "relating to the operating of a motor vehicle while intoxicated," and that he had twice before been convicted of felony DWI, once in 2001 and once in 2005, with the 2005 conviction being for an offense that occurred after the 2001 conviction became final. On the basis of Villarreal's two prior felony convictions, the State sought to enhance his punishment range to one carrying a minimum term of imprisonment of twenty-five years up to a maximum sentence of life imprisonment. *See id.* § 12.42(d).

[2]. Villarreal's written motion also asserted that the blood-test results should be suppressed because the officers conducted his arrest and search without a valid warrant, reasonable suspicion, or probable cause; that the officers failed to read him the required statutory warnings under Transportation Code Section 724.015; that he did not voluntarily consent to the blood test; and that the statute purportedly authorizing the taking of his blood without a warrant should be held unconstitutional. These additional claims were abandoned at the suppression hearing.

ducted an evidentiary hearing, at which Williams was the sole witness. Williams stated that he "could have" obtained a warrant, but believed he "did not statutorily have to" in light of the mandatory-blood-draw provision in the Code.[3] He further stated that his decision to require the taking of the specimen was based solely on the statutory authorization and not on any emergency at the scene or the existence of exigent circumstances. Aside from Williams's testimony, the parties additionally stipulated that Villarreal's "blood was drawn without his consent and without a warrant."

After the close of evidence, Villarreal's attorney argued that the Supreme Court's recent decision in *Missouri v. McNeely* held that, in the absence of exigent circumstances, a DWI suspect's blood may not be drawn without a warrant, and he further argued that the federal Constitution overrides the Texas statute that authorizes a mandatory blood draw in certain situations. *See Missouri v. McNeely,* —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013); TEX. TRANSP. CODE § 724.012(b). The State's attorney disagreed that *McNeely* affected the validity of Texas's mandatory-blood-draw provision and, based on the fact that a portion of *McNeely* was a plurality opinion, she asserted that its holding did not necessarily disapprove of this type of mandatory statutory blood draw conducted pursuant to implied consent. After the attorneys' arguments, the trial court granted Villarreal's motion.

The State filed a motion asking the trial court to reconsider its ruling. In its motion, the State repeated its arguments interpreting the meaning of the *McNeely* decision. The State asserted that *McNeely* is generally inapplicable to situations involving a mandatory blood draw through implied consent in that *McNeely* addressed only exigent circumstances and did not address other Fourth Amendment exceptions. The State also asserted that *McNeely* included language signifying that the Supreme Court remains open to implied-consent laws as an alternative to a warrant. The State contended that the plurality portion of the *McNeely* opinion signified that "there appears to be a differently-constituted-five-vote block [sic] that remains open to a modified rule departing from the warrant requirement in circumstances other than a *per se* blood-alcohol exigency." It suggested that the Supreme Court's language contained "positive references" to implied-consent laws and "in no way disapproved of the States' carefully tailored implied consent schemes where only specified and limited situations authorized compelled blood draws after refusal," and when such searches are based upon probable cause.

The State's motion to reconsider additionally made three specific arguments, which are discussed more fully below, in support of its broader contention that a warrantless, nonconsensual search conducted pursuant to the statutory authority in the Transportation Code does not violate the Fourth Amendment: (1) Courts should uphold such a search under the consent exception to the warrant requirement, appearing in the form of a waiver obtained through implied consent; (2) courts should consider whether some other exception to the search-warrant requirement might apply, such as expansion of the automobile exception into an automobile-driver exception or application of the special-needs exception; and (3) courts should conduct a balancing of governmental and private interests and find that a warrantless search of a DWI suspect's blood is generally reasonable in light of the minimally intrusive nature of a blood draw and

---

3. *See* TEX. TRANSP. CODE § 724.012(b).

the State's substantial public interest in protecting against drunk driving.

In its first argument, the State asserted that "a defendant's implied consent is valid as an exception to the warrant preference." It suggested that a defendant, by driving on Texas roadways, which is a privilege and not a right, has impliedly consented to have his blood drawn under the limited situations described in the mandatory-blood-draw provision, and he thus waives any right to later complain about a warrantless search conducted pursuant to that provision. The State asserted that, unlike consent in the traditional sense, such a waiver of Fourth Amendment rights applies "in spite of the suspect's protest at the time of the search in question." The State contended that the "Supreme Court has long recognized a parallel exception [to the consent exception] in the form of a prior waiver of the Fourth Amendment rights to probable cause and a warrant as a condition for some benefit extended to the suspect from the State." In the case of the mandatory-blood-draw statute, "which the law presumes the driving public to have read," the State suggested that "the driver impliedly agrees ahead of time that, in exchange for the privilege of driving on our roads, he is willing to waive the right to a warrant in these limited circumstances."

The State's second argument advocated for the broadening of the automobile exception to the warrant requirement into an automobile-driver exception, or, alternatively, application of the special-needs doctrine. The State claimed that, just as society has a lessened expectation of privacy in automobiles in light of their "ready mobility" and the "pervasive regulation of vehicles," a driver's expectation of privacy in his blood is similarly diminished because he is "just as mobile as his vehicle, [and] just as subject to pervasive licensure and regulation[.]" It suggested that a driver's

normal expectation of a warrant yields to common concerns inherent in a "highly regulated activity in which the driver freely chooses to engage." Drivers, it asserted, are "on notice of the lessened degree of privacy protection in matters that concern the safety of the roads on which they drive," and they should know that "their blood can be drawn without a warrant" under the conditions specified by statute. On that basis, it urged the court to "recognize a driver exception to the warrant requirement coextensive with the vehicle exception."

The State's third argument suggested that a Fourth Amendment balancing test should favor a warrantless blood draw by weighing the minimal intrusion of a blood draw against the substantial public interest in protecting against drunk driving. The State contended that, even short of a free-standing exception in the nature of the traditional exceptions to the warrant requirement, "the courts should allow the States to craft such an exception" to the warrant requirement based on the "substantial public interest in ridding the road of drunk drivers," as compared to only a "slight" invasion of a privacy interest through a minimal pin prick to the skin. Noting that the Legislature's objective for adopting the mandatory-blood-draw law applicable to this case was to "save lives," the State's attorney observed that Texas has the nation's worst drunk-driving problem and its citizens "face a uniquely disproportionate risk of being killed or injured by drunk drivers, compared to any other State." In contrast to the State's and society's substantial interest in curbing drunk driving, the State's attorney averred that a DWI suspect has a diminished privacy interest in his blood in light of the existence of implied consent and the highly regulated nature of driving. As for the nature of the intrusion itself, the State's attorney argued that a pin prick to

take a person's blood constitutes only a slight invasion of an individual's privacy because these types of tests are considered routine by most people.

After the State filed its motion asking the trial court to reconsider its ruling, the trial court made findings of fact and a conclusion of law impliedly denying the State's motion. In pertinent part, the trial court's findings of fact determined that Officer Williams credibly assessed the facts showing that Villarreal was intoxicated and had twice before been convicted of DWI; that Villarreal's blood was drawn without a warrant and without his consent; and that there were no exigent circumstances preventing the officer from obtaining a warrant.[4] The trial court's single conclusion of law stated, "The Court concludes that the Defendant's blood was illegally obtained without a warrant and in the absence of a recognized exception to the warrant requirement, and that the statutory blood draw was invalid and unconstitutional without exigent circumstances to support the absence of a warrant."

## C. The Court of Appeals Opinion

After the State filed an interlocutory appeal challenging the trial court's ruling in favor of Villarreal, the court of appeals affirmed the ruling suppressing the results of the blood test. *Villarreal*, 2014 Tex. App. LEXIS 645, 2014 WL 1257150, at *1, 11. In its sole issue on appeal, the State contended that the trial court erred by granting Villarreal's motion to suppress on the basis that the blood draw was involuntary and conducted without a warrant, and it asserted that the "repeat offender" provision of the mandatory-blood-draw statute could serve as a valid basis for upholding the search. *See* TEX. TRANSP. CODE

§ 724.012(b)(3). In rejecting the State's position, the court of appeals determined that (1) notwithstanding the officer's compliance with the mandatory-blood-draw provision, the warrantless blood draw in this case violated the Fourth Amendment, and (2) the mandatory-blood-draw statute was not unconstitutional. *Villarreal*, 2014 WL 1257150, at *8–11.

### 1. Court of Appeals Held that Fourth Amendment Violation Occurred

The court of appeals addressed the arguments that the State had presented to the trial court in support of its claim that the warrantless search of Villarreal's blood did not violate the Fourth Amendment. With respect to the State's broad claim that the *McNeely* holding was inapplicable to this case and included language signifying that the Supreme Court was open to implied-consent laws as an alternative to a search warrant, the court of appeals disagreed. *Id.* at *4, 10. It observed that *McNeely*, which had disavowed a per se rule of exigency for blood draws in DWI cases, signified that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of circumstances." *Id.* at *5. It further cited *McNeely* for the proposition that, "'where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.'" *Id.* at *10 (quoting *McNeely*, 133 S.Ct. at 1561).

In addressing the State's first specific argument that a driver has waived his right to a warrant through implied-consent laws, the court of appeals initially deter-

---

4. The remainder of the trial court's findings of fact determined that Villarreal narrowed the grounds in his motion to include only his claim that "taking a blood draw without a

warrant [is] a violation of the 4th Amendment," such that he abandoned any claim that he was illegally arrested or that the statute itself was unconstitutional.

mined that the State had failed to preserve this argument for appeal, although it then essentially addressed the merits of that argument. The court determined that, by stipulating that Villarreal's blood had been drawn without his consent, the State had forfeited that argument and could not rely on the waiver exception to the warrant requirement. The court of appeals stated, "[T]o the extent that the State argues that there was valid 'consent' under the Fourth Amendment—whether by the mandatory blood draw law or the implied consent law—it is barred from doing so in this appeal by its stipulation before the trial court that in this case '[t]here was no consent, no warrant.'" *Id.* at *11.

Although it found that the State had forfeited its argument regarding implied consent, the court appeared to address that argument indirectly, stating, "[T]here is a distinction between a consensual blood draw and an involuntary, mandatory blood draw. The implied consent law is premised on consent. In contrast, the mandatory blood draw law is premised on refusal to consent." *Id.* at *9 (citations omitted) (discussing Tex. Transp. Code §§ 724.011(a), 724.012(b)). It further observed that, although the State appeared to argue that "Chapter 724 creates a legislative consent or essentially a statutory waiver of the Fourth Amendment," that argument was inconsistent with the requirement that consent be given freely and voluntarily. *Id.* at *10 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Kolb v. State*, 532 S.W.2d 87, 89 (Tex.Crim.App.1976)).

The court of appeals indirectly rejected the State's second specific argument that, in addition to consent and exigent circumstances, there are other recognized exceptions to the search-warrant requirement that could apply to this case. In describing the general law, the court observed that "special needs" is one of the recog-

nized exceptions to the search-warrant requirement. *Id.* at *7. The court implicitly rejected the application of these other exceptions by observing that the "officer's sole basis for not getting a warrant was that the repeat offender provision of the mandatory-blood-draw law required him to take a blood sample without [Villarreal's] consent and without the necessity of obtaining a search warrant." *Id.* at *11.

The court of appeals also addressed the State's third specific argument that the minimal intrusion of a blood draw must be balanced against the substantial public interest in protection against DWI drivers. It disagreed with the State's claims that a driver arrested on suspicion of DWI has a lessened expectation of privacy in his blood. The court of appeals quoted the language from *McNeely* explaining that "an invasion of bodily integrity implicates an individual's most personal and deep-rooted expectations of privacy." *Id.* at *4 (quoting *McNeely*, 133 S.Ct. at 1558). It also cited *Schmerber v. California*, 384 U.S. 757, 771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), for the proposition that, although "the Constitution does not forbid the State's minor intrusions into an individual's body under stringently limited conditions," that principle "in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.* at *5. Although it recognized that the drunk-driving problem is a national epidemic and that there is a strong governmental interest in curbing DWIs, the court quoted *McNeely*'s observation that "the general importance of the government's interest in this area does not justify departing from the warrant requirement without showing exigent circumstances that make securing a warrant impracticable in a particular case." *Id.* at *4 (quoting *McNeely*, 133 S.Ct. at 1565).

## 2. Court of Appeals Held that Blood–Draw Statute Is Not Unconstitutional

In addition to agreeing with the trial court's conclusion that the warrantless search of Villarreal's blood constituted a Fourth Amendment violation, the court of appeals considered the constitutionality of the mandatory-blood-draw statute itself, and it determined that the statute was not unconstitutional "as applied" to Villarreal. *Id.* at *8. In resolving this matter, the court observed that, although the Texas mandatory-blood-draw statute "required the officer to obtain a breath or blood sample, it did not require the officer to do so without first obtaining a warrant. In fact, the statute does not address or purport to dispense with the Fourth Amendment's warrant requirement for blood draws." *Id.* at *11. In light of its determination that the statute itself does not dispense with the warrant requirement and its conclusion that the Fourth Amendment would require a warrant under these circumstances, the court upheld the trial court's ruling suppressing the evidence. *Id.*

We granted the State's petition for discretionary review to address its contention that the court of appeals erred to hold that a warrantless blood draw conducted pursuant to the provisions in the Transportation Code violates the Fourth Amendment.[5]

## II. Provisions In Transportation Code Do Not Form Constitutionally Valid Alternative to Warrant Requirement

In its first ground for review, the State contends that the court of appeals erred by holding that the provisions in the Transportation Code do not form a valid alternative to the Fourth Amendment warrant requirement. To explain why we reject the State's contention that the implied-consent and mandatory-blood-draw provisions establish a constitutionally valid basis for conducting a nonconsensual search in the absence of a search warrant, we review (A) the applicable statutory law and (B) general Fourth Amendment principles, and we then (C) discuss each of the State's particular arguments in turn.

### A. Transportation Code's Implied–Consent and Mandatory–Blood–Draw Provisions

Because the State relies upon the provisions in the Transportation Code as constituting a valid substitute for a warrant, we begin our analysis with a review of those provisions. The Transportation Code contains a provision establishing implied consent for all drivers arrested on suspicion of DWI. *See* TEX. TRANSP. CODE § 724.011. That provision states,

> If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place . . .

---

**5.** The State's petition presents three grounds for review:

1. Whether the Thirteenth Court of Appeals erred in refusing to hold that the mandatory blood draw provisions of the Texas Transportation Code are a constitutionally valid alternative to the warrant requirement.

2. Whether the Thirteenth Court of Appeals erred in holding that the State's stipulation that there was no consent to the blood draw amounted to a waiver of the "implied consent" or "deemed consent" argument under the Transportation Code.

3. Whether the Thirteenth Court of Appeals erred in concluding that the mandatory blood draw statute does not allow the arresting officer to draw blood without a search warrant or exigent circumstances, and specifically whether the court failed to consider the distinction between the statutory directive for the arresting officer to require or order the draw, and the nature of a warrant as an order of the issuing magistrate for the draw in question.

the person is deemed to have consented, subject to this chapter, to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance.

*Id.* § 724.011(a).[6] Although this provision appears to create a blanket rule of consent for all individuals arrested for DWI, its terms are further modified by Section 724.013, which establishes a right to refuse to provide a breath or blood sample in routine DWI cases. *See id.* § 724.013. That provision, entitled, "Prohibition on Taking Specimen if Person Refuses; Exception," provides that, "a specimen may not be taken if a person refuses to submit to the taking of a specimen designated by a peace officer." *Id.* But this right of refusal is not absolute. *See id.* (providing that right of refusal subject to exceptions "as provided by Section 724.012(b)"). Section 724.012(b), in turn, establishes that, when certain aggravating factors are present during a DWI stop, a suspect may not refuse to submit to a specimen and, even if a suspect refuses, an officer is required to obtain a specimen. *Id.* § 724.012(b). That statute provides,

(b) A peace officer shall require the taking of a specimen of the person's breath or blood under any of the following circumstances if the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle ... and the person refuses the officer's request to submit to the taking of a specimen voluntarily: (1) the person was the operator of a motor vehicle ... involved in an accident that the officer reasonably believes oc-

curred as a result of the offense and, at the time of the arrest, the officer reasonably believes that as a direct result of the accident:

(A) any individual has died or will die;

(B) an individual other than the person has suffered serious bodily injury; or

(C) an individual other than the person has suffered bodily injury and been transported to a hospital or other medical facility for medical treatment;

(2) the offense for which the officer arrests the person is an offense under Section 49.045, Penal Code [DWI with child passenger]; or

(3) at the time of the arrest, the officer possesses or receives reliable information from a credible source that the person:

(A) has been previously convicted of or placed on community supervision for an offense under Section 49.045 [DWI with child passenger], 49.07 [intoxication assault], or 49.08 [intoxication manslaughter], Penal Code ...; or

(B) on two or more occasions, has been previously convicted of or placed on community supervision for an offense under Section 49.04 [misdemeanor DWI], 49.05 [flying while intoxicated], 49.06 [boating while intoxicated], or 49.065 [assembling or operating an amusement ride while intoxicated], Penal Code[.]

*Id.* § 724.012(b). Reading these provisions in conjunction, we observe that they establish a statutory scheme by which an individual who is arrested for an "ordinary" DWI—that is, one that does not fall within any of the enumerated circumstances of Section 724.012(b)—has an absolute right to refuse to provide a specimen, notwith-

---

6. *See also* Tex. Transp. Code § 724.012(a) (providing that (a) "[o]ne or more specimens of a person's breath or blood may be taken if the person is arrested and at the request of a peace officer having reasonable grounds to believe the person: (1) while intoxicated was operating a motor vehicle in a public place").

standing the existence of implied consent. *See id.* §§ 724.011, 724,013; *see also Fienen v. State*, 390 S.W.3d 328, 332 (Tex.Crim. App.2012) (observing that, notwithstanding existence of implied-consent provision, in ordinary DWI situations, "a person retains an absolute right ... to refuse a test"). But, if one of the aggravating circumstances described in Section 724.012(b) is present, then, as the State observes, the statutory scheme appears to "extinguish" a suspect's right to refuse to submit a specimen under those specified circumstances. *See id.* § 724.012(b). Stated differently, if one of the aggravating circumstances is present, then, pursuant to the statute, even if a suspect refuses to comply, an officer has a mandatory duty to require that the suspect's blood be drawn. *Id.*

Because the dispute here centers on whether a warrantless, nonconsensual search of a DWI suspect's blood conducted pursuant to Section 724.012(b) complies with the Constitution, we turn to a review of the relevant Fourth Amendment principles.

**B. Fourth Amendment Requirements**

In general, to comply with the Fourth Amendment, a search of a person pursuant to a criminal investigation (1) requires a search warrant or a recognized exception to the warrant requirement, and (2) must be reasonable under the totality of the circumstances. Furthermore, of particular relevance to DWI cases, the Supreme Court has recognized that the Fourth Amendment is implicated in that (3) the collection of a suspect's blood invades a substantial privacy interest, and (4) the exigent circumstances exception to the search-warrant requirement is not established merely by the natural dissipation of alcohol. We explain each of these requirements in more detail below.

**1. A Search of a Person Pursuant to a Criminal Investigation Requires a Search Warrant or Recognized Exception to a Warrant**

The Fourth Amendment provides,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The touchstone of the Fourth Amendment is reasonableness. *Riley v. California*, —— U.S. ——, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)). The Supreme Court has held that, " '[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant.' " *Id.* (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)); *see also Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (describing "basic rule" as being that " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions' ") (citations omitted). The purpose underlying the search-warrant requirement in the context of a criminal investigation is to "ensure[ ] that the inferences to support a search are 'drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' " *Riley*, 134 S.Ct. at 2482 (quoting

*Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)).

Specifically, with respect to searches of people undertaken for the purpose of furthering a criminal investigation, the Supreme Court has determined that, in the absence of a search warrant, a "search of the person is reasonable only if· it falls within a recognized exception" to the warrant requirement. *McNeely,* 133 S.Ct. at 1558; *see also Riley,* 134 S.Ct. at 2482 ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."); *Kentucky v. King,* 563 U.S. ——, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) (a warrant "must generally be secured," but that requirement is "subject to certain reasonable exceptions"). The recognized exceptions to the warrant requirement that the State suggests are implicated in the present case are the consent exception, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); the automobile exception, *see California v. Acevedo,* 500 U.S. 565, 569, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); the search-incident-to-arrest exception, *see Gant,* 556 U.S. at 339, 129 S.Ct. 1710; and the special-needs doctrine, *see Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

### 2. Reasonableness is Judged Under the Totality of Circumstances

▮ "Absent more precise guidance from the founding era, we generally determine whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Riley,* 134 S.Ct. at 2484 (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). For the purpose of resolving such questions arising under the

Fourth Amendment, we "examine the totality of the circumstances" to determine whether a particular search is reasonable. *Samson v. California,* 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); *Brigham City,* 547 U.S. at 406, 126 S.Ct. 1943. Given this totality-of-the-circumstances approach, for the most part, "per se rules are inappropriate in the Fourth Amendment context." *United States v. Drayton,* 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (citing *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). As we explain more fully below, in examining the totality of the circumstances applicable to particular cases, the Supreme Court has approved of warrantless searches that fit within a recognized exception to the search-warrant requirement, or in limited situations involving "special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like." *Illinois v. McArthur,* 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001).

### 3. Collection of Suspect's Blood Invades a Substantial Privacy Interest— *Schmerber v. California*

In *Schmerber,* the Supreme Court considered for the first time whether a law-enforcement officer may lawfully compel an individual suspected of driving while intoxicated to submit to blood testing. 384 U.S. at 767–69, 86 S.Ct. 1826. The Court held that such an intrusion "plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." *Id.* at 767, 86 S.Ct. 1826. In describing the privacy interest at stake, the Court took note of "the interest in human dignity and privacy which the Fourth Amendment protects." *Id.* at 770, 86 S.Ct. 1826. It further observed that, in light of the fact that search warrants are "ordinarily required for searches of dwellings ... absent an emergency, no less

could be required where intrusions into the human body are concerned." *Id.* The Court stated that the need to secure a warrant from a "neutral and detached magistrate" before permitting a law-enforcement officer to "invade another's body in search of evidence of guilt is indisputable and great." *Id.*

The Court in *Schmerber* nevertheless upheld the warrantless, compelled search of Schmerber's blood as constitutionally permissible on the basis of exigent circumstances. *Id.* at 770–72, 86 S.Ct. 1826. Schmerber had been in a car accident and was taken to the hospital. The Court explained that, in light of those factors, the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *Id.* at 770, 86 S.Ct. 1826. It further explained that evidence of Schmerber's crime could have been lost if the officer had been required to seek a warrant to draw Schmerber's blood because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Id.* It added that "[p]articularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." *Id.* at 771, 86 S.Ct. 1826. The Court further noted that the blood test "involve[d] virtually no risk, trauma, or pain," and was conducted in a reasonable fashion "by a physician in a hospital environment according to accepted medical practices." *Id.* at 771–72, 86 S.Ct. 1826. Thus, after acknowledging the substantial nature of the privacy interest at stake, the Court nevertheless upheld the warrantless search of Schmerber's blood on the basis of the exigent-circumstances exception to the warrant requirement. *Id.*

### 4. Exigent Circumstances Not Established By Mere Natural Dissipation of Alcohol—*Missouri v. McNeely*

In *McNeely,* the Supreme Court addressed the question whether the natural metabolization of alcohol in the bloodstream presented a per se exigency that, taken on its own, would suffice to justify an exception to the warrant requirement for nonconsensual blood testing in all drunk-driving cases. 133 S.Ct. at 1556. *McNeely* involved an individual who was arrested for DWI and whose blood was drawn over his objection and without a search warrant. Concluding that the natural dissipation of alcohol does not constitute a per se exigency, the Court held that, "consistent with general Fourth Amendment principles, [ ] exigency in this context must be determined case by case based on the totality of the circumstances." *Id.* at 1557; *see also id.* at 1561 (acknowledging that "a significant delay in testing will negatively affect the probative value of the [blood-test] results," but rejecting that fact as basis for departing from the "careful case-by-case assessment of exigency").

Although *McNeely* dealt primarily with exigent circumstances, an exception to the warrant requirement not at issue in the present case, the opinion nevertheless contains general principles of Fourth Amendment law that apply specifically to the matter of nonconsensual blood draws in the context of a DWI investigation. Of great importance to our resolution of this appeal is the Court's broad recognition that such a warrantless search of a person for the purpose of gathering evidence in a criminal investigation can be justified "only if it falls within a recognized exception" to the warrant requirement, and that "that principle applies to" compulsory blood-specimen collection during a DWI investigation. *Id.* at 1558. The Court further reaffirmed the principle, first estab-

lished in *Schmerber,* that a "compelled intrusion beneath [the] skin and into [the] veins to obtain a sample of [ ] blood for use in a criminal investigation" constitutes "an invasion of bodily integrity" that implicates "an individual's most personal and deep-rooted expectations of privacy." *Id.* at 1558 (quoting *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)).

Having reviewed the relevant statutory law and Fourth Amendment principles, we now turn to a review of the State's arguments as to why it maintains that the statutory provisions in the Transportation Code rendered the Fourth Amendment warrant requirement inapplicable to this case.

## C. Warrantless, Nonconsensual Blood Draw Does Not Fall Within Any of State's Proffered Exceptions to Warrant Requirement

■ The State suggests that a search conducted pursuant to the mandatory-blood-draw provisions—specifically, in this case, the provision applicable to repeat DWI offenders—should be upheld as categorically reasonable under (1) the consent exception, applicable in the form of a prior waiver through implied consent, (2) the automobile exception, (3) the special-needs exception, (4) the search-incident-to-arrest exception, or, alternatively, (5) by treating a blood draw as a seizure instead of a search. We consider each of these contentions in turn and, finding them to be without merit, we hold that none of these established exceptions to the warrant requirement categorically applies to except the warrantless, nonconsensual testing of a suspect's blood pursuant to the provisions in the Transportation Code. We also note briefly here that, because the facts are undisputed and the questions before us are matters of law, we apply a *de novo* standard of review. *See Matthews v. State,* 431 S.W.3d 596, 607 (Tex.Crim.App.2014);

*Arguellez v. State,* 409 S.W.3d 657, 663 (Tex.Crim.App.2013).

## (1) Consent in the Form of a Prior Waiver

Before addressing the merits of the State's argument regarding implied consent, we first briefly explain why we agree with the State's contention that the court of appeals erred by determining that it forfeited its right to rely on implied consent as a valid basis for upholding the search in this case. We then explain why we disagree with the State as to the merits of its arguments that this search may be upheld under the consent exception to the warrant requirement on the basis of a defendant's irrevocable "prior waiver" of his Fourth Amendment rights.

## a. The State Did Not Forfeit Its Right to Rely on Consent in the Form of Waiver

■ In its second ground in its petition for discretionary review, the State challenges the court of appeals's determination that the State's stipulation that there was "no consent" to the blood draw amounted to a waiver of its "implied consent" or "deemed consent" argument based on the provisions in the Transportation Code. *See Villarreal,* 476 S.W.3d at 58–60, 2014 WL 1257150, at *11. At the hearing on the motion to suppress, the parties stipulated that Villarreal's "blood was drawn without his consent and without a warrant." It is clear from Villarreal's motion to suppress and the evidence and arguments presented at the hearing that the parties' intent was to stipulate that Villarreal's blood was drawn in spite of his refusal to provide a specimen and in the absence of a warrant. The parties thus stipulated to the factual matter of Villarreal's refusal, but such a stipulation does not foreclose the State from raising a particular legal argument on appeal. Furthermore, at all times, the record indicates that the parties under-

stood the dispute in this case to be narrowly based on the legal question of whether the State could properly rely on the provisions in the Transportation Code, including the implied-consent statute, as an alternative to a search warrant. We, therefore, agree with the State's assertion that the court of appeals incorrectly determined that the State forfeited its implied-consent argument on appeal. We, however, need not remand the case to the court of appeals for further consideration of this argument because, despite initially stating that the State had forfeited this argument on appeal, the court of appeals then went on to discuss and disapprove of the State's contention that implied consent could form a valid basis for upholding the search in this case. Because the court of appeals reviewed and rejected the State's argument that implied consent could serve as a valid basis for upholding the warrantless search in this case, we may properly review the court's resolution of that legal question. *See* Tex.R.App. P. 66.3 (providing for this Court's review of decisions of courts of appeals).

**b. Implied Consent that Has Been Withdrawn Is Not Voluntary Consent**

■ Although it recognizes that a waiver of Fourth Amendment rights through consent to search must ordinarily be carefully scrutinized for its free and voluntary character,[7] the State asserts that those principles are inapplicable to the present situation. Instead, it asserts that a "parallel exception" applies when a defendant has previously waived his Fourth Amendment rights in exchange for receiving some benefit or privilege from the State. Suggesting that this prior-waiver principle applies to the present circumstances, it asserts that an individual suspected of DWI "accept[s] a license to drive and such acceptance may carry with it an obligation to

allow statutorily authorized inspections of that activity that would otherwise require a warrant." On this basis, the State urges this Court to hold that, in light of the existence of the implied-consent and mandatory-blood-draw provisions, a driver "impliedly agrees ahead of time that, in exchange for the privilege of driving on our roads, he is willing to waive the right to a warrant in these limited circumstances. The deal is sealed when he gets behind the wheel, and it can't later be revoked when he gets caught driving in an impaired condition."

■ Although we acknowledge that Fourth Amendment rights "may be waived," *Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946), we find that principle to be inapplicable here. As the State acknowledges, to constitute a valid waiver of Fourth Amendment rights through consent, a suspect's consent to search must be freely and voluntarily given. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041 (observing that consent must be voluntarily given in that it was not "coerced by threats or force, or granted only in submission to a claim of lawful authority"); *see also Bumper,* 391 U.S. at 548, 88 S.Ct. 1788 (observing that consent must be "freely and voluntarily given"). An additional necessary element of valid consent is the ability to limit or revoke it. *See Florida v. Jimeno,* 500 U.S. 248, 252, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (suspect may "delimit as he chooses the scope of the search to which he consents"); *Miller v. State,* 393 S.W.3d 255, 266 (Tex. Crim.App.2012) (stating that it is "undisputed" that consent "may be limited or revoked"). The matter of whether consent is voluntary is a "question of fact to be determined from the totality of all the circumstances." *Schneckloth,* 412 U.S. at

---

7. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Meekins v. State,* 340 S.W.3d 454, 458 (Tex. Crim.App.2001).

227, 93 S.Ct. 2041. It would be wholly inconsistent with these principles to uphold the warrantless search of a suspect's blood on the basis of consent when a suspect has, as in the present case, expressly and unequivocally refused to submit to the search. That explicit refusal to submit to blood testing overrides the existence of any implied consent, and, unless some other justification for the search applies, there remains no valid basis for conducting a warrantless search under those circumstances. *See Bumper*, 391 U.S. at 548–49, 88 S.Ct. 1788 (explaining that a showing of "no more than acquiescence to a claim of lawful authority" cannot constitute valid consent). To the extent the State suggests that the implied-consent and mandatory-blood-draw provisions in the Transportation Code categorically extinguish a DWI suspect's right to withdraw consent when some aggravating circumstance is present, that suggestion cannot be squared with the requirement that, to be valid for Fourth Amendment purposes, consent must be freely and voluntarily given based on the totality of the circumstances, and must not have been revoked or withdrawn at the time of the search. *Compare* Tex. Transp. Code §§ 724.011, 724.012(b), *with Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041, *and Jimeno*, 500 U.S. at 252, 111 S.Ct. 1801. In other words, implied consent that has been withdrawn or revoked by a suspect cannot serve as a substitute for the free and voluntary consent that the Fourth Amendment requires.

### c. Prior Waiver of Fourth Amendment Rights in Other Contexts Inapplicable to Criminal Suspects

Recognizing this apparent inconsistency between Texas's implied-consent law and the requirements for establishing voluntary consent under the Fourth Amendment, the State forgoes urging us to directly hold that implied consent that has been revoked by a suspect can neverthe-

less supply the type of "bare consent" needed to overcome the warrant requirement. Instead, it urges us to hold that a driver who accepts the privilege of driving on Texas roadways has, by virtue of his enjoyment of that privilege, lost the right to later revoke the implied consent supplied by the Transportation Code or to complain about the absence of a warrant. Although the State suggests that the Supreme Court has "long recognized" that a prior waiver can serve as a "parallel exception" to the consent exception when the suspect has received some benefit or privilege in exchange for his waiver of constitutional rights, we are aware of no Supreme Court cases approving of this doctrine's applicability in a context similar to the one with which we are confronted today, which is a bodily search of an individual suspected of criminal wrongdoing. Furthermore, we find that the cases relied upon by the State to establish this "parallel exception" are distinguishable because they are limited to (i) the federal-regulatory context, (ii) the context of parolees and probationers, or (iii) the non-criminal context, none of which are implicated here.

### i. Exceptions Applicable to Federal–Regulatory Context Are Not Analogous

In asserting that such a parallel exception to the consent exception should be applied here, the State relies primarily on *Zap*, 328 U.S. at 627, 66 S.Ct. 1277. But that case is distinguishable on its facts. *Zap* involved the warrantless search of the accounting records of a United States Navy contractor who had expressly agreed by the terms of his contract to permit such inspections, which were authorized by federal regulation. *Id.* The Supreme Court upheld the warrantless search as permissible under the Fourth Amendment, observing that Zap, "in order to obtain the government's business, specifically agreed to

permit inspection" of his records, thereby waiving any claim to privacy in those records which he otherwise might have had. *Id.* at 628, 66 S.Ct. 1277. Thus, the Court's holding in *Zap* was primarily focused on the existence of a "contractual agreement for inspection" of business records and on the fact that Zap had knowingly waived his rights pursuant to a "business undertaking for the government." *Id.* at 629–30, 66 S.Ct. 1277. *Zap* is thus properly understood as indicating that, where an individual makes an express contractual waiver of his privacy rights in exchange for the opportunity to do business with the federal government, such a waiver may constitute valid prior consent to search a business premises within the meaning of the Fourth Amendment. *See id.* It does not, as the State suggests, more generally stand for the proposition that the government may exact from a citizen a generalized and irrevocable waiver of Fourth Amendment rights in exchange for the enjoyment of everyday privileges, such as driving on the State's roadways. Nor does it suggest that such a waiver would be valid if the waiving party were actually unaware that he was giving up his rights in exchange for some privilege. Furthermore, we note that the search in *Zap* was a search of "accounts and records" and was not a bodily search, which necessarily implicates a greater and more personal privacy interest than the interest one has in his business dealings. *See id.* at 628, 66 S.Ct. 1277.

Similarly, although the State contends that the Supreme Court's opinion in *United States v. Biswell* establishes that "acceptance of a license to engage in a pervasively regulated activity may carry with it an obligation to allow statutorily authorized inspection of that activity that would otherwise require a warrant," we do not read *Biswell* so broadly. *See* 406 U.S. 311, 311–12, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). In that case, the Court upheld the warrantless search of the business premises of a federally licensed firearms dealer pursuant to a federal statute authorizing such searches. *Id.* at 317, 92 S.Ct. 1593.[8] But the Court in that case emphasized that its analysis was rooted in "the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope." *Id.* at 315, 92 S.Ct. 1593. Because Biswell chose "to engage in this pervasively regulated business and to accept a federal license, he [did] so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." *Id.* at 317, 92 S.Ct. 1593. The Court further noted that Biswell had received a compilation of all the statutes governing his obligations and defining the inspector's authority to search, thus putting him on actual notice of his obligations. *Id.* The Court's upholding of the warrantless search in *Biswell* is properly understood as creating a limited exception to the warrant requirement that applies to searches of business premises in historically "pervasively regulated industries," for which the "threat to privacy [is] not of impressive dimensions[.]" *Id.* at 316, 92 S.Ct. 1593; *see also New York v. Burger,* 482 U.S. 691, 699, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (explaining that the "expectation of privacy in commercial premises" is significantly less than the "expectation in an individual's home"). We, therefore, disagree with the State's suggestion that the meaning of *Biswell* can be

---

8. The regulation at issue in *Biswell* authorized official entry during business hours into the premises "of any firearms or ammunition ... dealer ... for the purpose of inspecting or examining (1) any records or documents required to be kept ... and (2) any firearms or ammunition kept or stored" on the premises. *United States v. Biswell,* 406 U.S. 311, 311–12, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (citing 18 U.S.C. § 923(g)).

expanded to apply to a bodily search of a driver, simply by virtue of his acceptance of a driver's license and mere constructive knowledge, at most, of the terms of the mandatory-blood-draw statutes. The State's general assertion that engaging in any regulated activity subject to licensing and inspection requirements, even noncommercial ones, subjects participants to an irrevocable implied waiver of Fourth Amendment rights to privacy in their bodies while participating in that activity, is thus without support.

### ii. Exceptions Applicable to Parolees and Probationers Are Not Analogous

The State cites two cases that it suggests establish that "[g]overnmental and quasi-governmental bodies often condition the granting of a privilege upon the waiver of certain constitutional rights." *See United States v. Knights*, 534 U.S. 112, 116, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); *Samson*, 547 U.S. at 852, 126 S.Ct. 2193. *Knights* and *Samson* both dealt with warrantless searches of individuals who were on parole or probation. *Knights*, 534 U.S. at 114, 122 S.Ct. 587; *Samson*, 547 U.S. at 846, 126 S.Ct. 2193. The defendants in both of those cases had been required by the conditions of their release to expressly waive in writing their Fourth Amendment rights in exchange for avoiding prison time. *See Knights*, 534 U.S. at 116, 122 S.Ct. 587; *Samson*, 547 U.S. at 852, 126 S.Ct. 2193. These cases, however, do not stand for the proposition that the government may condition the granting of a privilege upon the waiver of a constitutional right, but instead are instructive in applying a general Fourth Amendment balancing test that applies in limited contexts, as we discuss later in this opinion. The Supreme Court expressly stated in *Knights* and *Samson* that it was not resting its holding in those cases on a consent rationale, but rather was applying a general

Fourth Amendment balancing test. *See Knights*, 534 U.S. at 118, 122 S.Ct. 587 (stating that rationale for upholding search was not based solely on prior waiver of rights, but was rather rooted in the basis that the search was "reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances,'" including Knights's "significantly diminished" expectation of privacy) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)); *Samson*, 547 U.S. at 853 n. 3, 126 S.Ct. 2193 (stating that holding was based on "general Fourth Amendment" totality-of-the-circumstances analysis, thereby avoiding the question "whether acceptance of the search condition constituted consent in the *Schneckloth* sense of a complete waiver of Fourth Amendment Rights"; "we decline to rest our holding today on the consent rationale"). Although the State contends otherwise, *Samson* and *Knights* cannot stand for the proposition that the Supreme Court has broadly recognized that acceptance of a condition or privilege from the government generally constitutes a valid basis for finding an advance irrevocable waiver of Fourth Amendment rights. Furthermore, even if the consent exception had been the basis for the holdings in *Samson* and *Knights*, we observe that the individuals in those cases had waived their Fourth Amendment rights expressly and knowingly. *See Knights*, 534 U.S. at 114, 122 S.Ct. 587 (observing that the defendant in that case had expressly agreed in writing that he would "[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant"); *Samson*, 547 U.S. at 846, 852, 126 S.Ct. 2193 (observing that California parolees must "agree in writing to be subject to search or seizure ... at any time of the day or night, with or without a search warrant"). The situation in those cases is further distinguishable from the situation presently be-

fore this Court, which involves an implied waiver of Fourth Amendment rights pursuant to a statutory scheme that does not expressly address the warrant requirement. · *See* TEX. TRANSP. CODE §§ 724.011(a), 724.012(b), 724.013.

### iii. Exceptions Applicable to Drug Testing of Public–School Students Are Not Analogous

The State also refers to *Board of Education v. Earls* to support its suggestion that the government may condition the granting of a privilege upon the waiver of certain constitutional rights. *Bd. of Educ. v. Earls*, 536 U.S. 822, 825, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). For similar reasons as those explained above, we find inapplicable the holding of *Earls*, which upheld warrantless drug testing of public-school students engaged in extracurricular activities under the special-needs exception to the warrant requirement. *See id.* In *Earls*, the Court expressly limited the reasoning of that case to the context of "administrative searches" undertaken for purposes "not in any way related to the conduct of criminal investigations." *See id.* at 828, 122 S.Ct. 2559 (observing that, although "[i]n the criminal context, reasonableness usually requires a showing of probable cause[,]" the probable-cause standard is "peculiarly related to criminal investigations and may be unsuited to determining the reasonableness of administrative searches" where the government seeks to prevent the development of hazardous conditions). It further based its

holding in that case on the existence of schools' "custodial and tutelary responsibility for children," the minimally invasive nature of urinalysis, and students' limited privacy interest in a public-school environment. *Id.* at 830, 122 S.Ct. 2559. Because the situation in the present case is not an administrative search but instead implicates the investigation of criminal conduct, the holding and reasoning in *Earls* are clearly inapplicable.

### d. Other Courts Have Rejected The Proposition that a DWI Suspect Waives His Fourth Amendment Rights Through Implied Consent

In addition to finding that the cases cited by the State fail to establish the broad proposition upon which it seeks to rely, we further note that courts in several other jurisdictions have recently considered challenges to statutes that aim to establish irrevocable implied consent and have concluded that those statutes, when used to draw a suspect's blood without a warrant and over his objection, do not establish valid legal consent within the bounds of the Fourth Amendment. *See, e.g., State v. Wulff*, 157 Idaho 416, 337 P.3d 575 (2014) (holding that Idaho statute establishing irrevocable implied consent for all drivers suspected of DWI "does not fall under the consent exception to the Fourth Amendment of the United States Constitution");[9] *Byars v. State*, — Nev. —, 336 P.3d 939, 951 (2014) (slip.op.) (rejecting State's argument that search was reasonable based on irrevocable consent provided by implied-consent statute);[10] *State v.*

9. The Idaho statute at issue in *Wulff* provided that a person gives implied consent to evidentiary testing, including a blood draw, when a person drives on Idaho's roads and a police officer has reasonable grounds to believe that the person has committed the offense of DWI. *State v. Wulff*, No. 41179, 157 Idaho 416, 337 P.3d 575 (2014) (citing IDAHO CODE § 18-8002).

10. The Nevada Supreme Court described Nevada's mandatory blood-draw law that, like Texas's law, requires involuntary blood draws based on probable cause, but unlike Texas's law, is not limited to third-offender DWIs, stating,

> According to the State, even though Byars refused to submit to the blood draw, he had consented to it by choosing to drive on Nevada roads. NRS 484C.160(1) provides

*Wells*, No. 172013–01145–CCA, 2014 WL 4977356, at *13 (Tenn.Crim.App. Oct. 6, 2014) (slip.op.) (holding that "the privilege of driving does not alone create consent for a forcible blood draw"; such a search is "not reasonable unless performed pursuant to a warrant or to an exception to the warrant requirement"; "[t]he implied consent law does not, in itself, create such an exception");[11] *State v. Fierro*, 853 N.W.2d 235, 237 (S.D.2014) (implied-consent statute did not constitute stand-alone exception to warrant requirement); *State v. Butler*, 232 Ariz. 84,302 P.3d 609, 613 (2013) (holding that, independent of implied-consent statute, Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw). Furthermore, we observe that almost all of the Texas courts of appeals that have considered such challenges to Texas's statuto-

ry scheme have reached that same conclusion.[12]

In *Byars*, the Nevada Supreme Court rejected the State's argument "that consent is valid based solely on [the defendant's] decision to drive on Nevada's roads," describing that argument as "problematic because the statute makes the consent irrevocable." 336 P.3d at 945. And in *Wulff*, the Idaho Supreme Court held that, after *McNeely*, that state's implied-consent statute was not an "acceptable" basis for conducting warrantless blood draws under the consent exception because the statute "operate[d] as a per se exception to the warrant requirement," for which the Supreme Court had "repeatedly expressed disapproval" in *McNeely*. *See Wulff*, 337 P.3d at 580. The *Wulff* court observed that whether consent is valid is a determination to be made based on the

that "any person who drives or is in actual physical control of a vehicle on a highway or on premises to which the public has access shall be deemed to have given his or her consent to an evidentiary test of his or her blood, urine, breath or other bodily substance" if a police officer has reasonable grounds to believe that the person was driving or in actual physical control of a vehicle while under the influence of alcohol or a controlled substance or was engaging in other conduct prohibited by certain statutes. If a driver does not submit to a test and the police officer has reasonable grounds to believe that the person was under the influence of alcohol or a controlled substance or engaging in other specified conduct, "the officer may direct that reasonable force be used to the extent necessary to obtain samples of blood from the person tested."
*Byars v. State*, — Nev. —, 336 P.3d 939, 945 (2014). Notably, the court concluded that it had "found no jurisdiction that has upheld an implied consent statute that allows an officer to use force to obtain a blood sample upon the driver's refusal to submit to a test." *Id.*

11. The Tennessee Court of Criminal Appeals described that state's implied-consent law, which permits a nonconsensual blood draw

when "law enforcement has 'reasonable grounds to believe' that the person was driving under the influence or had committed vehicular assault, vehicular homicide, or aggravated vehicular homicide as a proximate result of intoxication." *State v. Wells*, No. 172013–01145–CCA, 2014 WL 4977356, at *13 (Tenn.Crim.App. Oct. 6, 2014) (slip. op.) (citing T.C.A. § 55–10–406(a)(1) (2012)). Tennessee's implied-consent law is similar to Texas's law in that it permits a nonconsensual blood draw when there is probable cause to believe that some aggravating circumstance is present, such as the fact that the intoxicated driver has caused another person bodily injury or death. *Compare id.* to TEX. TRANSP. CODE § 724.011(b).

12. *See, e.g., State v. Anderson*, 445 S.W.3d 895 (Tex.App.—Beaumont 2014) (concluding that Section 724.012(b) "does not constitute an exception to the Fourth Amendment's warrant requirement"); *Aviles v. State*, 443 S.W.3d 291 (Tex.App.—San Antonio 2014) (op. on remand) (same); *Forsyth v. State*, 438 S.W.3d 216 (Tex.App.—Eastland 2014) (holding that implied consent under Transportation Code not equivalent to voluntary consent for Fourth Amendment purposes).

totality of the circumstances and, as such, "[a] holding that the consent implied by statute is irrevocable would be utterly inconsistent with the language in *McNeely* denouncing categorical rules that allow warrantless forced blood draws." *Id.* at 579, 581. We agree with these courts' assessments that, in the context of a non-consensual, warrantless bodily search of a person suspected of criminal activity, a statute providing for irrevocable implied consent cannot supply the type of voluntary consent necessary to establish an exception to the Fourth Amendment warrant requirement. We reject the State's argument that a suspect can be held to have validly and irrevocably waived his Fourth Amendment rights in advance of a search through the existence of implied consent on the sole basis of his receipt of the privilege of driving on Texas roadways.

## 2. Automobile Exception Is Inapplicable

With respect to the State's assertion that the warrantless search of a DWI suspect's blood should be upheld under the automobile exception, we reject that suggestion outright because the automobile exception has been expressly limited to the vehicular-search context. *See, e.g., Acevedo*, 500 U.S. at 580, 111 S.Ct. 1982. It cannot be expanded to encompass a bodily search in the form of a compulsory blood draw of an individual. *See Houghton*, 526 U.S. at 303, 119 S.Ct. 1297; *United States v. Di Re*, 332 U.S. 581, 587, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Furthermore, although the State appears to contend that a driver's privacy interest in his blood is, similar to his interest in an automobile, minimal under these circumstances in light of the existence of implied consent and the highly regulated nature of driving, we similarly disagree with that contention because it is inconsistent with the Supreme Court's description of the substantial privacy interests at stake here. *See McNee-*

*ly*, 133 S.Ct. at 1565 ("But the fact that people are 'accorded less privacy in ... automobiles because of th[e] compelling governmental need for regulation,' does not diminish a motorist's privacy interest in preventing an agent of the government from piercing his skin.") (quoting *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985)). We thus decline to expand the automobile exception to apply to a bodily search of a driver suspected of DWI.

## 3. Special Needs Exception is Inapplicable

Regarding the State's suggestion that this type of search may be upheld under the special-needs doctrine, we find that argument similarly unconvincing. As described above, the special-needs doctrine is limited to situations involving "special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin*, 483 U.S. at 873–74, 107 S.Ct. 3164; *see also King*, 133 S.Ct. at 1978 (describing special-needs doctrine as encompassing "programmatic searches of either the public at large or a particular class of regulated but otherwise law-abiding citizens"). In those limited situations, the need for a warrant is diminished because "the public interest is such that neither a warrant nor probable cause is required, or because an individual is already on notice, for instance because of his employment, or the conditions of his release from government custody, that some reasonable police intrusion on his privacy is to be expected." *King*, 133 S.Ct. at 1958.

Furthermore, the special-needs doctrine creates an exception to the warrant requirement only in situations in which the existence of special needs makes obtaining a warrant impracticable. *See Griffin*, 483 U.S. at 873, 107 S.Ct. 3164 (describing

exception as applying when special needs beyond the normal need for law enforcement " 'make the warrant and probable-cause requirement impracticable' "). The doctrine has thus been applied in the context of, among others, the need to deter drug use in public schools through compulsory drug testing of students participating in school-sponsored athletics programs, *Vernonia*, 515 U.S. at 653, 115 S.Ct. 2386, and in the context of the need to assure that railroad employees engaged in train operations are not under the influence of drugs or alcohol, *Skinner*, 489 U.S. at 623, 109 S.Ct. 1402. In both of those situations, the Court's holdings were once again rooted in the particular context of those cases. In *Vernonia*, the Court observed that "Fourth Amendment rights . . . are different in public schools than elsewhere" in light of schools' responsibility to ensure the safety and welfare of students, and students accordingly have a lesser expectation of privacy than members of the population generally. *Vernonia*, 515 U.S. at 656, 115 S.Ct. 2386. And in *Skinner*, the Court stated that the privacy interest at stake in that case was "minimal," that railway employees have long been subject to a reduced expectation of privacy in light of the historically pervasive regulation of that industry, and that the "governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion." *Skinner*, 489 U.S. at 627, 109 S.Ct. 1402.

Here, we see no basis for holding that the government's need to conduct searches of DWI suspects' blood constitutes a "special need" that would permit a departure from the probable-cause and warrant requirement. The need here does not go "beyond the normal need for law enforcement," nor does it "make the warrant and probable-cause requirement impracticable." *Griffin*, 483 U.S. at 873, 107 S.Ct. 3164. Furthermore, the Supreme Court has suggested that the special-needs doctrine is inapplicable when the primary purpose of a search is to generate evidence for law-enforcement purposes. *See Ferguson v. City of Charleston*, 532 U.S. 67, 83, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (invalidating public hospital's policy of conducting nonconsensual testing of pregnant women for illicit drug use because "the immediate objective of the searches was to generate evidence for law enforcement purposes"; given that fact, the case "simply does not fit within the closely guarded category of 'special needs' "); *see also Skinner*, 489 U.S. at 620–21, 109 S.Ct. 1402 (upholding warrantless drug testing of railroad employees in part because testing was "not to assist in the prosecution of employees, but rather to prevent accidents and casualties in railroad operations") (citations omitted).

In *Ferguson*, the Supreme Court observed that it had never applied the special-needs doctrine in the context of a search undertaken for the purpose of gathering evidence for use in a criminal investigation. *Ferguson*, 532 U.S. at 83 n. 20, 121 S.Ct. 1281 ("In none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes."). Furthermore, in light of the investigatory purpose underlying the searches in *Ferguson*, the Court explained that it would apply the normal Fourth Amendment framework that requires a warrant or an applicable exception, as opposed to a balancing-of-interests test. *Id.* at 85–86, 121 S.Ct. 1281. It explained, "The fact that positive test results were turned over to the police does not merely provide a basis for distinguishing our prior cases applying the 'special needs' balancing approach to the determination of drug use. It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment." *Id.* at 84, 121 S.Ct. 1281. Public-hospital employees who undertake to obtain evidence

of criminal conduct ."for the specific purpose" of incriminating patients, it observed; "have a special obligation to make sure that the patients are fully informed about their constitutional rights, as standards of knowing waiver require." *Id.* at 85, 121 S.Ct. 1281. The Court further explained that to hold otherwise would mean that "any search to generate evidence for use by the police in enforcing general criminal laws would be justified by reference to the broad social benefits that those laws might bring about (or, put another way, the social harms that they might prevent)." *Id.* at 84 n. 22, 121 S.Ct. 1281. Such an approach, it stated, would be "inconsistent with the Fourth Amendment." *Id.* at 84, 121 S.Ct. 1281.

In light of these principles, we conclude that the special-needs doctrine is inapplicable in the present context, when the search of a DWI suspect's blood is undertaken by law-enforcement officers for the primary purpose of generating evidence to be used in a criminal prosecution. *See id.* at 81, 121 S.Ct. 1281 (rejecting applicability of special needs when purpose "actually served" by search "'is ultimately indistinguishable from the general interest in crime control'") (citing *Indianapolis v. Edmond,* 531 U.S. 32, 44, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000)). We further note that at least one other court has concluded that the special-needs doctrine is inapplicable in the context of a mandatory blood draw of a DWI suspect where the "primary purpose of the warrantless seizure of [a defendant's] blood was evidentiary and prosecutorial." *Fierro,* 853 N.W.2d at 242–43. We similarly decline to hold that special needs applies in this context, and we reject the State's contention that the mandatory, nonconsensual blood draw in this case may be upheld under a special-needs balancing test.

### 4. Search Incident to Arrest Is Inapplicable

With respect to the suggestion that a warrantless blood draw constitutes a search incident to arrest, we also reject that contention because that exception to the warrant requirement applies only if such a search is "substantially contemporaneous" with the arrest and is confined to the area within the immediate control of the arrestee. *State v. Granville,* 423 S.W.3d 399, 410 (Tex.Crim.App.2014) (citing *Vale v. Louisiana,* 399 U.S. 30, 33, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970)). The justification for permitting such a warrantless search is (1) the need for officers to seize weapons or other things which might be used to assault an officer or effect an escape, and (2) the need to prevent the loss or destruction of evidence. *Id.* at 410 (citing *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). "Thus, a search incident to arrest cannot normally be justified if the 'search is remote in time or place from the arrest ... or no exigency exists.'" *Id.* (quoting *United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)). Although the State contends that the dissipation of alcohol in the bloodstream constitutes a "recognized exigency" that would justify applying the search-incident-to-arrest exception here, we find that argument to essentially propose adoption of a per se exigency rule that was expressly disavowed by *McNeely.* 133 S.Ct. at 1568. Furthermore, in situations involving the possible destruction of evidence, the Supreme Court has suggested that the search-incident-to-arrest exception is most commonly applied to an "active attempt by a defendant or his associates to conceal or destroy evidence upon arrest." *Riley,* 134 S.Ct. at 2473. Given that alcohol in the bloodstream dissipates at a predictable

rate and is encased within a defendant's veins, there is no possibility of that evidence being subject to sudden destruction or disappearance as a result of any active efforts by a defendant. Based on these considerations, we conclude that the search-incident-to-arrest exception is inapplicable.

### 5. Blood Draw Is Not Merely a Seizure

■ We briefly take note of the State's related argument that the drawing of a DWI suspect's blood constitutes a seizure, which "generally does not require a warrant," as opposed to a search. We summarily reject this argument because it is foreclosed by Supreme Court precedent that has repeatedly described any bodily intrusion as constituting a search for which either a warrant or an applicable exception is required. *See, e.g., King,* 133 S.Ct. at 1980 (using buccal swab on inner tissues of a person's cheek in order to obtain DNA samples is a search); *McNeely,* 133 S.Ct. at 1556; *Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826 (virtually any intrusion "into the human body" constitutes search); *Skinner,* 489 U.S. at 616, 109 S.Ct. 1402 (breathalyzer test, which requires "deep lung" breath for chemical analysis, constitutes a search). We decline to depart from the longstanding principle that the drawing of a suspect's blood constitutes a search within the meaning of the Fourth Amendment.

For all of the foregoing reasons, we conclude that the warrantless, nonconsensual testing of a DWI suspect's blood cannot be justified as a reasonable intrusion under any of the State's proffered exceptions to the warrant requirement.

### D. Search May Not Be Upheld Under General Fourth Amendment Balancing Test

■ As an alternative to a finding that warrantless, nonconsensual blood testing under the provisions in the Transpor-

tation Code falls within a recognized exception to the warrant requirement, the State urges us to hold that such a search may be upheld on the basis that it is reasonable under a general Fourth Amendment balancing test. That test, which is rooted in "traditional standards of reasonableness," requires a court to weigh " 'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.' " *King,* 133 S.Ct. at 1970 (quoting *Houghton,* 526 U.S. at 300, 119 S.Ct. 1297). In some circumstances, such as "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *McArthur,* 531 U.S. at 330, 121 S.Ct. 946. In support of its argument that such a balancing test is applicable here, the State suggests that "several related justifications," which "balance the need to rid public roads of drunk drivers against the lessened expectation of privacy that impaired drivers have concerning the drawing of a sample of their blood," suffice to establish an exception to the warrant requirement under the "narrowly specified circumstances" in the statute. Specifically, it urges us to weigh the government's legitimate interest in curbing drunk driving; the gravity of the offense; the desirability of a bright-line rule; the presumption of validity and constitutionality that attaches to legislative enactments; the reduced expectation of privacy of a DWI suspect who has been arrested; and the minimal nature of the intrusion.

Although we agree with the State's contention that the government has a substantial interest in preventing drunk driving, we disagree that a balancing test is appropriate given the context. The Supreme Court has made clear that, in the context

of an active criminal investigation, and when the primary goal of law-enforcement activity is the gathering of evidence, a warrantless search of a person is unreasonable unless it falls within an established exception to the warrant requirement. *See McNeely*, 133 S.Ct. at 1558 (warrantless search of the person is reasonable only if it falls within a recognized exception); *Riley*, 134 S.Ct. at 2482 ("[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant"; "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement"); *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402 (in "most criminal cases, we strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment"; "[e]xcept in certain well-defined circumstances, a search or seizure in [a criminal] case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause"). We decline to disregard this well-established principle in favor of a more generalized balancing-of-interests test.

In seeking to establish the viability of a balancing test here, the State relies primarily upon the standard set forth in *Maryland v. King*, in which the Supreme Court upheld the warrantless collection of DNA from felony arrestees as part of a routine booking procedure for serious offenses. *King*, 133 S.Ct. at 1970. In upholding the search in *King*, the Supreme Court took into consideration the limited circumstances under which arrestees' DNA would be collected and utilized. *Id.*

at 1966–68.[13] It emphasized that the collection of DNA from arrestees was reasonable in light of the fact that the "arrestee is already in valid police custody for a serious offense supported by probable cause." *Id.* at 1970. Furthermore, it observed that the mandatory "DNA collection is not subject to the judgment of officers whose perspective might be colored by their primary involvement in the often competitive enterprise of ferreting out crime," and it took note of the standardized nature of the tests and the regulations that authorized them. *Id.* The Court went on to observe that the purpose of the DNA collection was to allow law enforcement officers, "in a safe and accurate way[,] to process and identify the person and possessions they must take into custody." *Id.* Such procedures were thus justified as reasonable, in large part, because they were not based upon an individualized suspicion of criminal wrongdoing, which would trigger the need for the interposition of a neutral magistrate between the citizen and the law enforcement officer, but rather were part of the routine administrative procedures at the police station that guaranteed law enforcement's ability to identify and keep track of arrestees. *See id.* at 1977 ("In the balance of reasonableness required by the Fourth Amendment, therefore, the Court must give great weight both to the significant government interest at stake in the identification of arrestees and to the unmatched potential of DNA identification to serve that interest.").

With respect to the governmental interest at stake, the *King* Court went to great

13. The Court observed that a DNA sample would be collected only from an individual charged with a crime of violence or burglary; that the sample would not be processed or placed in a database until the individual had been arraigned and a judicial officer had verified that there was probable cause to detain

him; and that samples would be immediately destroyed if a judicial officer determined that there was no probable cause to detain the arrestee for the qualifying offense or if the arrest ultimately did not result in a conviction. *Maryland v. King*, —— U.S. ——, 133 S.Ct. 1958, 1967, 186 L.Ed.2d 1 (2013).

lengths to clarify that the DNA information being collected from arrestees was not for the primary purpose of gathering evidence against them, but rather was for the purpose of routine identification of inmates. *Id.* at 1971, 1977–78 (discussing government's "legitimate interest" in identifying inmates and stating that DNA collection "is no more than an extension of methods of identification long used in dealing with persons under arrest"). And, although four dissenters disagreed with that assessment, that fact formed the basis for the Court's departure from the normal warrant requirement in that case. *See id.* at 1980. Unlike *King*, where police used no discretion in the application of the routine-identification process, the primary purpose of the search in the present case is for investigation of a crime based on a discretionary determination by a law-enforcement officer that there is probable cause of intoxication. *See id.* at 1969–1970 ("The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the 'interpo[lation of] a neutral magistrate between the citizen and the law enforcement officer.'") (quoting *Treasury Employees v. Von Raab*, 489 U.S. 656, 667, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)). We decline to hold that the balancing approach taken in *King* is appropriate in this context.[14]

We further observe that, with respect to the privacy interest at stake, the *King* Court noted that a detainee has a "reduced expectation of privacy" and would be subjected to only a "minimal intrusion[ ]" in the form of a mouth buccal swab. *Id.* at 1978. But it further sought to establish that all searches are not acceptable "solely because a person is in custody." *Id.* at 1979. In situations involving weightier privacy concerns or greater intrusions, it acknowledged that such a search may nevertheless require a warrant. *Id.* (observing that where "privacy-related concerns are weighty enough," search "may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee").

Although the State contends that *King* broadly permits a reviewing court to conduct a weighing of competing interests for the purpose of determining the reasonableness of an investigative search, we disagree with this broad reading of *King*. The DNA search at issue in *King* involved the minimally intrusive, non-discretionary search of individuals who were already being subjected to routine booking procedures. In light of that fact, the Court concluded that "the additional intrusion upon the arrestee's privacy" beyond the already intrusive nature of other booking procedures was minimal. *Id.* at 1976, 1978. By contrast, here, puncturing the skin constitutes a substantial intrusion beyond what a DWI arrestee would otherwise experience. And the *King* Court recognized that a buccal swab is a "far more gentle process" than venipuncture to draw blood. *Id.* at 1968.

**14.** We note that one author has recently interpreted *King* as being "broadly consistent with" and leaving "intact" the traditional Fourth Amendment framework that requires either a search warrant or the applicability of an established exception to the warrant requirement. *See* David H. Kaye, *Why So Contrived? Fourth Amendment Balancing, Per Se Rules, and DNA Databases After Maryland v. King*, 104 J.Crim. L. & Criminology 535, 564 (2014). Kaye observes that *King* "does not liberate courts to weigh interests *ab initio* in light of the totality of the circumstances in every case," nor does it empower courts to consider, for example, "the nature of the specific crime [law enforcement] are seeking to solve in deciding whether a particular warrantless search ... is constitutional." *Id.* at 564 n. 167. Kaye further notes that, "[h]ad the majority wished to discard the [traditional] framework in this wholesale manner, it would not have needed to cobble together a set of purely detention-related state interests." *Id.*

Moreover, even if we were to accept the viability of a Fourth Amendment balancing test here as a substitute for the established exceptions to the warrant requirement, we would conclude that, on balance, a DWI suspect's privacy interest outweighs the State's interest in preventing drunk driving through warrantless searches. *McNeely* reaffirmed the principle that a compelled physical intrusion beneath the skin to obtain evidence in a criminal investigation implicates significant privacy interests, and this privacy interest is not automatically diminished simply because an individual is suspected of a serious DWI offense. *McNeely*, 133 S.Ct. at 1558. *McNeely* further rejected the government's interest in curbing drunk driving as a valid basis for departing from the traditional exceptions to the warrant requirement, stating that "the general importance of the government's interest in this area does not justify departing from the warrant requirement without a showing" that some established exception, such as exigency, applies. *Id.* at 1565. And, although we acknowledge the magnitude of the drunk driving problem in Texas and the government's legitimate and substantial interest in curbing that problem, we see no compelling need on the part of law enforcement to undertake to solve this problem through warrantless, nonconsensual searches of suspects' blood. This is particularly so in light of the fact that warrants for such blood testing are often readily available, thereby providing the "traditional justification that a warrant provides." *Id.* at 1559 (citing *Atwater v. Lago Vista*, 532 U.S. 318, 347 n. 7, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001)); *see also Skinner*, 489 U.S. at 622, 109 S.Ct. 1402 (noting that a "warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope"). The marginal benefit to law enforcement in combating Texas's drunk-driving problem through war-rantless searches is generally outweighed by an individual's substantial privacy interest here.

It is suggested by the dissenting opinions that a Fourth Amendment balancing test may properly be applied in these circumstances. Balancing the interests in this case, the dissenting opinions conclude that a warrantless, nonconsensual blood draw conducted pursuant to provisions in the Transportation Code should be upheld as generally reasonable in light of the Legislature's clear intent to except such a search from the warrant requirement; the statute's clear notice to repeat-offenders that they are subject to a mandatory search; and the similarities between this situation and situations involving constitutionally permissible warrantless searches of probationers, parolees, and arrestees. We disagree that these considerations present a valid justification for departing from the traditional Fourth Amendment framework that requires either a warrant or an applicable exception.

 Specifically, with respect to the contention that the Legislature has clearly indicated its desire to create a new exception to the warrant requirement, we observe that the statutory language itself is silent as to whether a law-enforcement officer conducting a mandatory, nonconsensual search of a DWI suspect's blood is required to first seek a warrant. *See* TEX. TRANSP. CODE § 724.012(b) (stating that a peace officer "shall require the taking of a specimen" of a suspect's breath or blood if one of the enumerated aggravating circumstances is present, but making no reference to Fourth Amendment warrant requirement). In any event, it is unclear why the Legislature's intent in enacting the mandatory-blood-draw statute should be dispositive of our analysis. The Legislature "may not restrict guaranteed rights set out in constitutional provisions." *Venn*

*v. State,* 86 Tex.Crim. 633, 218 S.W. 1060 (1920). To the extent the mandatory-blood-draw statute may be interpreted as authorizing a warrantless search that would violate a defendant's rights under the Fourth Amendment, it cannot do so. *See id.* We thus disagree with the assertion that a warrantless, nonconsensual search of a DWI suspect's blood may be upheld as constitutionally reasonable on the basis of the Legislature's putative intent to permit such a search.

For similar reasons, we ·disagree with the contention that a search of this nature should be upheld as reasonable on the basis that the statute gives clear notice to repeat-DWI offenders of their obligation to provide a blood or breath specimen. Although we may agree that the statutory scheme gives clear notice of the existence of implied consent and the requirement that a specimen be collected under certain circumstances, the statutory scheme does not expressly make clear that suspects will be required to submit to warrantless searches. *See* TEX. TRANSP. CODE §§ 724.011, 724.012. Even accepting the proposition that a DWI suspect may be deemed to have knowledge that a search of his blood is statutorily required under certain circumstances, he may also reasonably expect that such a search will be carried out in accordance with his Fourth Amendment rights. We are not persuaded that the implied-consent and mandatory-blood-draw provisions place suspects on clear notice that they are categorically subject to warrantless, nonconsensual searches.

With respect to the suggestion that ·requiring a third-offender DWI suspect to submit to having his blood drawn over his objection and without a warrant is analogous to the constitutionally permissible warrantless, nonconsensual searches of parolees and probationers, we disagree with that contention. The Supreme Court has explained why it is constitutionally permis-sible to conduct warrantless, nonconsensual searches of parolees and probationers. *See Knights,* 534 U.S. at 116, 122 S.Ct. 587; *Samson,* 547 U.S. at 852, 126 S.Ct. 2193; *Griffin,* 483 U.S. at 873, 107 S.Ct. 3164. In *Knights,* the Supreme Court upheld a warrantless search of Knights' dwelling, explaining that Knights' status as a probationer and his express agreement to submit to warrantless searches were "salient," and it further noted that probation, "like incarceration, is a form of criminal sanction imposed . . . after verdict, finding, or plea of guilty." *Knights,* 534 U.S. at 119, 122 S.Ct. 587. Thus, a probationer's freedom from imprisonment is subject to "reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Id.* The Court stated, "The judge who sentenced Knights to probation determined that it was necessary to condition the probation on Knights' acceptance of the search provision. . . . The probation order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition thus significantly diminished Knights' reasonable expectation of privacy." *Id.* at 120, 122 S.Ct. 587. The *Knights* Court observed that probationers are "more likely than the ordinary citizen to violate the law," and the government was accordingly justified in focusing on probationers "in a way that it does not on the ordinary citizen." *Id.*

Similarly, in *Samson,* the Court upheld the warrantless search of a parolee who had been stopped on the sidewalk and subjected to a search of his person in the absence of reasonable suspicion. *Samson,* 547 U.S. at 857, 126 S.Ct. 2193. As in *Knights,* the Court upheld the warrantless search primarily on the basis that parolees "are on the continuum of state-imposed punishments" and thus have "severely diminished· expectations of privacy by virtue of their status alone." *Id.* at 852, 126 S.Ct.

2193. It concluded that Samson "did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 853, 126 S.Ct. 2193. The holdings of both *Knights* and *Samson* are clearly rooted in the limited privacy interests of individuals who are actively subject to criminal penalties, thereby permitting "privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.*

In contrast to parolees and probationers, DWI suspects who have completed their sentences are not free on conditional liberty. Rather, DWI suspects who have discharged their sentences on their earlier DWI convictions enjoy absolute liberty from their prior convictions and have no ongoing supervisory relationship with any parole or probation officer. "To a greater or lesser degree, it is always true of probationers (as we have said to be true of parolees) that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin*, 483 U.S. at 874, 107 S.Ct. 3164. Furthermore, the situation faced by parolees and probationers is "an ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial—between the object of the search and the decisionmaker." *Id.* at 879, 107 S.Ct. 3164. In view of the basis for the Court's holdings in *Knights* and *Samson,* we conclude that there is no rational comparison between the reduced liberty interests of parolees and probationers, who have only conditional liberty and a supervisory relationship with a law-enforcement officer, and repeat-offender DWI suspects, who have fully discharged their earlier sentences and who have absolute liberty and no ongoing supervisory relationship. *See Knights,* 534 U.S. at 118, 122 S.Ct. 587; (observing that, in light of his status, Knights had "significantly diminished" expectation of privacy); *Samson,* 547 U.S. at 853, 126 S.Ct. 2193.

Furthermore, as explained previously, the Supreme Court's holding in *McNeely* makes clear that drawing the blood of an individual suspected of DWI falls under the category of cases holding that "a warrantless search of the person is reasonable only if it falls within a recognized exception" to the warrant requirement. *McNeely,* 133 S.Ct. at 1558. The Court in *McNeely* further explained that such an intrusion implicates an individual's " 'most personal and deep-rooted expectations of privacy.' " *Id.* (quoting *Winston,* 470 U.S. at 760, 105 S.Ct. 1611). These principles from *McNeely*—the recognition of the substantial privacy interests at stake and the applicability of the traditional Fourth Amendment framework that requires either a warrant or an applicable exception—apply with equal force to this case.

We hold that the provisions in the Transportation Code do not, taken by themselves, form a constitutionally valid alternative to the Fourth Amendment warrant requirement. We thus reject the State's assertion that a warrantless, nonconsensual blood draw conducted pursuant to those provisions can fall under one of the established exceptions to the warrant requirement described above, and we further reject the State's suggestion that such a search may be upheld under a general Fourth Amendment balancing test. We overrule the State's first ground.

## IV. Constitutionality of Blood–Draw Statute

The State's third ground asks this Court to review "[w]hether the Thirteenth Court of Appeals erred in concluding that the mandatory [blood] draw statute does not allow the arresting officer to draw blood without a search warrant or exigent circumstances, and specifically[,] whether the court failed to consider the distinction between the statutory directive for the arresting officer to require or order the

draw, and the nature of a warrant as an order of the issuing magistrate for the draw in question." The essence of the State's complaint is that, in interpreting the statutory language during the course of analyzing whether the statute was constitutional "as applied" to Villarreal, the court of appeals erred by determining that the plain language in the statute did not dispense with the requirement that an officer seek and obtain a search warrant. *See Villarreal,* 476 S.W.3d at 58, 2014 WL 1257150, at *11 (observing that the "literal text" of Section 724.012 "does not address or purport to dispense" with the warrant requirement). Having already determined that Villarreal's Fourth Amendment rights were violated when his blood was drawn without a warrant in light of his refusal to submit to the taking of a specimen, any further statutory analysis of whether the mandatory-blood-draw law itself purports to authorize such a warrantless search is unnecessary to resolve this Fourth Amendment issue. The remainder of the State's challenge with respect to the meaning of the statutory language pertains to the conclusion by the court of appeals that the statute was not unconstitutional.[15]

Villarreal's constitutional challenge, however, was abandoned at the trial-court level. Villarreal's written motion to suppress stated, "[I]f the defendant's blood was taken under the authority of a statute, the statute should be deemed unconstitutional." Later, however, Villarreal abandoned that complaint. Villarreal narrowed the focus of his motion to suppress to the question of whether the mandatory blood draw conducted without a warrant in this particular case violated the Fourth Amendment. And the trial court's findings of fact specifically determined that Villarreal had narrowed the grounds in his motion to address only the Fourth Amendment violation. The trial court's second fact finding stated, "The Court finds that the Defendant narrowed the focus of his motion, and represented as the sole basis of such motion, his claim that 'taking a blood draw without a warrant [is] a violation of the 4th Amendment.'" We, therefore, sustain the State's third ground to the extent that the court of appeals erred by addressing the constitutionality of the implied-consent statute because Villarreal abandoned his constitutional challenge in the trial court.

**15.** The court of appeals cited this Court's decision in *Beeman v. State* for the proposition that "the constitutionality of the repeat offender provision of the mandatory-blood-draw law must be based on the previously recognized exceptions to the Fourth Amendment's warrant requirement." *See State v. Villarreal,* No. 13–13–00253–CR, 476 S.W.3d 45, 2014 WL 1257150 (Tex.App.—Corpus Christi 2014) (citing *Beeman v. State,* 86 S.W.3d 613, 615 (Tex.Crim.App.2002)). In that case, after his blood was drawn pursuant to a search warrant, *Beeman* argued that the State had no right to obtain a search warrant to draw his blood in light of implied-consent laws for DWI cases. *Id.* In deciding that the State may properly seek a warrant to collect a blood specimen regardless of a suspect's refusal to submit a specimen under implied-consent laws, this Court stated, "The implied consent law expands on the State's search capabilities by providing a framework for drawing DWI suspects' blood in the absence of a search warrant. It gives officers an additional weapon in their investigative arsenal, enabling them to draw blood in certain limited circumstances even without a search warrant." *Id. Beeman* also observed that implied-consent laws do not give police officers anything "more than [what] the Constitution already gives them." *Id.* at 616. The holding in *Beeman,* that an officer may obtain a search warrant even where implied consent statutes would authorize an involuntary blood draw, remains good law. *See id.* But because it was decided before *McNeely, Beeman* has limited value with respect to the instant question whether a person's Fourth Amendment rights are violated when his blood is drawn over his objection pursuant to the implied-consent statute.

## V. Conclusion

We hold that a nonconsensual search of a DWI suspect's blood conducted pursuant to the mandatory-blood-draw and implied-consent provisions in the Transportation Code, when undertaken in the absence of a warrant or any applicable exception to the warrant requirement, violates the Fourth Amendment. We affirm the judgment of the court of appeals suppressing the blood-test results on the basis of a Fourth Amendment violation.

KELLER, P.J., filed a dissenting opinion in which HERVEY, J., joined.

MEYERS, J., filed a dissenting opinion.

KEASLER, J., dissented.

KELLER, P.J., filed a dissenting opinion in which HERVEY, J., joined.

The Supreme Court has created a continuum of exceptions to the warrant requirement that inform the analysis in the present case. (1) Parolees are subject to warrantless, suspicionless, intrusive searches.[1] (2) Probationers are subject to warrantless intrusive searches if there is reasonable suspicion to believe they have committed an offense.[2] (3) People arrested on probable cause for serious offenses are subject to warrantless searches by the collection of DNA from a buccal swab.[3] I believe that the search in this case falls between the second and third categories of cases. I respectfully dissent.

In *King*, the Supreme Court relied in part on an arrestee's reduced expectation of privacy where the arrestee was "already in valid police custody for a serious offense supported by probable cause."[4] The search was analyzed by reference to "reasonableness, not individualized suspicion."[5] Reasonableness is determined by weighing "'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.'"[6] The fact that the buccal swab was minimally intrusive weighed heavily in the Court's decision.[7]

The search in the present case was more intrusive than the search in *King*, but appellee was more than simply an "arrestee." He had at least two prior convictions for DWI, and that is the precise reason that he was subject to the mandatory-blood-draw statute. The fact of his prior convictions is what put this case between *King* and *Knights*.

In *Knights*, the Supreme Court considered the "totality of the circumstances" to decide whether the warrantless search of a probationer's apartment violated the Constitution.[8] Among other things, the Court took into account the high recidivism rate of probationers.[9] The relevant provision of the Texas statute requires not just the possibility of recidivism, but recidivism in fact, in that it requires a person to have been convicted of or placed on probation in two prior DWI cases. And the offense for

1. *Samson v. California*, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (search of shirt pocket).

2. *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (search of apartment).

3. *Maryland v. King*, —— U.S. ——, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013).

4. *Id.* at 1970.

5. *Id.*

6. *Id.* (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)) (bracketed material in *King*).

7. *Id.* at 1969.

8. *Knights*, 534 U.S. at 118, 122 S.Ct. 587.

9. *Id.* at 120, 122 S.Ct. 587.

which the person is under arrest must be an intoxication offense. In *Knights,* the Court said, "[The State's] interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." [10]

The question boils down to whether a person with two prior DWI convictions is similar enough to a probationer that the totality of the circumstances allows a search that would not be allowed for someone without that criminal record. Before *King,* that would have been a difficult position to defend. Now that the Supreme Court has held that the mere fact that a person is arrested for a serious offense justifies a warrantless, standardized, minimally intrusive search, there appears to be room for a statute that permits a warrantless, standardized, more intrusive search of a person arrested for DWI who has two prior convictions for DWI.

The touchstone of the Fourth Amendment is reasonableness. Under the totality of the circumstances, what happened in this case does not strike me as unreasonable. Therefore, I respectfully dissent.

MEYERS, J., filed a dissenting opinion.

While it is well settled that the Fourth Amendment will ordinarily require a warrant for a search or seizure conducted by the State, it is also well settled that there are multiple exceptions to this warrant requirement. *See, e.g., Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Here, the majority has concluded that the mandatory blood draw outlined in Section 724.012(b)(3)(B) of the Texas Transporta-

tion Code does not fall within any of the current recognized exceptions to the warrant requirement. I do not disagree with this conclusion. I do, however, believe that the Legislature intended to create a new exception to the warrant requirement with this statute, and that this exception is constitutional.

Section 724.012(b)(3)(B) states that an officer "shall require the taking of a specimen of the person's breath or blood" if the officer has an individual under arrest for an intoxication offense and some other circumstance exists, such as the individual having two prior convictions for driving while intoxicated. The majority holds that when this type of search of the blood occurs nonconsensually and without a warrant, as in this case, it is not constitutional. However, even outside the circumstances listed in this provision, officers who obtain a warrant are allowed to take blood or breath samples from any individual arrested for driving while intoxicated. If this is permitted in any case, then the existence of this provision would have no purpose unless it is meant to allow for unwarranted searches in the specific instances listed. The majority's conclusion renders this provision unnecessary. Further, if a warrant is required, the wording of the statute stating that the officer "shall" get a specimen would place an officer in violation of the law if the magistrate refuses to sign the officer's warrant, since the officer would be prevented from obtaining a specimen.

This provision should be upheld as an exception to the warrant requirement because the search is not an unreasonable one and because individuals are put on clear notice that they can expect some police intrusion under these specific circumstances.[1] This statute is far clearer

---

10. *Id.* at 121, 122 S.Ct. 587.

1. The specific circumstances we refer to occur when an individual with at least two prior intoxication offense convictions has already

than the judicially created exceptions to the warrant requirement, such as exigent circumstances, which is not objectively defined in a written statute. This provision was created legislatively and is codified in the Texas Transportation Code. Therefore, drivers are deemed to have knowledge of it and have notice that such a search is required under these specific circumstances. Although this is not exactly the same as a term of probation where the defendant is required to breathe into a device that measures blood alcohol content before starting his car, if the Legislature passed a statute requiring defendants to continue to use such a device after their probationary period expired, I would certainly think that would pass constitutional muster. The current situation is the same thing as requiring sex offenders to continue to register with the State long after their punishment or probation has expired. Here, we are essentially telling defendants that after their second conviction of driving while intoxicated, they must submit to a search, even without a warrant, if arrested for such an offense again.

Further, Section 724.012(b)(3)(B) is limited in scope, applying only to individuals with two prior convictions (not mere arrests) of driving while intoxicated. It is not an overreaching statute that is applicable to the average driver as it affects only the individuals who are repeat offenders and are well aware of the legal consequences of driving while intoxicated, but have been arrested for yet another intoxication offense. The State has a special interest in prosecuting these dangerous individuals in order to protect the public by keeping repeat offenders off the roads, and the Legislature enacted this provision to provide an exception to the warrant requirement in these instances where such a special danger is present.

been arrested on suspicion of a third intoxi-

Because I believe that it is clear that the Legislature wanted to create an exception to the requirement that a warrant be obtained before taking a specimen from an individual under arrest for driving while intoxicated in specific, limited circumstances, I disagree with the majority's conclusion. I would hold that Section 724.012(b)(3)(B) contains a constitutional exception to the warrant requirement and would overturn the decision of the court of appeals. Therefore, I respectfully dissent.

## OPINION

Per curiam.

Having granted the State's motion for rehearing in this case, and having considered its merits, we now conclude that the State's motion was improvidently granted. We deny the State's motion for rehearing. No further motions for rehearing will be entertained.

MEYERS, J., filed a concurring opinion.

RICHARDSON, J., filed a concurring opinion.

NEWELL, J., filed a concurring opinion.

KEASLER, J., filed a dissenting opinion in which HERVEY, J., joined.

YEARY, J., filed a dissenting opinion in which KELLER, P.J., joined.

## OPINION CONCURRING TO THE DENIAL OF STATE'S MOTION FOR REHEARING

MEYERS, J., filed a concurring opinion.

In the original opinion in this case, I had authored a dissent indicating that I thought the Legislature had created an exception to the warrant requirement with

cation offense.

Texas Transportation Code Section 724.012(b)(3)(B). While I do believe that is what the Legislature did in other sections of the mandatory-blood-draw statute, I no longer think that is what happened with the specific section we are examining, related to prior intoxication-offense convictions.

All the Legislature did in Section 724.012(b)(3)(B) was establish the criteria that it felt indicated that an individual was giving implied consent to or waiving his right to object to a warrantless blood draw. I now do not believe that the criteria outlined in the statute-two prior convictions of an intoxication offense-is sufficient to establish that there was a waiver or consent, absent any additional evidence showing the individual's consent to this particular blood draw.

When a defendant pleads guilty, we have well-established criteria and admonishments that the court must make in order for the defendant's waiver of a jury trial to be considered knowing and voluntary. It should not be different in such a significant way when an individual is waiving his right to refuse a bodily search or blood draw. Both are basic constitutional rights.

My analysis today differs somewhat from the original majority opinion in this case, which indicated that "a statute providing for irrevocable implied consent cannot supply the type of voluntary consent necessary to establish an exception to the Fourth Amendment requirement." I would point out that, unlike some of the cases the original majority examined, here, the Legislature provided for additional criteria that must exist before the blood draw is required. It is not a blanket provision that mandates blood draws be done across the board, on the sole basis that an individual was driving on the Texas roadways. Regardless, however, it is still not permissible for the statute to provide for an individual's knowing consent or waiver

based only on past convictions. You cannot make the presumption that a past intoxication offense indicates consent to an unwarranted blood draw.

For the foregoing reasons, I join the Court's opinion denying the State's motion for rehearing.

## CONCURRING OPINION

RICHARDSON, J., filed a concurring opinion.

I join in the Court's decision to deny the State's motion for rehearing. Last year, this Court was asked to decide whether the warrantless, nonconsensual drawing of blood from David Villarreal, arrested on suspicion of driving while intoxicated, conducted pursuant to the implied-consent (Section 724.011(a)) and mandatory-blood-draw (Section 724.012(b)) provisions in the Texas Transportation Code, violated the Fourth Amendment of the United States Constitution. The Court's 2014 opinion held that the drawing of Villarreal's blood, undertaken without a warrant, and in the absence of any applicable, recognized exception to the warrant requirement, was a search of his person in violation of the Fourth Amendment. *State v. Villarreal,* No. PD–0306–14, 475 S.W.3d 784, 2014 WL 6734178 (Tex.Crim.App.2014). I agree with that decision.

The warrantless search of a person is reasonable *only* if it falls within a recognized exception to the Fourth Amendment. *Missouri v. McNeely,* 133 S.Ct. 1552, 1558 (2013) (holding that the natural metabolization of alcohol in the bloodstream was not a per se exigent circumstance); *Riley v. California,* —— U.S. ——, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."); *Payton v. New York,* 445 U.S. 573, 586, 100

S.Ct. 1371, 63 L.Ed.2d 639 (1980) (Warrantless searches are presumptively unreasonable, and there are only a few carefully delineated exceptions to that basic presumption); *United States v. Leon,* 468 U.S. 897, 960–61, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (Stevens, J., concurring & dissenting) ("We have, of course, repeatedly held that warrantless searches are presumptively unreasonable, and that there are only a few carefully delineated exceptions to that basic presumption."). As recently as June of 2015, the Supreme Court held in *City of Los Angeles v. Patel,* 135 S.Ct. 2443 (2015), that

> [t]he Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It further provides that "no Warrants shall issue, but upon probable cause." Based on this constitutional text, the Court has repeatedly held that "searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant,* 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

Although *Patel* involved a facial challenge to a City of Los Angeles municipal ordinance, the opinion makes it clear that a statute cannot give validity to searches and seizures that fall outside of the Fourth Amendment or a recognized exception thereto. Because it is clear that the warrantless blood draw in this case does not fall within a recognized exception to the warrant requirement, I do not believe that this Court has the ability to find such a search valid based solely on the theory that it was reasonable because Villarreal was a repeat DWI offender.

In this case, Officer Williams noted in his report that he did not rely on any exception to the warrant requirement to justify the warrantless blood draw, but instead stated that he was "invoking [his] authority under [Texas Transportation Code], Section 724.012(b), to require the suspect to submit to the taking of a specimen of the suspect's blood." *State v. Villarreal,* No. PD–0306–14, 475 S.W.3d 784, 788, 2014 WL 6734178, at *2 (Tex.Crim. App.2014). In our 2014 *Villarreal* opinion, the Court discussed each recognized exception to the warrant requirement and evaluated whether the facts of this case fit under any one of them. They don't. The Supreme Court does not recognize a defendant's status as a repeat DWI offender as constituting a separate exception to the warrant requirement or as falling within one of the already recognized exceptions to the warrant requirement.

It is without question that the needs of law enforcement in putting a stop to repeated instances of drunk driving are certainly compelling. It makes sense that when a repeat DWI offender, such as David Villarreal, is once again arrested on suspicion of driving while intoxicated, he *should* have a significantly lessened expectation of privacy that would make a warrantless blood draw, under those circumstances, a reasonable search of his person. However, that is not the law. And, irrespective of whether I believe that such warrantless search certainly seemed reasonable under those circumstances, since it does not fall within an exception recognized by the Supreme Court, it was an unlawful search.

Therefore, I do not believe that our Legislature has created in Section 724.012(b)(3)(B), or even *could* create, a statutory exception to the Fourth Amendment's warrant requirement. I join the majority because I believe this Court's

2014 decision properly follows Supreme Court precedent.

## CONCURRING OPINION

·. NEWELL, J. filed a concurring opinion.

In any case involving the Fourth Amendment, I believe the exceptions to the warrant requirement should be carefully considered and only extended based on a proper reasonableness analysis. And if we are to recognize a new exception to the warrant requirement, we should not employ a totality-of-the-exceptions approach that picks among the desired qualities of established exceptions while discarding the rationales that justify those exceptions. Instead, we should employ a proper Fourth Amendment balancing test that weighs the State's interest in the detection and prevention of crime against an individual's privacy interest in his own blood. As the original majority opinion correctly holds, under a proper Fourth Amendment balancing test, a *per se* warrantless blood draw is not permissible based upon the criminal status of the subject and the dissipation of alcohol from his bloodstream.[1] This is why I join the order dismissing the State's motion for rehearing as improvidently granted and agree with the original majority opinion.

Fourth Amendment analysis of warrantless searches rests heavily on a simple notion: "It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established

and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).[2] These exceptions have been established by engaging in a balancing test in which legitimate government interests are weighed against the individual's expectation of privacy. *See, e.g. Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex.Crim.App.2007). However, the United States Supreme Court, in conducting that inquiry, has repeatedly cautioned that "[t]here is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." *Ker v. California*, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (plurality opinion) (citations and quotations omitted).

### Per Se Rules Are Strongly Disfavored Under the Fourth Amendment

As the United States Supreme Court has repeatedly realized, *per se* rules are incompatible with the Fourth Amendment's protection and respect for an individual's right to be free from unreasonable searches. *United States v. Drayton*, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ("[F]or the most part *per se* rules are inappropriate in the Fourth Amendment context."); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (expressly disavowing any "litmus-paper test" or single "sentence or ... paragraph ... rule," in recognition of the "endless variations in the facts and circumstances" implicating the Fourth Amendment); *Michigan v. Chesternut*, 486 U.S. 567, 572–573, 108 S.Ct. 1975, 100 L.Ed.2d

---

1. It is worth noting that no member of this Court appears to argue that the warrantless search for and seizure of blood in this case was justified under an established exception to the warrant requirement. Rather, the proponents of the search and seizure in this case seem to rely upon the general Fourth amendment balancing test to recognize a new exception to the search warrant requirement, or

perhaps an extension of the existing exigent-circumstances exception.

2. Established exceptions to the warrant requirement include the consent exception, the exigent-circumstances exception, the automobile exception, the search-incident-to-arrest exception, and the special-needs doctrine.

565 (1988) (rejecting bright-line rule urged by the parties as contrary to the "traditional contextual approach"); *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (rejecting a *per se* rule adopted by the Florida Supreme Court). "While the desire for a bright-line rule is understandable, the Fourth Amendment [does] not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Missouri v. McNeely*, 133 S.Ct. 1552, 1564 (2013) (plurality op.).

In *Missouri v. McNeely*, the Supreme Court reiterated its rejection of *per se* rules in the context of the warrantless search and seizure of blood by declining to recognize a *per se* exigency claim based upon the destruction of alcohol evidence in a DWI defendant's bloodstream. 133 S.Ct. at 1563 ("In short, while the natural dissipation of alcohol may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically."). The Court had granted review to resolve a split of authority on the question of whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations. *McNeely*, 133 S.Ct. at 1558. The Court rejected this *per se* exigency claim, not only on the basis of its own history of disinclination towards *per se* rules, but also because the record failed to establish any exigency beyond the dissipation of alcohol attendant to any DWI case. *Id.* at 1567.

A plurality of the Court expressed its concern that a *per se* rule that "categorically authorizes warrantless blood draws" on a particular basis would "discourage efforts to expedite the warrant process." *Id.* at 1563. Leading the plurality, Justice Sotomayor observed that "the Fourth Amendment [does] not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Id.* at 1564. And the plurality opinion pointed to widespread state statutory restrictions upon nonconsensual blood testing without a warrant as support for the proposition that compelled blood draws implicate a significant privacy interest. *Id.* at 1567.

Justice Kennedy did not join this portion of the Supreme Court's opinion, writing instead to note the limited nature of the Court's holding. He observed that states and other governmental entities that enforce driving laws can adopt rules, procedures, and protocols that meet the reasonableness requirements of the Fourth Amendment and give helpful guidance to law enforcement officials. *Id.* at 1569 (Kennedy, J. concurring). Of course, he gave no hint as to what such rules, procedures, or protocols might be.[3] And, he did not join the concurring and dissenting opinion authored by Chief Justice Roberts, which proposed a bright-line rule based upon the exigency attendant to the natural dissipation of alcohol and a showing that there was no time to secure a search warrant. *Id.* at 1568. At most, Justice Kennedy agreed with eight other members of

---

**3.** This is hardly an earth-shattering observation on the part of Justice Kennedy that states or governmental entities can pass laws consistent with the Fourth Amendment. We have recognized as much in other contexts. *See e.g. Hudson v. State*, 662 S.W.2d 957, 960 (Tex.Crim.App.1984) (noting that article 15.25 of the Code of Criminal Procedure must be interpreted consistently with the Supreme Court rulings on the Fourth Amendment). But I do not read into Justice Kennedy's explicit refusal to reach the issue any implication that he would decide the issue in a particular way (much less his approval of the Texas statute at issue in this case).

the Court that the natural elimination of alcohol from a suspect's bloodstream was an exigent circumstance, but that circumstance alone did not justify a *per se* rule dispensing with the warrant requirement itself. *Id.* at 1569.

### The Warrant Requirement and its Exceptions

Given the constitutional antipathy for *per se* rules and the affinity for a proper balancing test of the interests involved, I agree with the original majority opinion that Texas Transportation Code § 724.012(b)(3)(B) does not create a *per se* rule that a minimum number of prior offenses justifies a warrantless blood draw when coupled with the natural dissipation of alcohol in a suspect's blood stream. The Fourth Amendment requirement that a search warrant be secured from a neutral magistrate before carrying out a search is not officious formalism. As the Supreme Court explained in *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948):

> The point of the Fourth Amendment ... is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime ... is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

The mere fact that the warrant may seem like an unnecessary, additional step does not sufficiently justify abandoning the constitutional safeguard of a prior determination of probable cause by a neutral magistrate. It is a requirement subject only to certain, well-establish exceptions.

To be clear, these exceptions are established independent of one another. We should not craft an entirely new exception by mashing up all the existing exceptions and picking and choosing from their most attractive qualities. Each exception to the warrant requirement has an individual rationale behind it. Searches incident to arrest are justified based on the interest of officer safety, the prevention of escape, and the destruction of evidence. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The automobile exception was established because historically there is a lower expectation of privacy in the interior of motor vehicles as well as an inherent exigency in the automobile's mobility. *See Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The exigent circumstances exception concerns the imminent destruction of evidence and the inability of law enforcement to obtain a warrant. *See McNeely*, 133 S.Ct. at 1558–559 (listing variety of circumstances giving rise to exigency, but noting that, under each type of circumstance, a warrantless search is justified because there is a compelling need for official action and no time to secure a warrant).

All of these exceptions involve varying government interests and differing levels of privacy interests. Yet, none of the exceptions to the warrant requirement are interchangeable in their basic principles. Therefore, we should not sanction a rule in which an impermissible warrantless search that cannot satisfy the automobile exception,[4] the search-incident-to-arrest exception,[5] the exigent-circumstances exception,[6] or the hot-pursuit exception[7] somehow equals a permissible warrantless search when all those exceptions are added together because the defendant has a minimum number of DWI offenses and the alcohol in his blood is naturally dissipating. This unprecedented totality-of-the-exceptions approach adds zeros to create one, ignoring that the exceptions to the Fourth Amendment warrant requirement "have been jealously and carefully drawn." *Hudson v. State*, 588 S.W.2d 348, 351 (Tex. Crim.App.1979) (quoting *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958)). We cannot Frankenstein them into an entirely new exception that would consume its predecessors.

In other words, although a balancing approach to Fourth Amendment analysis is permitted, it should not be at the sacrifice of other carefully delineated exceptions to the warrant requirement or the warrant requirement itself lest the balancing-test exception swallow the whole rule. Instead, it is in keeping with the notion that a search is presumptively valid with a warrant even though there are certain circumstances, particularly where legitimate government interests abound, when an exception may validate a search done without a warrant. *See New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) ("The determination of the standard of reasonableness *governing any specific class of searches* requires balancing the need to search against the invasion which the search entails.") (emphasis added). As the original majority opinion correctly notes, the Supreme Court has recently made very clear that, "in the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley*, 134 S.Ct. at 2482; *McNeely*, 133 S.Ct. at 1558 ("[A] search of a person is reasonable only if it falls within a recognized exception [to the warrant requirement]"); *see also Kentucky v. King*, 563 U.S. 452, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) (noting that a warrant must generally be secured subject to certain reasonable exceptions). I join the majority in returning to our original opinion in this case because I cannot support the creation of a new exception to the warrant requirement where the search at issue is not supported by any of the rationales underlying the carefully delineated exceptions to the warrant requirement set out by the Supreme Court.

## Appellee's Privacy Interest Is Not Diminished

The individual's right to be free from an "invasion of bodily integrity" is obvious and substantial. *McNeely*, 133 S.Ct. at 1558. Just as no one can deny that drunk driving is a scourge upon our roadways, nor can they deny the fact that the government's intrusions beyond the body's surface "implicate most personal and deep-rooted expectations of privacy." *McNeely*, 133 S.Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)). The Supreme Court made clear in *Schmerber v. California*, that the Fourth Amendment forbids any

---

4. *Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).

5. *Riley v. California*, 134 S.Ct. 2473 (2014).

6. *McNeely*, 133 S.Ct. at 1566.

7. *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

such intrusions "on the mere chance that desired evidence might be obtained." 384 U.S. 757, 769–70, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Under the plain text of the Fourth Amendment, a person's right to be free from a search of his or her body is "first among equals." U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

Villarreal's "privacy interest in preventing an agent of the government from piercing his skin," cannot be minimized to that of a probationer or parolee based on the fact that he has prior offenses. *McNeely*, 133 S.Ct. at 1565. As we correctly noted in our original opinion, parolees are in the legal custody of the State and, therefore, cannot enjoy the privacy rights of a general citizen. One's status as a probationer or parolee is "salient" and, by virtue of that status, neither "enjoy[s] the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)); *see also Samson v. California*, 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). The Supreme Court has noted that both parolees and probationers are on the "continuum" of state-imposed punishments thereby allowing for diminished privacy rights much like a prisoner has. *Samson*, 547 U.S. at 850, 126 S.Ct. 2193. Additionally, while recidivism is certainly the State's concern in the context of probationers and parol-

ees, so too is rehabilitation.[8] Thus, diminished privacy rights are justifiable given the interest in providing "restrictions … meant to assure that the probation serves as a period of genuine rehabilitation." *Griffin*, 483 U.S. at 875, 107 S.Ct. 3164; *see also Knights*, 534 U.S. at 119, 122 S.Ct. 587; *see also Samson*, 547 U.S. at 853, 126 S.Ct. 2193.

The circumstances that justify a diminished privacy right in probationers and parolees are not present in cases that involve repeat offenders like Villarreal. Repeat offenders are not part of that punishment continuum expressed in *Samson* nor are they subject to the same restrictions placed on prisoners, parolees or probationers. There is no supervisory or custodial relationship between the State and a person with prior convictions. *See also Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (noting the legal and supervisory relationship between the student at the State and comparing it to that of probationers before explaining the student's diminished expectation of privacy). As such, they have the same privacy interest in their bodily integrity as any other person. Notably, the Supreme Court appears to agree given that it has not considered a defendant's status as a repeat offender (as opposed to the nature and circumstances of the offense) when determining the extent of his privacy rights under a Fourth Amendment balancing test. *See e.g., McNeely*, 133 S.Ct. at 1557, n. 1; *Welsh v. Wisconsin*, 466 U.S. 740, 746, n. 6, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Riley v. California*, 134 S.Ct. 2473, 2482 (2014).

The concern over recidivism is also no justification for a holding that a minimum number of prior offenses is sufficient, on

---

**8.** Labeling such drivers "incorrigible" seems to make this point clear. By definition, incorrigible means "Incapable of being corrected, reformed, amended, or improved." BLACK'S LAW DICTIONARY (6th ed.1991).

its own, to justify a warrantless blood draw. Although I acknowledge the recidivism rate of repeat offenders such as Villarreal and others like him, nothing in our jurisprudence allows for the likelihood of one's relapse into a life of criminal activity to dictate whether they are subject to the protections of the Fourth Amendment. Instead, this consideration has its proper place, if anywhere, in the totality of the circumstances analysis. *Knights*, 534 U.S. at 118, 120, 122 S.Ct. 587 (When considering the "totality of the circumstances" to decide whether the warrantless search of a probationer's apartment violated the Constitution, the Supreme Court, among other things, took into account the high recidivism rate of probationers.).

Accepting the notion that recidivism justifies *per se* warrantless searches would have far-reaching effects as well as unintended consequences. For example, it is reasonable to believe that repeat offenders of sexual assaults are at high risk of re-offending. Does this recidivist threat justify conducting a warrantless search of an offender's home whenever an officer feels he has probable cause that a crime has been committed?[9] Does the passage of time help the recidivist regain his or her expectation of privacy? Moreover, I do not see how this recidivism theory is limited to a showing of two prior DWI convictions when it rests upon statistics regarding the likelihood that a person who belongs to a particular class would commit a crime in the future. If the legislature can designate one class of person as deserving of less privacy based upon a statistical likelihood to commit a crime, what

is to stop them from designating other classes of individuals worthy of a warrantless search based upon a statistical propensity for violence? In my view, it is more prudent to interpret the holdings in *Knights* and *Samson* consistently with the rationales that justified the searches at issue in those cases in light of these considerations.

Even though the Supreme Court has recognized the seriousness of an offense as an exigent circumstance worthy of consideration under a totality-of-the-circumstances analysis, it has refused to convert that exigent circumstance into a *per se* rule justifying a warrantless search. In *Welsh v. Wisconsin*, the Supreme Court considered the nature of the underlying offense to be "an important factor to be considered." 466 U.S. 740, 751, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). It did so, however, in the context of the "exigent-circumstances calculus." *Id.* And then, even in that context, the Court made clear that "no exigency is created simply because there is probable cause to believe that a serious crime has been committed." *Id.* at 753, 104 S.Ct. 2091. Nothing in *Welsh* suggests or even implies that a more "serious" offense validates a *per se* exception to the warrant requirement. To the contrary, the Court made clear that its skepticism regarding whether a "minor offense" would ever be a factor in the exigent-circumstances calculus should not be construed as an endorsement a *per se* exigency rule where a "serious crime" is involved. Rather than imply a new exception to a warrantless search, the Court

---

9. Certainly, probable cause could be used to obtain a warrant but merely the existence of prior convictions would not, on its own, support a warrantless search under one of the exceptions to the warrant requirement. *See Parker v. State*, 206 S.W.3d 593, 597 (Tex. Crim.App.2006) (noting that there are two hurdles an officer must pass to justify warrantless entry into the home. "Probable cause ... is the first hurdle ... [t]he second hurdle is that exigent circumstances ... must also exist. If either probable cause or exigent circumstances are not established, a warrantless entry [into the home] will not pass muster under the Fourth Amendment.").

limited *Welsh* to a traditional, exigent-circumstances analysis. And reading *Welsh* as elevating the gravity of the offense to a singularly determinative factor would be inconsistent with subsequent opinions by the Supreme Court admonishing lower courts for reading *Welsh* "far too broadly" and restating that its opinion went to a much more limited point that "warrantless entry to arrest a misdemeanant ... should be rare." *Stanton v. Sims,* —— U.S. ——, 134 S.Ct. 3, 6–7, 187 L.Ed.2d 341 (2013) (citing *Welsh,* 466 U.S. at 753, 104 S.Ct. 2091); *see also Illinois v. McArthur,* 531 U.S. 326, 336, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (refusing to consider the underlying offense as an important factor given that the case involved temporary restriction outside the home, rather than warrantless entry into the home like in *Welsh* ).

Furthermore, *Maryland v. King* does not support the claim that the defendant lacks a sufficient expectation of privacy in his body because of his arrest for a "serious" offense.[10] In *King,* the Court considered the buccal swab procedure in the context of a search incident to an arrest during the "routine administrative procedure[s] at a police station house incident to booking and jailing the suspect." *Maryland v. King,* 133 S.Ct. 1958, 1971 (2013). According to the Court, taking and analyzing a cheek swab of the arrestee's DNA was a legitimate police booking procedure that is reasonable under the Fourth Amendment. *Id.* at 1980. But the Court took care to note that "[a] buccal swab is a far more gentle process than a venipuncture to draw blood" was of "central relevance to determining reasonableness." *Id.* at 1969. The Court made a conscious effort to create a wall between its analysis of the facts in *King* and how it had determined the reasonableness of the warrantless blood draw in *McNeely* only two months earlier.

This becomes even more clear when considering the government interest at play in *King,* which the Court described as the "need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody," rather than the gathering of evidence for future prosecution. *Id.* at 1970. The purpose of the buccal swab was not investigation; the government simply needed to ensure a "more accurate form of identifying arrestees" that allowed officers to know who they had in their jails. *Id.* at 1976; *see also id.* at 1980 (J. Scalia, dissenting) ("Whenever this Court has allowed a suspicionless search, it has insisted upon a justifying motive apart from the investigation of crime.").[11] This

---

**10.** The Supreme Court does note in *King* that the arrestee subject to the buccal swab search is necessarily in valid police custody "for a serious offense supported by probable cause." *Maryland v. King,* 133 S.Ct. 1958, 1970 (2013). However, the Court also makes clear that its concern with the severity of the offense derives from the nature of the crime itself, not the status of the offender. *Id.* at 1973 (noting that the determination of bail is contingent upon "the nature and the circumstances of the offense charged"). And the Court provides links to studies that identify "preventable" felony offenses, none of which identify felony DWI as the type of "serious" offense preventable by the type of search at issue. *Id.* (citing to several studies that iden-

tify murder, rape, aggravated robbery, burglary, aggravated kidnapping, felony assault, robbery, and sexual assault as the serious offenses that could be prevented through the use of buccal swab identification procedures). I remain unpersuaded that the reference to a "serious offense" in *King* includes felony DWI.

**11.** It is also worth noting that the majority in *King* recognized to potential for prompt DNA testing to exonerate the wrongfully imprisoned and speed up the apprehension of criminals before they commit additional crimes. 133 S.Ct. at 1974. The warrantless blood-draw in a DWI case does not carry a similar potential.

interest, compared with the minimal invasion of individual privacy rights at issue in *King*, led to the conclusion that a buccal swab during the booking process was a reasonable search. *Id.* at 1980.

But seizure of the felony DWI defendant's blood serves no interest in identification or officer safety. Instead, the purpose of the blood draw is to engage in further investigation for the most accurate evidence of intoxication possible. Given the Supreme Court's deliberate avoidance of using investigation as a justification for even the most minimal of bodily searches in *King*, we should not read *King* to justify a warrantless blood draw for purely investigative purposes. Like the majority in our original opinion, I can find no rationale for extending *King* beyond the facts of that case and certainly not to the extent that it supports a warrantless blood draw based solely on the driver's criminal record.

### The State's Interest in Blood Alcohol Concentration Amounts to a General Interest in Crime Control

The government's interest in protecting the public from the dangers of drunk driving is compelling, and I do not question the legitimacy of this interest. In *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court noted this compelling state interest when upholding the constitutionality of DWI checkpoints. And the Court also based its decision in *Sitz* upon the existence of both objective standards and a showing that the checkpoints themselves effectively made the roads safer because they resulted in DWI arrests. *Id.* at 454–55, 110 S.Ct. 2481.

But the Supreme Court relied upon a governmental interest apart from the investigation of crime in *Sitz*. That is why the Court later refused to expand *Sitz* to include drug-interdiction checkpoints be-cause the primary purpose of those checkpoints was a "general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 44, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Notably, the Court recognized that the State's interest in stopping the trafficking of illegal narcotics was great, but it nevertheless did not find the type of close connection between the State's need to detect and prevent crime and use of the checkpoint to do so as it did in *Sitz*. *Id.* at 44–45, 121 S.Ct. 447.

The Court took this analysis a step further in *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). There, the Medical University of South Carolina instituted a policy whereby pregnant mothers would be screened for cocaine use and required any mother who tested positive to comply with a substance abuse treatment program under threat of arrest. *Id.* at 72–73, 121 S.Ct. 1281. In holding that this program violated the Fourth Amendment, the Court focused upon the nature of the "special need" asserted as a justification for the warrantless search. *Id.* at 79, 121 S.Ct. 1281. According to the Court, "the 'special need' that was advanced as a justification for the absence of a warrant or individualized suspicion was one divorced from the State's general interest in law enforcement." *Id.* The Court acknowledged that the ultimate goal of the program, protecting the health of both mother and child, was a beneficent one, but still held that the purpose actually served by the search was indistinguishable from a general interest in crime control. *Id.* at 81, 121 S.Ct. 1281.

Notably, Justice Kennedy concurred to observe that the "special needs" cases had always turned upon the "ultimate goal" of the search and seizure at issue rather than the "immediate purpose" declared by the majority. *Id.* at 87, 121 S.Ct. 1281 (Kennedy, J. concurring) (referencing *Skinner*

v. *Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) as one example of a "special needs" case). Yet, he also acknowledged that in those cases, "[t]he traditional warrant and probable-cause requirements are waived ... on the explicit assumption that the evidence obtained in the search was not intended to be used for law enforcement purposes." *Id.* While Justice Kennedy recognized that the hospital may have had a legitimate need unrelated to law enforcement, the program had "a penal character with a far greater connection to law enforcement than other searches sustained under our special needs rationale." *Id.* at 89, 121 S.Ct. 1281. I see the same issue with the warrantless collection of blood alcohol evidence in recidivist DWI cases; there is certainly a connection between blood alcohol levels and roadway safety, but the State's interest in blood alcohol evidence, at least under current Texas law, does not advance the State's need to detect and prevent crime for the safety of those on the roadway beyond a general interest in crime control.

Under Texas law, evidence of blood alcohol concentration is not necessary to arrest or even convict a DWI driver, even one charged with felony DWI. Blood alcohol concentration is one way of proving intoxication, and a higher alcohol concentration enhances a sentence from a Class B misdemeanor to a Class A misdemeanor. Tex. Penal Code Ann. § 49.01(1) (West 2013); Tex. Penal Code Ann. § 49.04 (West 2013). But the State can also prove intoxication by showing a particular concentration of alcohol in a driver's breath and urine or even without any showing of any particular alcohol concentration whatsoever. Tex. Penal Code Ann. § 49.01(2) (West 2013). Police officers can certainly arrest a suspect without a warrant when they have probable cause to believe that person has committed the offense of driving while intoxicated, but their ability to do so is not tied to either a showing of a particular blood alcohol concentration or the driver's status as a repeat offender. Tex. Code Crim. Proc. Ann. art. 14.03 (West 2013); *Miles v. State*, 241 S.W.3d 28, 41 (Tex. Crim.App.2007) (noting that driving while intoxicated is an offense against the public peace).

The statutory provisions related to license suspension place some reliance upon blood alcohol concentration (as well as breath-alcohol concentration), but they are also not dependent upon that evidence to suspend even a recidivist DWI offender's driver's license. A DWI offender, even one who commits a felony DWI, can have his license suspended regardless of whether he provides or refuses to provide a specimen of blood. Tex. Transp. Code Ann. § 524.011 (West 2013) (setting out officer's duty to take possession of an arrestee's driver's license upon an analysis of either a breath or blood specimen showing an alcohol concentration over the legal limit); Tex. Transp. Code Ann. § 724.032 (West 2013) (setting out officer's duty to take possession of an arrestee's driver's license upon a driver's refusal to provide a requested specimen for alcohol concentration testing). Significantly, an arresting officer must still give a temporary driver's license to the arrested DWI driver, even a repeat offender, until the Texas Department of Public Safety suspends the driver's license after receiving a report from the arresting officer regarding the results of the analysis of the breath or blood specimen. Tex. Transp. Code Ann. § 524.012 (West 2013). The same requirements exist when a person refuses to submit to the taking of a specimen. Tex. Transp. Code Ann. § 724.032 (West 2013). While the periods of these suspensions are increased if the driver has previously had his or her driver's license suspended, the suspension periods are not dependent upon a showing of a particular blood alcohol concentration.

TEX. TRANSP. CODE ANN. § 524.022 (West 2013): TEX. TRANSP. CODE ANN. § 724.035 (West 2013).

The conditions of pre-trial release and post-conviction probation place are equally independent of any showing of blood alcohol concentration. A defendant charged with a Class A misdemeanor DWI or above is required to get an ignition interlock device installed upon his or her car as a condition of bail regardless of whether there is evidence of a particular blood alcohol concentration. TEX. CODE CRIM. PROC. ANN. art 17.441 (West 2013). After conviction, a defendant placed on community supervision may be required to have an ignition interlock device installed on his or her vehicle in an ordinary DWI case, but the installation is mandatory if he or she has been convicted of felony DWI regardless of any showing of a particular blood alcohol concentration. TEX. CODE CRIM. PROC. ANN. art. 42.12 sec. 13(I) (West 2013). A trial court is also required to order installation of an ignition interlock device if it is shown at trial that the defendant had an alcohol concentration of 0.15 or more, but a showing of blood alcohol concentration is not required. *Id.* The period of installation is not extended based upon the defendant's status or a showing of a particular blood alcohol concentration. *Id.* And jail time required as a condition of probation for felony DWI defendants is not contingent (or extended) upon a showing of a defendant's blood alcohol concentration. TEX. CODE CRIM. PROC. ANN. art. 42.12 sec. 13(a)(1) (West 2013).

These provisions reveal a scheme designed to secure useful, even compelling evidence for trial rather than to detect intoxicated drivers through blood testing in order to prevent drunk driving accidents. Unlike the sobriety check points in *Sitz,* the governmental intrusion at issue in this case—the warrantless seizure of blood—does not further the State's compelling interest in getting drunk drivers off the road before they cause an accident beyond a general interest in law enforcement. Moreover, the seizure of this blood alcohol concentration evidence has no more impact upon the felony DWI defendant than it does a misdemeanor DWI defendant.

The State's interest in this case must be weighed in the context of the search at issue, namely the search for blood alcohol concentration evidence. *Vernonia School Dist.,* 515 U.S. at 661, 115 S.Ct. 2386 (explaining that a "compelling state interest" must be considered in light of the particular search at hand). To be constitutionally valid, the "primary purpose" of the warrantless search has to serve more than a general interest in crime control. *City of Los Angeles, Calif. v. Patel,* —— U.S. ——, 135 S.Ct. 2443, 2452, 192 L.Ed.2d 435 (2015). And while the State has a compelling interest in keeping the public safe from drunk drivers, the search for and seizure of blood alcohol evidence in this case merely furthers the State's general interest in crime control. *Ferguson,* 532 U.S. at 82–84, 121 S.Ct. 1281 ("While the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence *for law enforcement purposes* in order to reach that goal."); *see also Edmond,* 531 U.S. at 44, 121 S.Ct. 447. And to the extent that one would argue that *Skinner v. Railway Labor Executives' Assn.* supports the warrantless search in cases like the one before us, the Supreme Court has made clear that *Skinner* was justified upon a rationale beyond the normal need for law enforcement. *Skinner,* 489 U.S. at 620, 109 S.Ct. 1402. Like the majority in our original opinion in this case, I cannot apply these "special needs" cases to circumstances that do not

serve the underlying rationale that permitted the searches in those cases.

### Driving is not a "Closely Regulated Industry"

For similar reasons, I cannot agree that the search at issue in this case has all the hallmarks of an administrative search of a closely regulated industry, assuming that such searches are distinct from "special needs" searches. The Supreme Court has held that administrative searches by municipal health and safety inspectors require a search warrant even though the State has an interest in preventing the unintentional development of conditions which are hazardous to the public health and safety. *Camara v. Municipal Court and City and County of San Francisco*, 387 U.S. 523, 535–36, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). While the Court allowed for the need for inspectors to search a residence without a warrant to maintain code compliance, it nevertheless refused to sanction warrantless inspections unless the State could demonstrate that the warrant requirement would frustrate the State's regulatory goals. *Id.* at 533, 87 S.Ct. 1727. According to the Court, in the context of administrative searches, "the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Id.* (citing *Schmerber, supra*, 384 U.S. at 770–71, 86 S.Ct. 1826).

But the Supreme Court has allowed administrative inspections of a closely regulated industry. *New York v. Burger*, 482 U.S. 691, 702, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). Such searches are premised upon the theory that the owner or operator of a commercial premises in a "closely regulated" industry has a reduced expectation of privacy. *Id.* Moreover, such searches must meet three criteria: (1) a showing of a substantial governmental interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspection must be necessary to further the regulatory scheme; and (3) the certain and regular application of the inspection must provide a constitutionally adequate substitute for a warrant. *Id.* at 702–03, 107 S.Ct. 2636.

Here, the felony DWI defendant is not a part of a "closely regulated industry" by driving. So far, the Court has only recognized four industries that have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise. *Patel*, 135 S.Ct. at 2454 (observing that liquor sales, firearms dealing, mining, and running a junkyard are the only industries recognized by the Court as "closely regulated"). Driving is not one of them. And as discussed above, the felony DWI defendant does not have a lessened expectation of privacy by virtue of his status, so any analogy between a citizen driver to a private business owner of a closely regulated industry necessarily fails at the outset.

Even assuming that the analogy is viable, the search at issue in this case is not necessary to further the regulatory scheme. As discussed above, none of the regulations attendant to multiple DWI convictions are tied to the blood test results themselves. And, as with the "special needs" cases, the search at issue only furthers the State's general interest in crime control rather than some interest in licensing drivers. Suggesting that the search in this case has all the hallmarks of an administrative search is like saying an elephant seal has all the hallmarks of an elephant.

**Like _McNeely,_ This Opinion is Narrow**

Despite all the gnashing of teeth and rending of garments that may follow this Court's adherence to its original majority opinion, it is important to note the limited nature of the holding. We did not hold that police could never obtain blood alcohol evidence from DWI defendants, even the most incorrigible ones. Neither did we hold that police must always secure a search warrant to do so. We simply held that the status of a driver suspected of driving while intoxicated coupled with the natural dissipation of alcohol from his blood does not, by itself, justify a warrantless search and seizure. Like the Supreme Court in _McNeely,_ we did not foreclose the possibility that a warrantless search and seizure of a felony DWI driver's blood could be justified upon a showing of exigent circumstances, or another exception to the warrant requirement. But the State has not made such a showing in this case. It simply pointed to the statute, just as the State did in _McNeely._

I join the majority's order dismissing the State's motion for rehearing as improvidently granted. And I agree with the original majority opinion because I cannot support a holding that a felony DWI defendant has a greater expectation of privacy in the contents of his cell phone than his own blood. With these thoughts, I concur.

### DISSENTING OPINION

KEASLER, J., filed a dissenting opinion, in which HERVEY, J., joined.

After exhibiting clear indications of intoxication during a routine traffic stop, David Villarreal was escorted to a hospital, and his blood was drawn pursuant to a Texas statute requiring such searches of drivers with two or more prior driving-while-intoxicated (DWI) convictions. The judge suppressed the results of the blood draw as a Fourth Amendment violation, and we affirmed.[1] Properly weighing the circumstances of this particular case and the underlying interests at play, I dissent from this Court withdrawing its order granting the State's motion for rehearing. Instead, I would withdraw our prior opinion and hold the search reasonable.

### I. Facts and Procedural History

On the night of March 31, 2012, Corpus Christi police stopped David Villarreal's vehicle. The police suspected that Villarreal was intoxicated, and an officer from the department's DWI unit—trained and certified in field-sobriety tests—was called to the scene. In the course of the traffic stop, Villarreal exhibited several signs of intoxication, including red and watery eyes, slurred speech, and swaying. Villarreal refused the officer's request to undergo a standardized field-sobriety test. Based on his own observations and those provided to him by the patrolman who initially stopped Villarreal, the officer then arrested Villarreal for DWI, handcuffed him, and read him his _Miranda_ rights. When the officer read the statutory warning requesting a blood sample, Villarreal refused. But after searching Villarreal's criminal history, the officer learned that Villarreal had eight previous DWI arrests and three prior DWI convictions. On the basis of those prior convictions, the officer escorted Villarreal to a nearby hospital where his blood was drawn by a qualified technician.

The officer obtained neither Villarreal's affirmative consent to the blood draw nor a court-ordered search warrant authorizing it. The officers ordered the blood draw

---

1. _State v. Villarreal,_ No. PD–0306–14, 475 S.W.3d 784, 2014 WL 6734178 (Tex.Crim. App. Nov. 26, 2014).

pursuant to a provision of the Texas Transportation Code that mandates blood draws of drivers arrested for DWI with at least two prior DWI convictions.[2] The blood draw revealed a blood-alcohol concentration (BAC) level of 0.16, twice the statutory 0.08 level sufficient to qualify as "intoxicated."[3]

Based on his three prior DWI convictions, Villarreal was indicted for felony DWI.[4] Villarreal moved to suppress the results of the warrantless, non-consensual blood draw under the Fourth Amendment and the Supreme Court's recent decision in *Missouri v. McNeely*.[5] At the suppression hearing, the arresting officer conceded that there were no exigent circumstances and that he could have obtained a warrant for the blood draw, but argued that he did not have to because of the Texas Transportation Code's relevant provision. The judge granted Villarreal's motion, suppressed the blood-draw results, and denied the State's motion to reconsider. When the State filed an interlocutory appeal challenging the trial court's rulings, the court of appeals affirmed.[6]

## II. Analysis

Statutes like the Transportation Code's mandatory blood-draw provisions "are presumed to be constitutional until it is determined otherwise."[7] Nevertheless, the Supreme Court's recent holding in *Missouri v. McNeely* has sparked a renewed debate as to how the Fourth Amendment operates in DWI cases. The Fourth Amendment secures the people "in their persons, houses, papers, and effects" from "unreasonable searches and seizures."[8] The amendment itself can be broken into two clauses: (1) the Reasonableness Clause and (2) the Warrants Clause.[9] Although a properly obtained warrant is often the surest way to prevent evidence from later being excluded at trial,[10] it is not the only constitutionally valid method of obtaining evidence.

While a search pursuant to warrant supported by probable cause and issued by a neutral magistrate will generally be presumed reasonable,[11] a warrantless search can also be reasonable if it falls within "a few specifically established and well-delineated exceptions."[12] The State, however, bears the burden of establishing that the search falls under one of these exceptions.[13] Although the Supreme Court has recognized several of these discrete exceptions to the general warrant requirement—including exigent circumstances—these exceptions are merely applications of the Fourth Amendment's general reasonableness standard.[14] Therefore, the "touchstone of the Fourth Amendment is

2. *See* Tex. Transp. Code § 724.012(b)(3)(B).

3. *See* Tex. Penal Code § 49.01(2)(B).

4. *See id.* at §§ 49.04, 49.09(b).

5. —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013).

6. *State v. Villarreal*, No. 13–13–00253–CR, 476 S.W.3d 45, 61, 2014 WL 1257150, at *11, 2014 Tex.App. LEXIS 645, at *34 (Tex.App.– Corpus Christi Jan. 23, 2014, pet. granted).

7. *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex.Crim.App.2009).

8. U.S. Const. amend. IV.

9. *See id.*

10. *See Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

11. *See United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

12. *United States v. Robinson*, 414 U.S. 218, 242, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

13. *Id.* at 243, 94 S.Ct. 467.

14. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ("[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable.").

reasonableness, not individualized suspicion."[15] And reasonableness is determined in relation to both the search's "scope and manner of execution."[16]

When evaluating the "traditional standards of reasonableness," we balance the degree to which the search "intrudes upon an individual's privacy" against the degree to which it "is needed for the promotion of legitimate governmental interests."[17] However, the relevant state interest is not a "fixed, minimum quantum of governmental concern."[18] Instead, it is an "interest that appears important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy."[19]

## A. The Transportation Code does not create a per se exigency exception to the Fourth Amendment and the State has failed to establish exigency in this case.

In *Missouri v. McNeely*, the Supreme Court held that the "natural metabolization of alcohol in the bloodstream" does not present a "per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving

cases."[20] After a police officer observed a truck speeding and crossing the center line, he stopped the truck and noticed that its driver—McNeely—exhibited several signs of intoxication: bloodshot eyes, slurred speech, and the smell of alcohol on his breath.[21] McNeely admitted to the officer that he had been drinking and later performed poorly on a battery of field-sobriety tests.[22] When McNeely refused to allow the officer to measure his BAC level with a portable breath-test device, the officer drove McNeely to a nearby hospital so that his blood could be tested.[23] The test revealed a BAC level of 0.154, significantly above the legal limit of 0.08.[24] At no point did either McNeely affirmatively consent to the blood test or the officer obtain a warrant for the blood test.[25]

When McNeely moved to suppress the results of the blood test under the Fourth Amendment, the prosecution argued that the "natural dissipation of alcohol in the bloodstream" created a per se exigency under the Fourth Amendment.[26] In effect, the prosecution wagered everything on dissipation alone. The Supreme Court rejected that per se approach to the exigency exception, opting instead for a "totality of the circumstances" approach, which the

15. *Samson v. California*, 547 U.S. 843, 855 n. 4, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006).

16. *Maryland v. King*, —— U.S. ——, 133 S.Ct. 1958, 1970, 186 L.Ed.2d 1 (2013) ("Urgent government interests are not a license for indiscriminate police behavior."). *See also Schmerber v. California*, 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ("[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner.").

17. *Wyoming v. Houghton*, 526 U.S. 295, 299–300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).

18. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

19. *Id.*

20. *McNeely*, 133 S.Ct. at 1556.

21. *Id.*

22. *Id.* at 1556–57.

23. *Id.* at 1557.

24. *Id.*

25. *Id.*

26. *Id.* at 1558.

Court explained was the approach that it applied earlier in *Schmerber v. California*.[27] It noted that, in *Schmerber*, it had cited the dissipation of alcohol in the bloodstream only in conjunction with the "special facts" of the required hospitalization of the accused and investigation of the crime scene, which meant that "there was no time to seek out a magistrate and secure a warrant."[28] The Court further noted the advances that had occurred "in the 47 years since *Schmerber* was decided that allow for the more expeditious processing of warrant applications, particularly in contexts like drunk-driving investigations where the evidence offered to establish probable cause is simple."[29] But the Court warned that such advances did not foreclose all claims of exigency.[30]

Although the Supreme Court's holding in *McNeely* might appear at first glance to be a watershed decision in Fourth Amendment jurisprudence, its ultimate effect is narrow. The Supreme Court admits as much, stressing that the Court was reviewing only a proposed per se exigency exception to the Fourth Amendment based solely upon "the natural metabolization of alcohol in the bloodstream."[31] But before *McNeely*, we had already recognized that Fourth Amendment analysis generally disfavors per se rules and instead turns on "the particular facts and circumstances of the underlying case," with no one factor being determinative.[32] Therefore, any contention that the mandatory blood-draw provision pertaining to recidivist DWI offenders could be based solely on an exigency exception that itself is based solely on the dissipation of alcohol in the bloodstream has stood on shaky legal footing for some time—and clearly lacks any footing whatsoever post-*McNeely*. And because the arresting officer himself conceded during the suppression hearing that there were no exigent circumstances and that he could have obtained a warrant for the blood test, there is no reason that I would reject the judge's finding of a lack of exigency under the circumstances.[33]

## B. Given the circumstances of this case and the underlying interests at play, the blood draw was constitutionally reasonable.

Nevertheless, my finding of a lack of exigency under the circumstances does not foreclose all possibility of finding the search of Villarreal constitutionally reasonable. Exigency is only one iteration of the general reasonableness framework of the Fourth Amendment. And considering all the relevant circumstances and interests at

27. *Id.* at 1559–60 ("Our decision in *Schmerber* applied this totality of the circumstances approach.").

28. *Id.* at 1560 (citing *Schmerber*, 384 U.S. at 770–71, 86 S.Ct. 1826).

29. *Id.* at 1561–62 (noting technological advancements like warrant applications by telephone, radio, email, and video-conferencing).

30. *Id.* at 1562 ("We by no means claim that telecommunications innovations have, will, or should eliminate all delay from the warrant-application process.").

31. *Id.* at 1556. *See also id.* at 1569 (noting that "the instant case, by reason of the way in which it was presented and decided in the state courts, does not provide a framework where it is prudent to hold any more than that always dispensing with a warrant for a blood test when a driver is arrested for being under the influence of alcohol is inconsistent with the Fourth Amendment.") (Kennedy, J., concurring in part).

32. *McGee v. State*, 105 S.W.3d 609, 616 (Tex. Crim.App.2003).

33. *See State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex.Crim.App.2008) ("In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling.").

play in this case under that much broader framework—(1) Villarreal's status as a recidivist DWI offender, (2) the regulatory hallmarks of his offense, (3) the reasonable means and procedures of the search, and (4) the Legislature's enactment of the mandatory blood-draw provision itself—I conclude that the blood draw performed on Villarreal was reasonable.[34] While I believe that no one circumstance or interest alone can overcome Villarreal's subjective expectation of privacy, when considered together under the totality of the circumstances—as McNeely requires[35]—I conclude that they do. Although this analysis may not provide as much guidance to officers in the field as a bright-line rule would, as Justice Sotomayor stressed in McNeely, it is "hardly unique."[36]

Because I find no error in the officer's search of Villarreal, I do not address the State's alternative theories: (1) that Villarreal "is deemed to have consented" to the blood draw under the Transportation Code,[37] and (2) that the search resulted from a reasonable mistake of law. The State bases the latter argument on the Supreme Court's recent decision in Heien v. North Carolina,[38] an opinion issued after our initial holding in this case and which did not require exclusion of evidence

so obtained. But the idea that even searches based on an erroneous understanding of the law do not require the exclusion of evidence if they result from a reasonable mistake of law only serves to demonstrate the degree to which reasonableness pervades Fourth Amendment analysis, and therefore bolsters my ultimate conclusion.[39]

1. Villarreal's status as a recidivist DWI offender results in a diminished expectation of privacy.

First and foremost, under the Fourth Amendment's general reasonableness standard, the Supreme Court has often recognized a lower expectation of privacy based on an individual's status. Prisoners are a ready example. In Hudson v. Palmer, the Supreme Court held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell."[40] While in prison serving multiple convictions, Palmer's locker and cell had been subjected to a "shakedown" search that revealed a ripped pillowcase.[41] Prison officials brought a charge of destroying state property against Palmer, who was found guilty and ordered to reimburse the state.[42] When Palmer challenged the prison's warrantless, non-consensual shake-

---

34. See Illinois v. McArthur, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) ("When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [Supreme Court] has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.").

35. McNeely, 133 S.Ct. at 1559-60.

36. Id. at 1564 ("Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments.").

37. See TEX. TRANSP. CODE §§ 724.011, 724.013.

38. —— U.S. ——, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014).

39. Id. at 540 ("It was thus objectively reasonable for an officer in Sergeant Darisse's position to think that Heien's faulty right brake light was a violation of North Carolina law. And because the mistake of law was reasonable, there was reasonable suspicion justifying the stop.").

40. 468 U.S. 517, 525-26, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

41. Id. at 519-20, 104 S.Ct. 3194.

42. Id. at 520, 104 S.Ct. 3194.

down search under the Fourth Amendment, the Supreme Court held that it was "satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." [43]

The Supreme Court later expanded this reasoning to probationers in *United States v. Knights*.[44] Knights received probation for a drug offense that was conditioned on Knights submitting his "person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." [45] When a police officer later suspected that Knights was involved in a vandalism and arson spree, he searched Knights's apartment—based solely upon the probation condition—and found a cache of incriminating evidence linking Knights to the crime spree.[46] When Knights moved to suppress the fruits of that warrantless search, the Supreme Court noted the "dual concern" implicit in probation: "On the one hand is the hope that [the probationer] will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community." [47]

The Court particularly stressed the recidivism rate of probationers as part of its reasonableness analysis.[48] The Court held that when "an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." [49] And in so doing, the Supreme Court rejected the interpretations of the district court and the Ninth Court of Appeals that held the search condition in the probation order "must be seen as limited to probation searches, and must stop short of investigation searches." [50]

The Supreme Court continued this trend in 2006, when it extended this diminished expectation of privacy to parolees in *Samson v. California*.[51] In that case, the police detained Samson, a parolee, on suspicion that he was the subject of an outstanding parole warrant.[52] The police, however, quickly learned that no outstanding parole warrant existed.[53] The police nevertheless searched Samson "based solely on [his] status as a parolee." [54] Under California law, every state parolee was required to "agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." [55] During the

43. *Id.* at 527–28, 104 S.Ct. 3194 ("We believe that it is accepted by our society that '[loss] of freedom of choice and privacy are inherent incidents of confinement.'") (citing *Wolfish*, 441 U.S. at 537, 99 S.Ct. 1861).

44. 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).

45. *Id.* at 114, 122 S.Ct. 587.

46. *Id.* at 115, 122 S.Ct. 587.

47. *Id.* at 120–21, 122 S.Ct. 587.

48. *Id.* at 120, 122 S.Ct. 587 ("The recidivism rate of probationers is significantly higher than the general crime rate.").

49. *Id.* at 121, 122 S.Ct. 587.

50. *Id.* at 116, 122 S.Ct. 587.

51. 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006).

52. *Id.* at 846, 126 S.Ct. 2193.

53. *Id.*

54. *Id.* at 846–47, 126 S.Ct. 2193.

55. *Id.* at 846, 126 S.Ct. 2193 (citing CAL. PENAL CODE ANN. § 3067(a) (West 2000)).

search the officers found a plastic baggie containing methamphetamine.[56]

The Supreme Court held the search constitutional because of Samson's diminished expectation of privacy as a parolee and the state's legitimate interest as his custodian.[57] The Court noted that in California, a parolee remains in the legal custody of the California Department of Corrections, must comply with all the terms and conditions of parole, and must sign an order submitting to suspicionless searches—all of which spurred the Court to conclude that Samson "did not have an expectation of privacy that society would recognize as legitimate."[58] And the Court again stressed the state's interests in "reducing recidivism" and "promoting reintegration and positive citizenship."[59]

"No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it."[60] And recidivism is a significant issue plaguing DWI offenders—just as the Supreme Court found it to be a significant issue plaguing probationers in *Knights*[61] and parolees in *Samson*.[62] According to the National Highway Traffic Safety Administration (NHTSA), "[h]istorically, drivers with prior DWI convictions have been overrepresented in fatal crashes, and the risk elevates for drivers with multiple DWI convictions."[63] Indeed, NHTSA recently

calculated recidivism rates for DWI offenders at 25%, and calculated rates as high as 31% in 1995.[64]

Although the Supreme Court in *McNeely* held that "the general importance of the government's interest in [policing drunk driving] does not justify departing from the warrant requirement without showing exigent circumstances that make securing a warrant impractical in a particular case," we are not now presented with the sort of plain-vanilla exigency case that the Supreme Court was in *McNeely*.[65] We are instead presented with a case involving a defendant who has at least three times already established a proclivity to endanger the public at large by driving intoxicated and who, on yet another occasion, exhibited clear indications of intoxication when pulled over and arrested. I do not believe that society is prepared to recognize an expectation of privacy equal to that of an ordinary citizen for an individual who has demonstrated such a clear and continual disregard for the safety of others on the roadways.

*Knights* also made clear that the State interest "in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen."[66] Although Villarreal is not a proba-

---

56. *Id.* at 847, 126 S.Ct. 2193.

57. *Id.* at 850–57, 126 S.Ct. 2193.

58. *Id.* at 851–52, 126 S.Ct. 2193.

59. *Id.* at 853, 126 S.Ct. 2193.

60. *McNeely*, 133 S.Ct. at 1565 (citing *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)).

61. *See Knights*, 534 U.S. at 120, 122 S.Ct. 587.

62. *See Samson*, 547 U.S. at 853, 126 S.Ct. 2193.

63. Nat'l Highway Traffic Safety Admin., DOT HS 811 991, DWI Recidivism in the United States: An Examination of State-Level Driver Data and the Effect of Look-Back Periods on Recidivism Prevalence 1–2 (Mar. 2014), *available at* www.nhtsa.gov/staticfiles/nti/pdf/811991–DWI_Recidivism_in_USA–tsf–rn.pdf.

64. *Id.* at 1.

65. *See McNeely*, 133 S.Ct. at 1565.

66. *Knights*, 534 U.S. at 121, 122 S.Ct. 587.

tioner, I find that his status as a recidivist DWI offender implicates the very same State interests as those pertaining to probationers: safeguarding the populace from recidivism. Indeed it would be unwise to hold, based on the simple fact that the Legislature has seen fit to protect that State interest by means of a mandatory blood-draw provision, that somehow the State interest is significantly less compelling than its interest in probation. The Legislature may have simply recognized that, as opposed to offenders who pose a more general threat of recidivist criminality that would require continual probationary supervision, recidivist DWI offenders pose a more specific threat—not that they are more likely to commit some crime, but that they are more likely to commit the specific crime of DWI—and fashioned its response accordingly.[67]

Furthermore, as in *Samson*, the Legislature has even placed Villarreal on notice that he would be subject to such a search based on his status as driver with two or more DWI convictions.[68] Although there is no evidence to show that he signed any notice agreement as Samson did, I do not find this distinction compelling because ignorance of the law is generally no excuse[69] —an assumption that is especially compel-

ling when a person chooses to exercise not a right, but a privilege like driving.[70] And given that the police already had probable cause to arrest Villarreal for driving while intoxicated, any expectation of privacy Villarreal might have "necessarily would be of a diminished scope."[71] Therefore, I would hold that under the Fourth Amendment's general reasonableness standard, the government's heightened interest in protecting our roadways from an established DWI recidivist who had already been arrested after exhibiting clear indications of intoxication significantly diminished Villarreal's expectation of privacy.

## 2. The search of Villarreal bears the hallmarks of a regulatory search.

Furthermore, although felony DWI is a criminal offense and the results of any blood draw performed pursuant to an arrest under it will likely be used in a subsequent criminal prosecution, it also exhibits many of the hallmarks of a regulatory offense, which generally afford a defendant a diminished expectation of privacy. For example, beyond possible fines and jail time, DWI convictions can also lead to license suspension or revocation, annual surcharges to maintain a license, intervention and education programs, and the installation of ignition interlock devices.[72]

---

67, *See Karenev*, 281 S.W.3d at 434 (presuming statutes constitutional).

68. *See* TEX. TRANSP. CODE § 724.012(b)(3)(B). *See also Samson*, 547 U.S. at 846, 126 S.Ct. 2193 (citing CAL. PENAL CODE ANN. § 3067(a) (West 2000)).

69. *See, e.g.*, TEX. PENAL CODE § 8.03(a) ("It is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken effect."). *See also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A.*, 559 U.S. 573, 581, 130 S.Ct. 1605, 176 L.Ed.2d 519 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.' ").

70. *See Tharp v. State*, 935 S.W.2d 157, 159 (Tex.Crim.App.1996) ("Driving is not a constitutionally protected right, but a privilege.").

71. *Bell v. Wolfish*, 441 U.S. 520, 557, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *See also King*, 133 S.Ct. at 1978 ("Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, however, his or her expectations of privacy and freedom from police scrutiny are reduced.").

72. *See generally* TEX. CODE CRIM. PROC. art. 42.12 § 13. *See also* TEX. TRANSP. CODE § 708.102.

And as we have explained before, the "primary purpose" of such regulatory sanctions "is not to deter the licensee or to seek retribution, but is to protect the public from the carnage on the public roads of Texas caused by drunk drivers." [73] These regulatory consequences of a felony-DWI offense further highlight the State's legitimate interest in protecting its roadways from DWI recidivism.

In *Skinner v. Railway Labor Executives' Association*,[74] several associations of railway workers sought to enjoin the Federal Railroad Administration under the Fourth Amendment from promulgating regulations mandating similar blood and urine tests of railway workers involved in train accidents. The Supreme Court initially recognized that a blood draw "infringes an expectation of privacy that society is prepared to recognize as reasonable." [75] But in rejecting this facial challenge to the regulation, the Court noted the governmental interest "in ensuring the safety of the traveling public and of the employees themselves," which "plainly justifies prohibiting covered employees from using alcohol or drugs on duty, or while subject to being called for duty." [76] And the Court held that this interest "requires and justifies the exercise of supervision to assure that the restrictions are in fact observed." [77]

Given the number of innocent people who travel our roadways and the numerous DWI-related tragedies that occur each year, the State possesses just as compelling—possibly even more compelling—an interest in ensuring the "safety of the traveling public" on our roadways as on our railways. Therefore, that interest "requires and justifies" the same sort of "supervision to assure that the restrictions are in fact observed" as the Supreme Court allowed in *Skinner*.[78] And I do not believe that a simple blood draw performed on a driver with an extensive DWI history who has already been properly arrested on suspicion of DWI and would therefore be subject to a whole battery of searches—fingerprinting, booking, inventory, and possibly even buccal-swab searches—is any more unreasonable under the circumstances than one performed on a railway worker who just happens to be working when an accident occurs.

### 3. The means and procedures of the search performed on Villarreal were reasonable.

It is also significant to a general reasonableness analysis that the blood draw performed on Villarreal was reasonable in both its means and procedures. The Supreme Court has acknowledged that blood draws—as invasions of a person's bodily integrity—implicate a person's "most personal and deep-rooted expectations of privacy." [79] But it has also recognized that the Fourth Amendment "neither forbids nor permits all such intrusions," but instead constrains against "intrusions which are not justified in the circumstances, or which are made in an improper manner." [80] We have held that this requires that both

---

73. *See Tharp*, 935 S.W.2d at 159 (addressing the administrative license-suspension provision of the former TEX. REV. CIV. STAT. art. 6687b–1).

74. 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

75. *Id.* at 616, 109 S.Ct. 1402.

76. *Id.* at 621, 109 S.Ct. 1402.

77. *Id.* (citations omitted).

78. *See id.*

79. *Winston v. Lee*, 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

80. *Id.* (citing *Schmerber*, 384 U.S. at 768, 86 S.Ct. 1826).

the "means" and "procedures" employed be constitutionally reasonable.[81]

In order for the means employed to be reasonable, we must determine whether "the test chosen was reasonable."[82] The Supreme Court has long recognized that the search employed on Villarreal—a blood test—is a "highly effective means of determining the degree to which a person is under the influence of alcohol."[83] And this effectiveness stands in marked contrast to the two most common substitutes for a blood test: (1) a less accurate reading from a breath test, and (2) an officer's subjective analysis of a driver's performance in a battery of field-sobriety tests. Thus, a properly performed blood test serves our judicial system's interest in ensuring, to the best degree possible, access to the most accurate and objective evidence of a driver's sobriety.

Similarly, in order for the procedures of a search to be reasonable, we must determine whether "the test was performed in a reasonable manner."[84] Although a blood draw does implicate Fourth Amendment principles, the one Villarreal underwent—executed in a hospital by a qualified technician—can hardly be deemed unreasonably performed under the circumstances. In contrast, we held in *McGee v. State*[85] that a warrantless cavity search performed by a police officer in a fire station was reasonable under the circumstances. The police received a tip that McGee and two

other men had been selling crack cocaine at an intersection and that McGee had been hiding the drugs between his buttocks.[86] When police arrived at the intersection, they found three men matching the descriptions given, smelled marijuana, and saw blue smoke indicative of marijuana use.[87] When McGee admitted that someone else had been smoking marijuana, police handcuffed the three men and drove them to a nearby fire station.[88] At the station, a police officer found several rocks of crack cocaine on McGee when he escorted McGee to a private area of the station and ordered him to "drop his pants, bend over, and spread his buttocks."[89]

When McGee challenged the constitutionality of this warrantless, non-consensual search, we upheld it despite such "[v]isual body-cavity searches" being "among the most intrusive of searches."[90] We determined that the "legitimate interests of law enforcement outweigh[ed] the intrusiveness of the search."[91] In doing so, we noted that the search, while uncomfortable, was not violent, was performed by an officer with on-the-job experience in performing cavity searches, and was carried out in a hygienic environment with sanitary rubber gloves.[92]

In contrast to McGee's ordeal, the search performed on Villarreal strikes me as far more reasonable. Although both were initially arrested based on probable

---

81. *State v. Johnston*, 336 S.W.3d 649, 658 (Tex.Crim.App.2011) (citing *Schmerber*, 384 U.S. at 768, 771, 86 S.Ct. 1826).

82. *Id.*

83. *See Schmerber*, 384 U.S. at 771, 86 S.Ct. 1826 ("[W]e are satisfied that the test chosen to measure petitioner's blood-alcohol level was a reasonable one.").

84. *Id. See also Johnston*, 336 S.W.3d at 658.

85. 105 S.W.3d 609 (2003).

86. *Id.* at 612.

87. *Id.*

88. *Id.* at 612–13.

89. *Id.* at 613.

90. *Id.* at 616.

91. *Id.*

92. *Id.* at 616–17.

cause, only Villarreal was searched within the sterile confines of a hospital.[93] And only the search of Villarreal was performed by a trained medical professional.[94] The Supreme Court stressed the importance of these two distinctions in *Schmerber*.[95]

But most importantly, the nature of the two searches differed greatly. Since *Schmerber*, the Supreme Court has considered blood draws "commonplace," and has noted that "for most people the procedure involves virtually no risk, trauma, or pain."[96] And *McNeely* did not overrule *Schmerber*.[97] Its sole critique of *Schmerber* —noting "the 47 years since *Schmerber* was decided"—only questioned the exigent circumstances that drunk-driving investigations can create, not the commonplace nature of a blood draw itself.[98] In contrast, the Supreme Court has warned that a body-cavity search, like the one performed on McGee, "instinctively gives [the Court] the most pause."[99] We ourselves have found that such searches can be "de-

meaning, dehumanizing, undignified, humiliating, and terrifying."[100] Thus, if the visual body-cavity search performed on McGee passed the rigors of the Fourth Amendment's reasonableness standard, how can we now find that the commonplace blood draw performed on Villarreal does not?

**4. The Legislature's enactment of the Transportation Code's mandatory blood-draw provision is worthy of consideration.**

Finally, I believe the Legislature's decision on this issue is worthy of consideration. The United States Constitution is the "supreme Law of the Land."[101] No state can legislate around its strictures, including the Fourth Amendment. And it is a bedrock constitutional principle that it is "emphatically the province and duty of the judicial department to say what the law is."[102] Nevertheless, the Supreme Court has acknowledged—for example, in circumstances relating to fingerprinting—some role for state legislatures in assisting

93. *See id.* at 617 ("The search occurred in a fire station.... The fire station was not as sterile an environment as a hospital."). *See also Johnston*, 336 S.W.3d at 662 ("Though a medical environment may be ideal, it does not mean that other settings are unreasonable under the Fourth Amendment. According to our research, reasonableness depends upon whether the environment is a safe place in which to draw blood.").

94. *See McGee*, 105 S.W.3d at 616 ("Officer Rowan testified that while he had never had formal training for conducting cavity searches, he had on-the-job experience while working with senior officers.").

95. *See Schmerber*, 384 U.S. at 771–72, 86 S.Ct. 1826 ("We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an

unjustified element of personal risk of infection and pain.").

96. *Id.* at 771, 86 S.Ct. 1826.

97. *McNeely*, 133 S.Ct. at 1560 ("Thus, our analysis in *Schmerber* fits comfortably within our case law applying the exigent circumstances exception.").

98. *Id.* at 1561–62.

99. *Wolfish*, 441 U.S. at 558, 99 S.Ct. 1861.

100. *McGee*, 105 S.W.3d at 616 (citations omitted).

101. U.S. Const. art. VI, cl. 2.

102. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.").

to shape the contours of the Fourth Amendment's protections.[103]

Therefore, judges should not interpret their authority as a monopoly on constitutionality. It is not a license to act like bullies in black robes. Instead, legislatures should be allowed some role in shaping and framing constitutional issues, especially those like the Fourth Amendment that delve into vague and esoteric concepts like "reasonableness" and "expectation[s] of privacy that society would recognize as legitimate."[104] Compared to the judicial branch, the Legislature is well-equipped structurally, as the representative of Texans generally, to clarify these difficult concepts. And this concept is not new to our jurisprudence. It is why we generally presume a statute constitutional "until it is determined otherwise."[105]

However, judges must never forget that the Fourth Amendment was established as a check on government action, including action by the Legislature. Therefore, I would not interpret the Transportation Code's provisions as per se rules allowing warrantless, non-consensual blood draws. The State cannot merely invoke a statutory provision to escape Fourth Amendment analyses. Such an interpretation would comport with neither state nor federal law.[106] But that did not occur here. Although the arresting officer did focus his authority to compel a blood draw of Villarreal on the relevant Transportation Code provision and conceded that there were no exigent circumstances, he also testified that Villarreal exhibited clear signs of intoxication, had been properly arrested on suspicion of DWI, and possessed a DWI

history well beyond the requirements of the provision.

Therefore, I interpret the Transportation Code's provisions as significant—but not necessarily determinative—evidence of the nature and weight of the state interests at play in policing intoxicated driving. They are but one consideration in the Fourth Amendment's overall "totality of the circumstances" analysis that we have long recognized and that the Supreme Court reaffirmed in *McNeely*. And I find the provision pertaining to recidivist DWI offenders a particularly compelling circumstance in that analysis, especially when considered in conjunction with Villarreal's clear indications of intoxication that led to his arrest and his extensive DWI history beyond the provision's requirements.

## III. Conclusion

In light of all the circumstances particular to this case and the underlying interests at play, I would hold that the blood draw performed on Villarreal was reasonable. Therefore I would withdraw our prior opinion and conclude that the trial court erred in suppressing the results of the blood draw. For these reasons, I respectfully dissent.

### DISSENTING OPINION

YEARY, J., filed a dissenting opinion in which KELLER, P.J., joined.

Drunk driving is a scourge on our roadways. The carnage and destruction that drunk drivers inflict on their fellow citizens is enough, the United States Supreme Court has said, to justify programmatic checkpoints by which every driver may be

---

103. *Hayes v. Florida*, 470 U.S. 811, 817, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (referencing *Davis v. Mississippi*, 394 U.S. 721, 728, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) and *Dunaway v. New York*, 442 U.S. 200, 215, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)).

104. *See Samson*, 547 U.S. at 852, 855 n. 4, 126 S.Ct. 2193.

105. *See Karenev*, 281 S.W.3d at 434.

106. *McNeely*, 133 S.Ct. at 1559–60; *McGee*, 105 S.W.3d at 616.

briefly detained (that is to say, minimally *seized* for Fourth Amendment purposes) to investigate whether they may be driving while intoxicated. *Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). But the same consideration does not justify the incrementally greater intrusion inherent in a blood draw (a *search* for Fourth Amendment purposes—and a search of the *person*, which is just a step below that so-called "first among equals," the search of the person's *house*)[1] without first obtaining a warrant, if practicable. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Neither does the indisputable fact that evidence of intoxication steadily dissipates from the driver's bloodstream over time categorically justify application of the exigent circumstances exception to the warrant requirement—at least not for the run-of-the-mill DWI offender. *Missouri v. McNeely,* 133 S.Ct. 1552 (2013).[2]

In my view, however, the whole constitutional calculus changes once the offender has proven himself to be an incorrigible drunk driver. In that instance, the fact of numerous prior convictions for DWI, along with the officer's probable cause to believe the offender has struck yet again, may reasonably take the place of the objective assessment that a magistrate's warrant would otherwise provide. Moreover, the gravity of the recidivist's offense and his evident incorrigibility makes it all the more imperative that the best evidence of intoxication not be lost in the time it usually takes to secure a warrant. For this combination of reasons, I would hold that, to the extent that Section 724.012(b)(3)(B) of the Texas Transportation Code requires a peace officer to draw blood samples from incorrigible DWI suspects, Tex. Transp. Code § 724.012(b)(3)(B), regardless of whether the peace officer first seeks a search warrant, it operates in a constitutionally acceptable manner. Because the Court rescinds its grant of the State's motion for rehearing in this case without even seriously considering this proposition, I respectfully dissent.

## INTRODUCTION: THE INCORRIGIBLE DRUNK DRIVER

The compelled extraction of blood from the human body for purposes of conducting an evaluation of blood-alcohol concentration is unquestionably a search for Fourth Amendment purposes. *Skinner v. Railway Labor Exec. Assn,* 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (citing *Schmerber,* 384 U.S. at 767–68, 86 S.Ct. 1826); *Maryland v. King,* 133 S.Ct. 1958, 1969 (2013). Indeed, "[t]he ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested [individual's] privacy interests."

1. *Compare Florida v. Jardines,* —— U.S. ——, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.") *with Wyoming v. Houghton,* 526 U.S. 295, 303, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999) (recognizing "the unique, significantly heightened protection afforded against searches of one's person").

2. This Court is bound, of course, by the United States Supreme Court's construction of the Fourth Amendment. And indeed, my quarrel is not with the holding of *McNeely* itself, with which I am inclined to agree. In any given year, as many as 1.4 million people are arrested in this country for driving while intoxicated. *See, e.g.,* Fed. Bureau of Investigation, Estimated No. Of Arrests, Arrest Table 29 (2010), https://www.fbi.gov/about–us/cjis/ucr/crime–in–the–u.s.–2010/tables/10tbl29.xls (reporting more than 1.4 million arrests for driving while intoxicated in the year 2010). I do not disagree that to subject every one of them to the indignity of a compelled blood draw without the intervention of the detached judgment of a neutral magistrate should be deemed unreasonable for Fourth Amendment purposes.

*Skinner,* 489 U.S. at 616, 109 S.Ct. 1402. "Such an invasion of bodily integrity implicates an individual's 'most personal and deeply-rooted expectations of privacy.'" *McNeely,* 133 S.Ct. at 1558 (quoting *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)). Particularly in the context of criminal investigations, "[s]earch warrants are ordinarily required . . . absent an emergency . . . where intrusions into the human body are concerned." *Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826.

To be sure, the "exigent circumstances" exception to the warrant requirement may apply even in a typical drunk driving case, since, with the passage of time and "the human body's natural metabolic processes," the alcohol level in an individual's blood will change and its evidentiary value will diminish. *McNeely,* 133 S.Ct. at 1560. But, as the Supreme Court recently determined in *McNeely,* this "natural dissipation" of critical evidence does not justify an absolute rule whereby the police may invariably draw blood without a warrant in every case in which they have probable cause to believe a driver has been driving while intoxicated. *Id.* at 1568.

Still, *McNeely* does not represent the final word on the need for a warrant to take blood for alcohol testing in the universe of all DWI cases. After all, even in the context of searches of the person, "the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *King,* 133 S.Ct. at 1969 (quoting *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). In this vein, I take the holding of *McNeely* to be no broader than the articulation given to it by Justice Kennedy, who supplied the fifth and deciding vote, in his concurring opinion: "[T]he instant case . . . does not provide a framework where it is prudent to hold any more than that always dispensing with a warrant for a blood test when a driver is arrested for being under the influence of alcohol is inconsistent with the Fourth Amendment." *McNeely,* 133 S.Ct. at 1569 (Kennedy, J., concurring).

Justice Kennedy went on to insist that this "general proposition . . . ought not to be interpreted to indicate this question is not susceptible of rules and guidelines that can give important practical instructions to arresting officers, instructions that in any number of instances would allow a warrantless blood test in order to preserve the critical evidence." *Id.* I believe the rules and guidelines to which Justice Kennedy alluded may include, in keeping with the Fourth Amendment, a determination by the Legislature that particular circumstances will not only justify, but will in fact *mandate,* a blood draw, irrespective of the existence of a warrant, in order to preserve the best evidence of a very serious crime. So long as those legislatively-prescribed circumstances are themselves sufficient to render the search of the person, though warrantless, categorically "reasonable" in contemplation of the Fourth Amendment, such a statute should be respected and followed. By mandating blood draws for incorrigible DWI offenders, that is, in my view, what Section 724.012(b)(3)(B) of the Transportation Code has done, and I would uphold it as *not* "inconsistent" with the Fourth Amendment, which ultimately secures the people only against searches that are, after all, "unreasonable." The Court should take the State's motion for rehearing as an occasion to say why it believes I am wrong, rather than to summarily un-grant a meritorious motion.

## I. REASONABLENESS IS THE TOUCHSTONE

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons . . . against unreasonable searches . . . shall not be violated, and no Warrants shall issue, but

upon probable cause[.]" U.S. Const. amend. IV. In *Riley v. California*, the United States Supreme Court recently summarized the state of its holdings with respect to searches undertaken in the context of criminal investigations:·

> As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness. Our cases have determined that where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant. Such a warrant ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.

134 S.Ct. 2473, 2482 (2014) (internal citations, quotation marks, brackets, and ellipses omitted).[3] Seizing upon this language from *Riley*, as well as similar language in *McNeely*, this Court on original submission declared that it was bound by the presumption that a search of the person must be supported by a warrant unless the circumstances called for application of an already well-established exception. *See State v. Villarreal*, 475 S.W.3d 784, 808–09, 2014 WL 6734178, at *17 (Tex.Crim.App. Nov. 26, 2014) ("The Supreme Court has made clear that, in the context of an active criminal investigation, and when the primary goal of law-enforcement activity is the gathering of evidence, a warrantless search of a person is unreasonable unless it falls within an established exception to the warrant requirement.").[4]

But has the Supreme Court really made this proposition so clear? I do not believe the presumption in favor of warrants is as monolithic as the Court made it out to be on original submission. Examples abound of cases involving criminal investigations in which the Supreme Court has not automatically resorted to the presumption that a search must be supported by a warrant in the absence of some already well-established exception. Often a question arises with respect to the proper scope of a seemingly well established exception. In this context, the Supreme Court has not hesitated to apply a more generalized approach to "reasonableness," one which simply balances the State's particular interest in law enforcement against the citizen's particular expectation of privacy. And it has done so not *just* in the context of cases involving administrative searches or suspicionless programmatic searches (the so-called "special needs" cases),[5] but *also* in the context of cases that involve, as this

---

**3.** *Riley* involved a question of whether the warrantless search of cell phones for evidence of criminal activity could be upheld under the search-incident-to-arrest exception to the warrant requirement. The Supreme Court ultimately determined that the rationale for that exception did not extend to defeat the enhanced expectation of privacy inherent in the personal content of a modern-day cellular telephone.

**4.** *See also Ferguson v. City of Charleston*, 532 U.S. 67, 74 n. 7 & 78, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (tracing the development of so-called "special needs" cases and seem-

ing to disown "a balancing test" in the context of "the normal need for law enforcement").

**5.** Describing such "special needs" cases, the Supreme Court has observed that "[w]e have upheld suspicionless searches and seizures to conduct drug testing of railroad personnel involved in train accidents; to conduct random drug testing of federal customs officials who carry arms or are involved in drug interdiction; and to maintain automobile checkpoints looking for illegal immigrants and contraband, and drunk drivers." *Vernonia*

Court characterized it on original submission, "an active criminal investigation[.]" *Villarreal,* 475 S.W.3d at 809, 2014 WL 6734178, at *17.

For instance, in *Wyoming v. Houghton,* 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), the Supreme Court addressed the proper scope of the so-called automobile exception to the warrant requirement. The specific question was whether the automobile exception—the rule that probable cause to search an automobile for contraband authorizes a warrantless search of any container therein that might feasibly contain that contraband—ought to embrace a warrantless search of a passenger's personal belongings, namely, the passenger's purse. *Id.* at 297, 119 S.Ct. 1297. Though *Houghton* clearly involved a criminal investigation, the Supreme Court nonetheless declared that the proper approach to the question was to

> evaluate the search ... under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

*Id.* at 300, 119 S.Ct. 1297. Ultimately holding that the automobile exception should indeed extend to justify a warrantless search of the passenger's purse, the Supreme Court observed along the way that the competing interests "militate in favor of the needs of law enforcement, and against a personal-privacy interest that is ordinarily weak." *Id.* at 306, 119 S.Ct. 1297.

And in *Riley* itself, the Supreme Court again resorted to the generalized balancing test, this time in order to determine the appropriate scope of the search-incident-to-arrest exception to the warrant requirement during a criminal investigation. The Supreme Court acknowledged that "a mechanical application" of its precedents in this area "might well support the warrantless search" of the defendant's cell phone following his arrest. 134 S.Ct. at 2484. But, rather than fall back on such a rote application, the Supreme Court invoked *Houghton,* once again to declare:

> [W]e generally determine whether to exempt a given type of search from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."

*Id.* (quoting *Houghton,* 526 U.S. at 300, 119 S.Ct. 1297). Re-evaluating the competing interests that are at stake when it comes to cell phones, the Supreme Court concluded that the search-incident-to-arrest exception to the warrant requirement should not control and that, absent some other valid exception, the Fourth Amendment requires a warrant. *Id.* at 2484–91.[6]

---

*School District 47J,* 515 U.S. 646, 653–54, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

**6.** Another case involving a criminal investigation that conducts a balancing approach to measure personal privacy against governmental interest in order to determine the legitimate scope of an exception to the general warrant requirement is *Georgia v. Randolph,* 547 U.S. 103, 114–20, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). The question in *Randolph* was whether investigating police officers could enter a home with the consent of one co-occupant when another co-occupant—

the defendant—was also present who objected to the entry. *Id.* at 106, 126 S.Ct. 1515. Concluding that such a warrantless intrusion would be unreasonable for Fourth Amendment purposes, the Supreme Court observed that, "in the balancing of competing governmental interests entailed by the bar to unreasonable searches, the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place." *Id.* at 114–15, 126 S.Ct. 1515 (citation omitted). The objecting occupant's right to privacy in

Both *Houghton* and *Riley* involved a question about the proper scope of an exception to the warrant requirement in the context of a criminal investigation. *McNeely* similarly involved the question of the proper scope of such an exception: the exigent circumstances exception. But, because of the unyielding approach taken by the State of Missouri, the Supreme Court did not have to conduct a general balancing analysis in *McNeely*. By arguing that dissipation of blood alcohol levels in the

blood invariably presents a sufficient exigent circumstance in *every* case of driving while intoxicated—no matter the other attending circumstances—Missouri presented a proposition that was essentially binary in nature and could be answered in an equally binary fashion: a simple "yes" or "no." The Supreme Court answered "no": "In short, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically."

his home is substantial, the Supreme Court continued, and "the State's other countervailing claims do not add up to outweigh it." *Id.* at 115, 126 S.Ct. 1515. The Supreme Court concluded that "nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches a private living quarters over a resident's objection." *Id.* at 120, 126 S.Ct. 1515.

Although less pertinent here, the Supreme Court has also engaged in the general balancing approach in other criminal-investigation cases that involve, essentially, the question whether some *new* exception to the warrant requirement should be recognized. For example, in *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), the question was whether it was "reasonable" under the Fourth Amendment to prevent a suspect from entering his home, absent a warrant, for the time it would take investigating officers to obtain a search warrant for the house itself. *Id.* at 329, 121 S.Ct. 946. Instead of applying a presumption that a warrant should be obtained absent some well-established exception, the Supreme Court chose to "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id.* at 331, 121 S.Ct. 946. Considering all the circumstances, including the possibility that McArthur would destroy the contraband that was the subject of the search warrant if not detained, the Supreme Court held that the detention was, indeed, a "reasonable" seizure under the Fourth Amendment. *Id.* at 332, 121 S.Ct. 946. It concluded that, "[g]iven the nature of the intrusion and the law enforcement interest at stake, this brief seizure of the

premises was permissible." *Id.* at 333, 121 S.Ct. 946.

Also in *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the Supreme Court similarly evaluated the constitutionality of a search conducted in the course of a focused criminal investigation. The suspect under investigation, Knights, happened to be on probation, and the investigating officer used his probationary status as a justification for conducting a warrantless search of his apartment for evidence of a suspected crime. *Id.* at 114–15, 122 S.Ct. 587. The issue in the case was whether the Fourth Amendment would tolerate such a search when it was conducted pursuant to a condition of probation requiring probationers to submit to warrantless searches. *Id.* at 116, 122 S.Ct. 587. The Supreme Court once again analyzed the question "under our general Fourth Amendment approach of 'examining the totality of the circumstances,' with the probation search condition being a salient circumstance." *Id.* at 118, 122 S.Ct. 587 (citing *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). As in *Houghton*, the Supreme Court declared that the reasonableness of a warrantless search should be determined by balancing the degree of intrusion upon the suspect's privacy interest against the degree to which it promotes a legitimate government interest. *Id.* at 118–19, 122 S.Ct. 587. The Supreme Court expressly cautioned that it was *not* conducting a "special needs" analysis as it had done previously in *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)—and yet, it still applied its general balancing analysis to the question of the validity of the warrantless search, upholding it. *Id.* at 117–19, 122 S.Ct. 587.

133 S.Ct. at 1563. The Supreme Court in *McNeely* did *not* have to go further and ask itself whether any *particular* set of circumstances beyond the brute fact of evidence-dissipation might reasonably support an exemption from the general warrant requirement. Had it been confronted with such an issue of scope, there is no reason to doubt the Supreme Court would have undertaken the same balancing approach as it did in *Houghton* and *Riley*, to determine whether exigent circumstances might, under those particular circumstances, justify a warrantless search of the DWI offender's person.

For these reasons, I believe the Court on original submission should have acknowledged that the general balancing approach is appropriate in this case, notwithstanding *McNeely*. I would urge the Court to conduct that balancing analysis and, having conducted it, conclude that the balance tips in the State's favor. After a brief exposition of the statutory scheme, I will devote my efforts to explaining why I believe that is the right conclusion.

## II. THE STATUTORY SCHEME

Even when operated normally, an automobile can be a dangerous implement; in the wrong hands, it can be a deadly weapon. *Walker v. State,* 897 S.W.2d 812, 814 (Tex.Crim.App.1995). Because we all must share the public roadways, driving is a highly regulated activity—a privilege, not a right. See *Texas Department of Public Safety v. Richardson,* 384 S.W.2d 128, 132 (Tex.1964) ("It is clear that one making use of the highways of the state is exercising a privilege which is subject to regulation."); *Davison v. State,* 166 Tex. Crim. 376, 381, 313 S.W.2d 883, 886 (1958) (opinion on State's motion for reh'g) (driving "is a privilege and not a right"). Most drivers understand this, having passed an examination before receiving a license, and having been pulled over for a driving infraction at some point if they have been licensed for any period of time at all.

Texas is a so-called "implied consent" state. *See McNeely,* 133 S.Ct. at 1566 (plurality opinion) ("[A]ll 50 states have adopted implied consent laws[.]"). This means that Texas has adopted a statutory scheme whereby any person who has been arrested for driving while intoxicated is "deemed to have consented" to the taking of a breath or blood specimen for a determination of his blood-alcohol concentration. TEX. TRANS. CODE § 724.011(a).[7] Accordingly, a breath or blood specimen "may" be taken if the DWI offender accedes to an arresting officer's "request." TEX. TRANSP. CODE § 724.012(a)(1).[8] Despite these so-called "implied consent" provisions, however, an arresting officer may not *compel* the taking of such a specimen from the ordinary first- or second-time DWI offender who simply refuses to submit. TEX. TRANS. CODE § 724.013.[9] Under these circumstances, the officer must obtain a search

---

7. "If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place ... while intoxicated, ... the person is deemed to have consented, subject to this chapter, to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration[.]"

8. "One or more specimens of a person's breath or blood may be taken if the person is arrested and at the request of a peace officer

having reasonable grounds to believe the person ... while intoxicated was operating a motor vehicle in a public place[.]"

9. "Except as provided by Section 724.012(b), a specimen may not be taken if a person *refuses to submit to the taking of a specimen* designated by a peace officer." The driver's refusal has adverse consequences, of course—the suspension of his driving privileges and the use of his refusal against him upon subsequent prosecution. TEX. TRANS. CODE §§ 724.035, 724.061.

warrant. In *Beeman v. State*, 86 S.W.3d 613, 616 (Tex.Crim.App.2002), this Court recognized that implied consent is just one way an officer can seek to obtain a blood or breath specimen; if the first- or second-time DWI offender refuses to give consent in fact, the officer can still go beyond the statutory scheme and seek a search warrant to compel the taking of a specimen of breath or blood consistent with the Fourth Amendment. But nothing in the statutory scheme requires the officer either to ask for a specimen or to seek a warrant to compel a specimen in the case of the ordinary DWI offender.

That is not the case under Section 724.012(b)(3)(B) of the Transportation Code. Under this provision, the DWI suspect with at least two prior DWI convictions does not have the same statutorily granted ability to refuse consent as does the first- and even the second-time offender. Tex. Trans. Code §§ 724.012(b)(3)(B). That is because the statutory scheme leaves the arresting officer no room for discretion; once he has "arrest[ed]" a suspect for DWI and he "possesses or receives reliable information" that he is a three-time (or more) DWI offender, the officer "shall require the taking of a specimen"—without exception. *Id.*; Tex. Transp. Code § 724.013. Nothing in Section 724.012(b) explicitly speaks to whether the arresting officer needs first to seek to obtain a warrant before taking the required specimen. Nor does Section 724.012(b) spell out any particular contingencies, apart from the fact of a new arrest and the discovery of at least two prior DWI convictions, that would serve to relieve the arresting officer of having to obtain a warrant. Rather, it unequivocally requires the arresting officer to compel the three-time DWI offender to submit to a specimen of breath or blood, regardless of whether the officer has obtained a warrant or whether any previously well-established exception to the warrant requirement

might be found to apply under the circumstances of the particular case.

Thus, while the arresting officer in the run-of-the-mill DWI case has some measure of discretion in deciding whether to seek a specimen for blood-alcohol analysis, this is not so when it comes to his investigation of the incorrigible DWI offender. The evident legislative intent of Section 724.012(b)(3)(B) is to eliminate the arresting officer's choice whether to obtain such a specimen from an incorrigible DWI offender. He simply must do so. Indeed, even if he seeks a warrant and the neutral and detached magistrate declines to issue it, the statute still requires the officer to take the specimen. In this sense, at least—by mandating the taking of a blood or breath specimen from every incorrigible DWI offender, without exception—the statute authorizes warrantless searches of the body of the incorrigible DWI offender.

So the question arises: Does the Fourth Amendment tolerate a legislative judgment that the exigency inherent in the loss of BAC evidence with the passage of time justifies the authorization of a warrantless blood draw to combat the manifest dangers presented by the incorrigible DWI offender? I believe that the Legislature's judgment would pass the Supreme Court's general balancing test for Fourth Amendment reasonableness.

## III. THE BALANCE OF INTERESTS

### A. Preamble: The Purpose of the Warrant Requirement

"An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." *Skinner*, 489 U.S. at 621–22, 109 S.Ct. 1402 (citing, among other cases, *United States v. Chadwick*, 433 U.S. 1, 9,

97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)—a case involving a focused criminal investigation). A warrant also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case." *Id.* at 622, 109 S.Ct. 1402. But a warrantless search or seizure may yet be reasonable under the Fourth Amendment when, under a particular scenario, "a warrant would do little to further these aims." *Id.* Moreover, the Supreme Court has proclaimed that "the government's interest in dispensing with the warrant requirement is at its strongest when ... the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Id.* (internal quotation marks and citations omitted). This is particularly true when "the delay necessary to procure a warrant ... may result in the destruction of valuable evidence." *Id.* When "imposing a warrant requirement ... would add little to the assurances of certainty and regularity already afforded by [a particular regulatory regime], while significantly hindering, and in many cases frustrating," the State's objectives, a warrant is not "essential" to assure the reasonableness of that regime under the Fourth Amendment. *Id.* at 624, 109 S.Ct. 1402. I evaluate the constitutional validity of Texas's "implied consent" statutory regime with these principles foremost in mind.

## B. Query: Is the Purpose of a Warrant Already Served?

A DWI offender may be arrested without a warrant, consistent with the Fourth Amendment, so long as the arresting officer has probable cause to believe he has committed that offense. *See Gerald Devenpeck v. Alford,* 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) ("In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."). Thus, the DWI offender's interest in not being bodily *seized* is not so weighty as to require the intervention of a magistrate to independently evaluate probable cause. Is his incremental interest in not also being *searched* sufficiently weighty as to invoke the protections of a magistrate to evaluate the officer's assessment of probable cause? That depends upon the nature and scope of the search: a warrantless search of the person incident to arrest, limited to immediately assuring the officer's safety and/or to preserving evidence that could be destroyed, is ordinarily reasonable. *Riley,* 134 S.Ct. at 2483–84. Indeed, even in the absence of a formal arrest, a warrantless search of the person may be reasonable if the State's objective is to preserve "highly evanescent evidence." *Cupp v. Murphy,* 412 U.S. 291, 296, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (citing, of all things, *Schmerber*).[10]

The State unquestionably has an abiding and compelling interest in stemming the tide of drunk driving: "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." *Sitz,* 496 U.S. at 451, 110 S.Ct. 2481. But when it is balanced against the DWI offender's privacy interest to avoid a search that involves puncturing both the skin and a blood vessel in order to obtain his blood—even for the

---

**10.** In *Cupp v. Murphy,* the Supreme Court concluded that a pre-arrest warrantless search of Murphy's fingernails was justified because: 1) Murphy was aware that police suspected him of an offense, giving him a motive to destroy evidence; 2) he refused to consent to fingernail scrapings; 3) he put his hands behind his back and rubbed them together; and then 4) he put them in his pockets, making "a metallic sound, such as keys or change rattling[.]" 412 U.S. at 296, 93 S.Ct. 2000.

sake of preserving "highly evanescent evidence" of the level of alcohol in his bloodstream at time of the offense—the State's interest is not sufficiently weighty to justify a categorical rejection of the warrant requirement. *See McNeely*, 133 S.Ct. at 1563 ("[W]hile the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically.").

At least in the ordinary DWI case, the State's interest in preserving evidence is simply not substantial enough to justify dispensing with the intervention of a magistrate, if practicable, to independently verify the existence of probable cause. In that context, the efficacy of the magistrate cannot be doubted to serve his constitutionally intended function to stand between the citizen and the constable to assure that an objective basis in fact exists to merit the incrementally greater intrusion that a blood draw constitutes—beyond the mere fact of custodial arrest—upon the person of the offender.

But when it comes to Texas's incorrigible-DWI-offender scheme, the intervention of a magistrate adds little of practical value. The assurance of a detached neutrality is already to a certain extent inherent in the statutory scheme. The authorization of a warrantless blood draw under Section 724.012(b)(3)(B) is triggered only by (1) an arrest and (2) the discovery of reliable information that the suspect has been *actually convicted on at least two previous occasions* for driving while intoxicated. In order to arrest the incorrigible DWI offender, the officer must find probable cause to believe the suspect has been driving while intoxicated—the same finding a magistrate would have to make later to authorize a blood draw.[11] But once the officer also receives reliable information from a credible source that the suspected DWI offender has been convicted at least twice before for the same conduct, his current determination of probable cause is significantly bolstered by objective evidence of the offender's proven propensity to commit such a crime.[12] Because the prior convictions lend substantial credence to the officer's probable-cause-to-arrest determination, a magistrate would rarely find occasion to doubt the overall factual basis of the officer's conclusion that the suspect may very well have offended once again.[13]

It should also prove rare for a magistrate to find cause to doubt the objectivity of the information that the arresting officer had relied upon to establish the DWI

---

11. The officer's probable cause determination can be tested later in a motion to suppress, of course, and if that probable cause fails, the evidence from the blood draw should then be suppressed in any event as fruit of the poisonous tree. *See, e.g., Monge v. State*, 315 S.W.3d 35, 40 (Tex.Crim.App.2010) ("The 'fruit of the poisonous tree' doctrine generally precludes the use of evidence, both direct and indirect, obtained following an illegal arrest.").

12. "[A] suspect's prior convictions ... are not barred from consideration on the issue of probable cause." 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.2(d), at 72–4 & n.147 (5th ed.2012). *See Brinegar v. United States*, 338 U.S. 160, 172–78, 69 S.Ct. 1302, 93 L.Ed. 1879 (1947) (explaining that evidence of a suspect's crimi-

nal propensity, while it may be deemed inadmissible at trial for policy reasons, is no less pertinent to the probable cause determination).

13. "[T]he citizen who has given no good cause for believing he is engaged in [criminal] activity is entitled to proceed on his way without interference. But one who recently and repeatedly has given substantial ground for believing that he is engaging in [similar criminal activity] has no such immunity[.]" *Brinegar*, 338 U.S. at 177, 69 S.Ct. 1302. *See, e.g., Commonwealth v. Rousseau*, 465 Mass. 372, 383–84, 990 N.E.2d 543, 553–54 (2013) (search warrant affidavit including information as to the suspects' "extensive criminal histories," was sufficient to supply probable cause).

suspect's past offenses. The arresting officer's "credible source," as required by the statute, is likely to be an official record, either conveyed to him by his dispatcher or memorialized on his squad car computer—the same kind of source a magistrate would likely consult were he to stray beyond the four corners of the warrant affidavit in order to verify the information in a search warrant application. The suspect's status as a twice-convicted DWI offender is essentially an objective fact, one that is not realistically subject to the "often competitive" perspective of the investigating officer. *Riley*, 134 S.Ct. at 2482 (quoting Justice Jackson's famous turn of phrase in *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)).[14] To insist on the intercession of a "neutral and detached" magistrate to rubber-stamp the officer's determination that there is probable cause to draw blood under these circumstances only elevates officious formalism over Fourth Amendment substance.

## C. Appellee's Expectation of Privacy

Both the forced extraction of blood and any subsequent chemical analysis thereof constitute discrete invasions of privacy that are subject to Fourth Amendment protection. *Skinner*, 489 U.S. at 616, 109 S.Ct. 1402. Just how weighty are these privacy interests? Though not so "gentle

[a] process" as the mere "light touch on the inside of the cheek" involved in taking a buccal swab for DNA purposes, *King*, 133 S.Ct. at 1969, blood draws are nonetheless "a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." *Schmerber*, 384 U.S. at 771, 86 S.Ct. 1826 (footnote omitted). "*Schmerber* thus confirmed 'society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity.'" *Skinner*, 489 U.S. at 625, 109 S.Ct. 1402, 103 L.Ed.2d 639 (quoting *Winston v. Lee*, 470 U.S. at 762, 105 S.Ct. 1611). Our statutory scheme ensures that any risk, trauma, or pain will be minimized, requiring that the blood extraction be performed by a qualified expert "in a sanitary place." TEX. TRANSP. CODE § 724.017(a) & (a–1); *Krause v. State*, 405 S.W.3d 82 (Tex.Crim. App.2013).

Moreover, the mandatory blood draw provisions of Section 724.012(b) do not kick in unless and until "the officer arrests" the offender. TEX. TRANSP. CODE § 724.012(b). "The expectations of privacy of an individual taken into police custody necessarily are of diminished scope." *King*, 133 S.Ct. at 1978 (citation, internal quotation marks, and brackets omitted).[15] Thus, any search

14. "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable mean draw from the evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

15. *Still, I doubt that the Supreme Court would automatically extend the search-incident-to-arrest exception to the warrant requirement to every DWI blood draw. Cf.*

*Riley*, 134 S.Ct. at 2488 ("The fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely.") Otherwise, *McNeely* itself might have been decided on the basis that a warrantless search incident to arrest for DWI may include a blood draw, in order to secure evidence from destruction. Instead, the Supreme Court held that the potential for the destruction of evidence did not excuse the State from seeking a warrant where, on the facts of the particular case, one could be obtained without risking a significant loss of evidence—at least for the ordinary DWI offender. 133 S.Ct. at 1561.

of the person of the DWI offender by taking a specimen of his blood is but an incrementally greater intrusion than that which is already permitted without a warrant, so long as probable cause to arrest exists.

Finally, with respect to the blood-draw analysis, the only private information the State seeks to obtain is "evidence of the alcohol concentration or presence of a controlled substance, drug, dangerous drug, or other substance[.]" TEX. TRANSP. CODE § 724.064. Nothing in Chapter 724 of the Transportation Code contemplates that the suspect's blood will be analyzed for any other purpose. Thus, the State conducts no additional testing to determine "whether [Appellee] is, for example, epileptic, pregnant, or diabetic." *King*, 133 S.Ct. at 1979 (quoting *Vernonia School Dist. 47J*, 515 U.S. at 658, 115 S.Ct. 2386). The search of the blood itself is sharply focused, and the revelation of personal information is circumscribed and quite limited.

None of this is to deny that a DWI offender's interests are not of the "most personal" nature, implicating "deep-rooted expectations of privacy." *McNeely*, 133 S.Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. at 760, 105 S.Ct. 1611). But the insult to bodily integrity inherent in the blood draw contemplated by Section 724.012(b) is relatively benign, the offender is legitimately under arrest at the time, and the extraction of private information from an analysis of that blood is not indiscriminate, revealing only potentially incriminating information relevant to driving while intoxicated, and nothing extraneous.[16]

### D. The State's Interest

#### 1. Combating DWI Incorrigibility

I need not dwell long on the abiding legitimacy of the State's interest. To begin with, "there is no denying the fact that there is a very strong societal interest in dealing effectively with the problem of drunken driving." 5 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 10.8(d), at 429 (5th ed.2012). Texas is not immune to the problem. In 2014 alone, officers statewide made 70,569 arrests for driving under the influence. TEX. DEP'T. OF SAFETY, TEXAS ARREST DATA (2014) http://www.txdps.state.tx.us/crimereports/14/citCh9Add.pdf. There were a total of 925 intoxication-related collisions involving fatalities in that same year, resulting in the deaths of 1,041 people—and this is over and above the 2,328 incapacitating injuries. TEX. DEP'T. OF TRANSP., TOTAL AND DUI (ALCOHOL) FATAL AND INJURY CRASHES COMPARISON (2014) http://ftp.dot.state.tx.us/pub/txdot/trf/crash-statistics/2014/37.pdf. In addition to the carnage that driving while intoxicated inflicts, the resulting property damage is estimated to be in the neighborhood of 43 billion dollars annually nationwide. L.J. Blincoe, T.R. Miller, E. Zaloshnja, & B.A. Lawrence, U.S. DEP'T. OF TRANSP., NAT'L. HIGHWAY SAFETY ADMIN., THE ECONOMIC AND SOCIETAL IMPACT OF MOTOR VEHICLE CRASHES 166 (2015), http://www-nrd.nhtsa.dot.gov/pubs/812013.pdf. These numbers are simply mind-boggling.

But even more is at stake here than ordinary DWI deterrence—a weighty enough consideration in its own right. Society also has at least a "substantial" inter-

**16.** It should be noted that I do not regard the recidivist DWI offender's incorrigibility as a factor that reduces his expectation of privacy. Unless he is still on probation or parole for one of his previous DWI convictions, he is not in the constructive custody of the State, and so he does not suffer the reduction of privacy that a probationer (*Knights*, 534 U.S. at 119–20, 122 S.Ct. 587) or a parolee (*Samson*, 547 U.S. at 850–52, 126 S.Ct. 2193) does. Rather, the fact that Appellee is an established DWI recidivist is properly regarded as a factor to be considered on the State's-interest side of the ledger.

est in "combating recidivism." *Samson v. California,* 547 U.S. 843, 853, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006).[17] In *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the Supreme Court expressly highlighted the Government's legitimate interest in curtailing recidivism in persons placed on probation, alluding to the "the concern, quite justified, that [they] will be more likely to engage in criminal conduct than an ordinary member of the community." *Id.* at 120–21, 122 S.Ct. 587. The Supreme Court concluded that the Government's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 121, 122 S.Ct. 587.[18] When balanced against a probationer's "significantly diminished" expectation of privacy, *id.* at 120, 122 S.Ct. 587, the Government's interest was deemed weighty enough to justify a holding that "the warrantless search ... supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." *Id.* at 122, 122 S.Ct. 587. The State's general interest in combating recidivism is also frequently weighty enough, all by itself, to "warrant privacy intrusions that would not

otherwise be tolerated under the Fourth Amendment." *Samson,* 547 U.S. at 853, 126 S.Ct. 2193.

In Section 724.012(b)(3)(B), the Legislature has effectively combined these two already-weighty interests: DWI in general, and the interest in combating recidivism. Moreover, the statute addresses these combined interests in a particularly efficacious way, targeting the repeated commission of a particularly pernicious offense. The blood draw is triggered only when there is credible information that the DWI suspect is *in fact* a multiple recidivist for whom there is probable cause to believe he has offended yet again. In this way, it constitutes a measured approach to the DWI problem, tailored to the most obvious peril: the intractable drunk driver—he who is most likely to endanger us all by *continuing* to re-offend. The offender who has already been convicted two or more times poses the direst threat, for he has shown himself, by his lack of self-control, to be the most apt to wreak havoc on life, limb, and property in the future. It is from him that society most needs to protect itself—and *does,* as illustrated by the enhanced punishments imposed upon repeat offenders enumerated in Section 49.09 of the Texas Penal Code. Tex. Penal Code § 49.09.[19] By merging (1) soci-

17. In *Samson,* the Supreme Court once again applied the general balancing approach to resolve the question of whether a condition of release on parole (as opposed to probation, as was the issue in *Knights* ) "can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." 547 U.S. at 847, 126 S.Ct. 2193. In weighing the State's-interest side of the balance, the Supreme Court emphasized "the grave safety concerns that attend recidivism." *Id.* at 854, 126 S.Ct. 2193. *See also Griffin v. Wisconsin,* 483 U.S. at 875, 107 S.Ct. 3164 (noting the State's interest in the intensive supervision of probationers to "reduce recidivism").

18. The Supreme Court would later reiterate in *Samson* that "a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." 547 U.S. at 853, 126 S.Ct. 2193.

19. Notable among Texas's self-protective measures is the statutory subjection of the most incorrigible offenders to a lock-out device that prevents them from driving "if ethyl alcohol is detected" on their breath. *Id.* § (h).

ety's legitimate concern to deter driving while intoxicated in general with (2) the heightened risk that the incorrigible DWI offender presents, Section 724.012(b)(3)(B) of the Transportation Code serves to vindicate a State's interest of the highest order.

## 2. Exigent Circumstances and the Gravity of the Offense

Tyler McNeely was himself a repeat DWI offender. 133 S.Ct. at 1557 n. 1. Even so, the Supreme Court in *McNeely* refused to take the inescapable fact that alcohol concentration dissipates from the bloodstream with the passage of time as a sufficient exigency to justify a blanket exception to the warrant requirement. But the State of Missouri did not argue that either the gravity of the offense or McNeely's particular status as a re-offender were relevant considerations in the exigent-circumstances calculation. Brief for Petitioner, *Missouri v. McNeely*, No. 11–1425, 2012 WL 5532197 (Nov. 9, 2012). Nor did the Supreme Court mention these considerations, much less factor them into its analysis, when it rejected Missouri's suggested categorical approach.[20]

As far as I am concerned, Appellee's status as an incorrigible DWI offender makes all the difference. Exigency may reasonably be measured on a sliding scale. The more dire the threat confronting soci-

ety, the more latitude the State must be granted to counter that societal threat. It is therefore eminently reasonable for the State to respond to the manifest danger that the incorrigible DWI offender poses by pursuing, not just arguably sufficient evidence, but the best evidence it can possibly muster against him.

We are used to thinking of the destruction of evidence as an exigency that operates exclusively as a function of time: "Where there are exigent circumstances in which police action must be 'now or never' to preserve the evidence of a crime, it is reasonable to permit action without prior judicial evaluation." *Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). It is thus the *"ready destructibility"* of evidence that justifies dispensing with the involvement of a magistrate. *Cupp v. Murphy*, 412 U.S. at 296, 93 S.Ct. 2000 (emphasis added). The Supreme Court was obviously thinking in such temporal terms when it declared in *McNeely* that "there would be no plausible justification for an exception to the warrant requirement" in "a situation in which the warrant process will not significantly increase the delay before the blood test is conducted" such as, *e.g.*, when "an officer can takes steps to secure a warrant while the suspect is being transported to a medical facility by another officer." 133 S.Ct. at 1561.[21] And indeed, how long it may

---

**20.** On original submission, this Court observed:

> *McNeely* reaffirmed the principle that a compelled physical intrusion beneath the skin to obtain evidence in a criminal investigation implicates significant privacy interests, and this privacy interest is not automatically diminished simply because an individual is suspected of a serious DWI offense. *McNeely*, 133 S.Ct. at 1558.

*Villarreal*, 475 S.W.3d at 811, 2014 WL 6734178, at *18. This observation is accurate right up until it gets to the word "serious." Nowhere on page 1558 of *McNeely* does the word "serious" even appear. In any event, while it may be true that the seriousness of

the offense does not diminish the DWI suspect's privacy interest, *see* note 16, *ante*, it may yet be a factor on the State's side of the balance to justify a warrantless search, since "the gravity of the offense" is "an important factor to be considered when determining whether any exigency exists[.]" *Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

**21.** *See also, id.* at 1574 (Roberts, C.J., concurring and dissenting) ("Simply put, when a drunk driving suspect fails field sobriety tests and refuses a breathalyzer, whether a warrant is required for a blood draw should come down to whether there is time to secure one.").

take the officer to get a warrant versus how long it takes to transport the suspect to a "sanitary place" where a qualified technician can draw his blood should be the paramount consideration when balancing the State's interest to preserve evidence against the privacy interests of the first- or second-time DWI offender.

But immediacy is not the only factor that the Supreme Court has recognized as relevant to the determination whether the destructibility of evidence may justify a warrantless search. In *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), police with probable cause to believe that Welsh had been driving while intoxicated entered his home and seized him without a warrant. The State argued that the officers' decision to proceed without a warrant was reasonable because evidence of intoxication would have been lost had the police not acted with dispatch. Welsh had been cited for a prior DWI offense, but Wisconsin law made a second offense no more than a misdemeanor, and the arresting officers were unaware of Welsh's first offense in any event. *Id.* at 746 & n. 6, 104 S.Ct. 2091.[22] The question was whether the combination of probable cause and the need to preserve evidence of Welsh's intoxication were sufficient to justify the police conduct in arresting him in his home without first obtaining a magistrate's imprimatur, notwithstanding the relative lack of importance that Wisconsin law assigned to his offense.

The Supreme Court held that a warrant was required. "Our hesitation in finding

exigent circumstances, especially when warrantless arrests in the home are at issue," the Court explained, "is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor." *Id.* at 750, 104 S.Ct. 2091. The Supreme Court went on to "hold that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Id.* at 753, 104 S.Ct. 2091. Wisconsin did not regard first- and second-time DWI offenders as constituting a particular societal threat, the Supreme Court observed, and "[g]iven this expression of the State's interest, a warrantless home arrest cannot be upheld simply because evidence of [Welsh's] blood-alcohol level might have dissipated while the police obtained a warrant." *Id.* at 754, 104 S.Ct. 2091.

If, as *Welsh* held, the "gravity of the underlying offense" is "an important factor" in the exigent circumstances calculus, then it should be applied even-handedly. That is to say, if the minor nature of an offense militates *against* the reasonableness of a warrantless seizure in the home, even with probable cause and reason to fear the imminent loss of evidence, then an offense of greater magnitude, such as a third-time DWI,[23] should militate in *favor* of the reasonableness of a warrantless search of the person—especially when evidence will be lost or seriously compromised in the time it would take to secure the warrant.[24] By this I do not mean to suggest that the seriousness of an offense, by itself, should ever amount to an exigent

---

**22.** "Indeed," the Supreme Court pointed out, "the statute continues to categorize a first offense as a civil violation that allows for only a monetary forfeiture of no more than $300." *Id.* at 746, 104 S.Ct. 2091.

**23.** *See* TEX. PENAL CODE § 49.09(b)(2) (three-time offender guilty of a third degree felony).

**24.** Subsequent case law has bolstered my understanding of *Welsh*. In *Illinois v. McArthur*,

531 U.S. at 335–36, 121 S.Ct. 946, the case in which the Supreme Court held that a warrantless seizure of a home was "reasonable" for the time it would take to obtain a search warrant, it applied the principle at work in *Welsh* to reach the opposite result: that, because McArthur's offense was more serious, and the intrusion less invasive, the temporary seizure of his home was reasonable. In *Brigham City, Utah v. Stuart*, 547 U.S. 398, 126

circumstance sufficient to exclude the need for a warrant; far from it. Such a holding would largely eviscerate the warrant requirement. But when there is a realistic danger that evidence may be lost, and the balance of interests between the State and the suspect is otherwise in equipoise, the degree of seriousness that the State has attributed to a particular offense may serve, as it did in *Welsh*, to tip the exigency scale.

What is more, as the gravity of the offense increases, so too does the need to preserve, not just some evidence of intoxication, but the very best evidence that may reasonably be obtained. Nobody disputes the "evanescent" character of blood alcohol concentration. Blood drawn at any time after the fact will not precisely reflect the blood alcohol concentration ("BAC") at the time of the offense. As we observed in *Mata v. State*, 46 S.W.3d 902, 909 (Tex. Crim.App.2001):

> As alcohol is consumed, it passes from the stomach and intestines into the blood, a process referred to as absorption. When the alcohol reaches the brain and nervous system, the characteristic signs of intoxication begin to show. * * * At some point after drinking has ceased, the person's BAC will reach a peak. After the peak, the BAC

will begin to fall as alcohol is eliminated from the person's body. The body eliminates alcohol through the liver at a slow but consistent rate.

> * * *

> [I]f a driver is tested while in the absorption phase, his BAC at the time of the test will be higher than his BAC while driving. If tested while in the elimination phase, his BAC at the time of the test could be lower than while driving, depending upon whether he had reached his peak before or after he was stopped.

We went on in *Mata* to emphasize that, "given the studies, other concepts seem indisputable, including that ... a test nearer in time to the time of the alleged offense increases the ability to determine the subject's offense-time BAC[.]" *Id.* at 916. In similar vein, the Supreme Court has also noted that, "because an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results." *McNeely*, 133 S.Ct. at 1561. And "longer intervals may raise questions about the accuracy of the [BAC] calculation." *Id.* at 1563. The upshot is that the more time that goes by before an arresting officer is able to draw a DWI suspect's blood for BAC testing,

S.Ct. 1943, 164 L.Ed.2d 650 (2006), the question was whether "police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Id.* at 400, 126 S.Ct. 1943. In answering that question in the affirmative, the Supreme Court justified reaching a different result than it had in *Welsh* because the emergency in *Stuart* involved "*ongoing* violence occurring *within* the home." *Id.* at 405, 126 S.Ct. 1943. Thus, the offense was both more serious and more imminent than the one involved in *Welsh*. These cases are consistent with *Welsh*'s central holding that the "gravity of the offense" is "an important factor to be considered when

determining whether an emergency exists[.]" *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091. And, in *Stanton v. Sims*, 134 S.Ct. 3 (2013), a civil rights case involving an issue of qualified immunity for a pursuing police officer, the Supreme Court held that *Welsh* did not purport to apply in the context of the so-called "hot pursuit" exception to the warrant requirement, and does not unequivocally stand for the proposition that an officer cannot enter the curtilage of a home without a warrant when he is in hot pursuit of a "jailable misdemeanor" offender. *Id.* at 4, 6. Nothing about *Stanton* serves to refute *Welsh*'s thesis that the gravity of the offense is an important factor in the exigent circumstances analysis.

the less convincing the State's evidence of intoxication will be.

The prospect that taking the time to seek a warrant will "negatively affect the probative value" of the State's evidence in an ordinary DWI case, the Supreme Court held in *McNeely*, does not support a *per se* acceptance of the destruction of evidence as an exigent circumstance to excuse a warrant in every case. *Id.* But when it comes to the incorrigible DWI offender, the State's interest in presenting the most persuasive evidence it possibly can is much greater than in the ordinary DWI prosecution. In this context, "the metabolization of alcohol in the bloodstream and ensuing loss of evidence" is just as inevitable, *id.*, but the resultant exigency is far more dire, for it hampers society's ability to protect itself from the very worst of DWI offenders—those who have proven themselves most likely to perpetrate future injury and property damage. Any delay that follows from requiring the arresting officer to stop and assess the feasibility of obtaining a warrant first will be that much more consequential. In short, in the prosecution of an incorrigible DWI offender, "second-best evidence" simply will not suffice to adequately satisfy the State's interests. *See id.* at 1571 (Roberts, C.J., concurring and dissenting) ("The need [to search for evidence of BAC] is no less compelling because the police might be able to acquire second-best evidence in some other way.").[25]

Nor is it satisfactory, as in the ordinary DWI case, to say that there may well be some cases in which it will take no longer to obtain a warrant than to convey the incorrigible DWI suspect to the "sanitary place" required by the statute for blood extraction. *See id.* at 1561 ("no plausible justification" for failing to seek a warrant where "the warrant process will not significantly increase the delay"); *id.* at 1572 (Roberts, C.J., concurring and dissenting) ("There might, therefore, be time to obtain a warrant in many cases."). That will undoubtedly be possible on occasion. But the cases will be few and far between in which it will be readily apparent to the arresting officer that to seek a search warrant will not significantly diminish the quality of the evidence because he can obtain the evidence in the same or less amount of time than it would take him to secure the warrant.

There are simply too many variables in any given encounter for an officer to have to worry about quickly parsing the circumstances to make a constitutionally acceptable judgment call. And while the "factors favoring a search will not always be present, ... the balancing of interests must be conducted with an eye to the generality of cases" and must "take account of these practical realities." *Houghton*, 526 U.S. at 305–06, 119 S.Ct. 1297. Indeed, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Kentucky v. King*, 131 S.Ct. 1849, 1860 (2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). When obtaining the best evidence is imperative because the suspect is a proven incorrigible DWI offender, "[a] rule that requires officers (and ultimately courts) to balance transportation delays, hospital availability, and access to magistrates is not a workable rule [since] natu-

---

25. In the context of the incorrigible DWI offender, we should take to heart Justice Thomas's assertion: "Police facing inevitable destruction situations need not forgo collecting the most accurate available evidence simply because they might be able to use an expert witness and less persuasive evidence to approximate what they lost." *Id.* at 1578 n. 2 (Thomas, J., dissenting).

ral processes inevitably destroy the evidence with every passing minute." *McNeely*, 133 S.Ct. at 1578 (Thomas, J., dissenting).[26]

## CONCLUSION

At least with respect to incorrigible DWI offenders, the Fourth Amendment does not require that the general balancing of competing interests occur at the level of the individual search, *McNeely* notwithstanding. In Section 724.012(b)(3)(B) of the Transportation Code, the Legislature has determined that a search of the incorrigible DWI offender's blood *must* be conducted. By implication, it has also determined that the blood must be drawn even in the absence of a search warrant. Thus, the Legislature itself has conducted the necessary balancing analysis to determine that such a warrantless search will always be "reasonable" under the Fourth Amendment. We should respect that legislative judgment if it is not inconsistent with Fourth Amendment reasonableness.

When I do the balancing myself, I agree with the legislative judgment that, as long as a blood draw is carried out in strict accordance with the statutory criteria, it may categorically be regarded as constitu-

---

**26.** *See also, e.g., Randolph*, 547 U.S. at 121–22, 126 S.Ct. 1515 (refusing to fashion a rule requiring police to seek out the co-occupant of a home in order to determine whether he might object to another co-occupant's consent to a search of the premises because this "would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field" and would "impose a requirement, time consuming in the field and in the courtroom, with no apparent systemic justification"). Forcing a police officer to pause to consider whether, under the circumstances of the particular case, he is likely to be able to obtain a search warrant in the same or less amount of time as it would take to convey his incorrigible DWI suspect to a "sanitary place" for blood extraction imposes a similarly counterproductive requirement.

---

tionally reasonable even without a warrant. While even the incorrigible DWI offender enjoys a substantial interest in preserving both the integrity of his body and the limited private information that a search for intoxicants in his blood may reveal, he has no absolute right to prevent such a search, so long as it is "reasonable" under the Fourth Amendment.[27] By contrast, the State has a compelling interest to put a stop to incorrigible drunk drivers, to do so with the best evidence it can possibly obtain, and to do so without requiring police officers to scrutinize each case individually to determine whether they can accomplish that imperative in the same or less time than it would take to process a warrant. Finally, so long as the statutory conditions precedent to the search are met, requiring 1) probable cause to arrest for driving while intoxicated, and 2) reliable proof of two prior DWI convictions, a magistrate's independent evaluation contributes little to further guarantee the objective reasonableness of the search.

I conclude that, on balance, a warrantless blood draw and analysis that is carried out under the terms prescribed by the statute will always prove to be reasonable for Fourth Amendment purposes.[28] The

---

**27.** *See, e.g., Riley*, 134 S.Ct. at 2493 ("Our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest.").

**28.** I do not mean to suggest that any one of the State's interests discussed above would suffice, by itself, to justify a warrantless blood draw under the statute. Rather, it is the combination of State's interests—the general interest to deter driving while intoxicated, the gravity of the offense of felony driving while intoxicated, the interest in preventing recidivism (and particularly, incorrigible driving while intoxicated), and the heightened interest in obtaining the best possible evidence against such offenders before it naturally and

statute, when properly complied with, will operate constitutionally in all of its applications, including as applied to Appellee in this case. Both the court of appeals and this Court on original submission erred, in my view, to hold otherwise. Rather than simply rescind our earlier order granting the State's motion for rehearing, the Court should take a second look and endorse the considered legislative judgment that any warrantless search conducted under the conditions set by Section 724.012(b)(3(B), will prove constitutional.[29]

I respectfully dissent.

inevitably dissipates—that serves categorically to outweigh the incorrigible DWI offender's privacy interest.

**29.** One final note: I wish to make it clear, if it is not already, that I am not advocating for some heretofore unheard-of exception to the general warrant requirement in cases involving criminal investigations. On the contrary, it is my whole thesis that, under a general balancing approach to Fourth Amendment "reasonableness," the scope of an already existing exception—the exigent circumstances exception—to the warrant requirement properly extends to authorize automatic blood draws for incorrigible DWI offenders when

the terms of the statute are satisfied. As recently as in *Riley*, the Supreme Court conducted such an analysis to determine whether a particular type of warrantless search was justifiable as a search incident to arrest. 134 S.Ct. at 2484–91. Here, after pursuing a similar analysis, I conclude that the Legislature has identified an application of the exigent circumstances exception that will always be reasonable and has simply codified it. Because I agree with the Legislature that this application of the exigent circumstances exception will operate in a constitutionally reasonable manner for Fourth Amendment purposes, I would reverse the judgment of the court of appeals.